**Nos. 2013-1360, -1361, -1364, -1365, -1366, -1367, -1368, 1369, -1370, -1371**

# In the United States Court of Appeals for the Federal Circuit

—————

IN RE ARMODAFINIL PATENT LITIGATION

—————

CEPHALON, INC., CEPHALON FRANCE, AND TEVA SANTE SAS,
PLAINTIFFS-APPELLEES

*v.*

WATSON LABORATORIES, INC., SANDOZ, INC., LUPIN LIMITED, AND APOTEX, INC.,
DEFENDANTS-APPELLANTS

—————

*APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE,*
*CASE NOS. 10-MD-2200, 10-CV-0007, 10-CV-0055, 10-CV-0210, 10-CV-0695, 10-CV-1078,*
*AND 11-CV-0782, CHIEF JUDGE GREGORY M. SLEET, PRESIDING*

—————

## BRIEF OF DEFENDANTS-APPELLANTS
## WATSON LABORATORIES, INC., SANDOZ INC., AND APOTEX INC.

—————

ROBERT BREISBLATT
CRAIG KUCHII
ROBERT T. SMITH
*Katten Muchin*
*Rosenman LLP*
*525 West Monroe Street*
*Chicago, Illinois 60661*
*(312) 902-5480*
*Robert.Breisblatt*
*@kattenlaw.com*

*Counsel for Apotex, Inc.*

JEFFREY R. GARGANO
PETER M. SIAVELIS
WAN-SHON LO
*McDermott Will &*
*Emery LLP*
*227 West Monroe Street*
*Suite 4400*
*Chicago, Illinois 60606*
*(312) 372-2000*
*slo@mwe.com*

*Counsel for Sandoz, Inc.*

JAMES F. HURST
MICHAEL K. NUTTER
KEVIN E. WARNER
WILLIAM P. FERRANTI
*Winston & Strawn LLP*
*35 West Wacker Drive*
*Chicago, Illinois 60601*
*(312) 558-5600*
*mnutter@winston.com*

*Counsel for Watson*
*Laboratories, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Watson Laboratories, Inc., certifies the following:

1. The full name of every party or amicus represented by us is:

   Watson Laboratories, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Not applicable.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented are:

   Watson Laboratories, Inc. is a wholly-owned subsidiary of Actavis, Inc. Actavis, Inc. is a publicly held corporation that owns more than 10% of Watson Laboratories, Inc.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:

   Winston & Strawn LLP (James F. Hurst, Michael K. Nutter, Kevin E. Warner, William P. Ferranti, David Luger, Gina J. Oka); Phillips Goldman & Spence, P.A., (John C. Phillips, Megan C. Haney).

Dated: August 14, 2013

/s/James F. Hurst
JAMES F. HURST

*Counsel for Defendant-Appellant*
*Watson Laboratories, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Sandoz, Inc., certifies the following:

1. The full name of every party or amicus represented by us is:

   Sandoz Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Not applicable

3. All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented are:

   Novartis AG

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:

   McDermott Will & Emery LLP: Jeffrey R. Gargano, Peter M. Siavelis, Wan-Shon Lo, Rita J. Yoon;  Proctor Heyman LLP: Neal Belgam

Dated:  August 14, 2013

/s/ Jeffrey R. Gargano

JEFFREY R. GARGANO

*Counsel for Defendant-Appellant Sandoz, Inc.*

# CERTIFICATE OF INTEREST

Counsel for defendant-appellant Apotex, Inc., certifies the following:

1. The full name of every party or amicus represented by us is:

   Apotex, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Not applicable (the real party in interest is the same as the party named in the caption).

3. All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented are:

   Apotex Inc. is wholly owned by Apotex Pharmaceuticals Holdings Inc. (APHI), which itself is wholly owned by Apotex Holdings Inc. (AHI). None of Apotex Inc., APHI, or AHI is a publicly traded company.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:

   Katten Muchin Rosenman LLP: Robert Breisblatt, Craig M. Kuchii, Robert T. Smith, Martin S. Masar III, Jessica R. Price, Charles B. Paradis, Martin T. LeFlevour; Flaster Greenberg P.C.: William J. Burnett, Jeffrey A. Cohen, Nella M. Bloom; Broad and Cassel: Matthew Scott Nelles

Dated: August 14, 2013

/s/ Robert Breisblatt

ROBERT BREISBLATT

*Counsel for Defendant-Appellant Apotex, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF RELATED CASES ..................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION .................................................................................... 2

STATEMENT OF THE ISSUE .................................................................. 7

STATEMENT OF THE CASE ................................................................... 7

STATEMENT OF FACTS ......................................................................... 8

    A.    The claimed invention is the identification of the most stable crystalline form of a known compound for a known pharmaceutical use. .............................................................. 8

    B.    The prior art '855 patent disclosed armodafinil in the form of "white crystals," its synthesis using ethanol, and its use in "pharmaceutical compositions." .......................................... 11

        1.    Crystalline armodafinil ........................................... 11

        2.    Preparation I and recrystallization from ethanol ..................... 12

        3.    Pharmaceutical compositions ................................. 16

    C.    The prior art taught that most drug compounds are polymorphic, that a polymorphic compound's most stable form should be used in pharmaceutical products, and two routine methods of identifying that most stable form. .................. 16

    D.    The district court's opinion ............................................. 20

SUMMARY OF ARGUMENT ............................................................... 23

STANDARD OF REVIEW ..................................................................... 27

ARGUMENT .......................................................................................... 28

I.    Given the disclosures in the '855 patent and standard crystallization
      protocols, it was obvious to obtain and use Form I. .....................................29

      A.    A POSA would have been highly motivated to identify and use
            armodafinil's most stable form. ...........................................................29

      B.    A POSA had more than a reasonable expectation of success in
            obtaining armodafinil's most stable form. ..........................................31

            1.    The prior art process disclosed in the '855 patent would
                  have produced Form I. ...............................................................32

            2.    The prior art also teaches two routine techniques for
                  obtaining Form I armodafinil. ...................................................33

      C.    Fatally distracted by the unpredictability of polymorphism
            generally, the district court ignored clear evidence that a POSA
            would have had a reasonable expectation of success in
            obtaining Form I through routine experiments. ...................................35

            1.    A POSA would have reasonably expected armodafinil to
                  be polymorphic and would have been motivated to
                  identify its most stable form. ....................................................36

            2.    The district court clearly erred in concluding that trial-
                  and-error experimentation would have been necessary to
                  identify the most stable form of armodafinil. .........................40

II.   The district court erred as a matter of law by upholding the asserted
      claims based on the unpredictabilty of Form I's 3-D structure, which
      Cephalon determined by a routine XRPD measurement. ..............................45

      A.    The district court's decision rests on the legally irrelevant fact
            that Form I's crystal structure was not predictable. ...........................46

      B.    It is settled law that patentability may not be based on the fact
            that the properties of Form I required testing to verify. ......................48

III.  A POSA would have had a reasonable expectation of success in
      making the claimed composition. ..................................................................53

      CONCLUSION .................................................................................................57

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Baxter Pharm. Prods., Inc.,*
    471 F.3d 1363 (Fed. Cir. 2006) .........................................................27

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,*
    229 F.3d 1120 (Fed. Cir. 2000) ...................................................23, 52

*DyStar Textilfarben GmbH v. C.H. Patrick Co.,*
    464 F.3d 1356 (Fed. Cir. 2006) ...................................................28, 31

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)...........................................................................25, 27

*KSR Int'l Co. v. Teleflex, Inc.,*
    550 U.S. 398 (2007)......................................................................25, 53

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,*
    275 F.3d 1347 (Fed. Cir. 2001) ...............................6, 24, 31, 32, 34

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007) ...................5, 25, 28, 34, 39, 49-52

*Toro Co. v. Deere & Co.,*
    355 F.3d 1313 (Fed. Cir. 2004) .........................................................53

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948)...........................................................................28

## STATUTES

28 U.S.C. § 1292(c)(1).................................................................................1

28 U.S.C. § 1295(a)(1).................................................................................1

28 U.S.C. § 1331............................................................................................1

28 U.S.C. § 1338............................................................................................1

## OTHER AUTHORITIES

Fed. R. App. P. 28(i) ....................................................................................7

## STATEMENT OF RELATED CASES

Defendants-Appellants Watson Laboratories, Inc., Sandoz Inc., and Apotex Inc. are not aware of any related cases.

## JURISDICTIONAL STATEMENT

These appeals arise out of consolidated Hatch-Waxman proceedings brought by Plaintiffs-Appellees (collectively "Cephalon") asserting infringement of U.S. Patent No. 7,132,570, which covers the use of a particular crystalline form of the wakefulness drug compound, armodafinil. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. It entered judgment on March 30, 2013. A76-77. On April 26 and 29, 2013, Defendants-Appellants Watson Laboratories, Inc., Sandoz Inc., Lupin Ltd., and Apotex Inc. filed timely notices of appeal. A12217-26.

With respect to the appeals by Watson, Sandoz, and Lupin, this Court has jurisdiction pursuant to 28 U.S.C. §1295(a)(1) because the district court's judgment is a final adjudication of all claims. With respect to Apotex's appeal, although certain claims and counterclaims involving two other patents remain pending, this Court has jurisdiction pursuant to 28 U.S.C. §1292(c)(1) because the district court's judgment granted Cephalon injunctive relief.

# INTRODUCTION

If affirmed, the district court's opinion would have far-reaching implications. The "inventors" of the asserted patent did nothing more than measure the 3-D crystal structure of the most stable crystalline form of a prior-art drug—a form that is almost invariably produced using any crystallization method disclosed in the prior art. Measuring a known parameter with standard equipment is the epitome of obviousness. And yet the district court held the patent valid based on its view that obviousness required the impossible: the ability to "predict" the specific 3-D structure of the crystal *before* testing.

Through that reasoning, the district court violated this Court's precedent and fashioned a new *per se* rule—one that would make *every* crystalline form of *every* known compound automatically patentable, even when the crystal form, like here, is produced using completely conventional methods. The district court erred as a matter of law in so holding, and its judgment should be reversed.

The asserted U.S. Patent No. 7,132,570 ("the '570 patent") claims a crystal known as "Form I," which all agree is the most stable and readily available form of the drug "armodafinil." Cephalon's earlier patent from the prior art—U.S. Patent No. 4,927,855 ("the '855 patent")—disclosed pharmaceutical preparations of armodafinil, their utility, and the use of ethanol to make armodafinil "*in the form of white crystals.*" A17030 Col. 3: 49-52.

2

Although the '855 patent did not characterize the form of those "white crystals," the record establishes that using ethanol to recrystallize armodafinil under *nearly any set of conditions* will produce the claimed Form I. *E.g.*, A15013-57 (declarations submitted to PTO showing that Form I was produced in 90% of successful crystallizations from ethanol, under a wide variety of conditions). In fact, Form I can easily be produced using a huge variety of standard crystallization conditions. For instance, when making armodafinil crystals, Cephalon reported to the FDA that it produced Form I *95% of the time* when using 48 different solvents in different concentrations, different temperatures, and different cooling gradients. A17335.

Beyond the inevitability of producing Form I, a person of ordinary skill in the art had every motivation to identify and use armodafinil's most stable form. The prior art taught that "probably every organic medicinal can exist in different polymorphs" (A15717; *accord* A14679, 81; A14822), that it is "routine practice in pharmaceutical pre-formulations studies" to "determine whether [a compound] is prone to polymorphism" (A14680; *accord* 14761), and that, all things being equal, it is important to use the most stable form in a pharmaceutical composition (*e.g.*, A17033; A14669). This is so because less stable ("metastable") crystalline forms tend to stabilize over time—particularly during manufacturing and storage. A14667; A14680-81; A14763-64; A14821; A14995; A15717. The prior art also

taught that going to market with a metastable drug form could have disastrous consequences.  A14669; A17033.

In addition, the prior art taught routine methods to obtain the most stable crystalline form of armodafinil, including ageing and polymorphic screening.  Both are controlled experiments, in which a polymorphic compound is put into contact with one or more solvents.  In the case of ageing in particular, the compound is dissolved and then recrystallizes in a more stable form.  This process repeats until all that remains is the most stable crystalline form.  In the end, both ageing and polymorphic screening would have enabled a chemist of ordinary skill to identify the most stable polymorphic form of armodafinil.

Against this backdrop, the *only* thing that the asserted '570 patent adds to the prior art '855 patent is the specific 3-D structure of Form I.  Cephalon measured that structure using a standard technique called powder X-ray diffraction ("XRPD"), which produces a sort of "fingerprint" for any given crystal form, identifying the spatial configuration of the molecules of the crystal in 3-D space.  By the time of the invention, measuring any crystal's inherent structure through XRPD was completely routine.

Nevertheless, the district court upheld Cephalon's patent as a nonobvious "invention"  based principally on its findings that "the prior art did not suggest the particular structure of Form I," and that "[t]he specific structure of Form I—i.e.,

the physical dimensions within the crystal and corresponding interplanar XRPD limitations of Claim 6 and its properties—could not have been reasonably predicted." A53.  But, again, because a crystal's inherent structure can **never** be predicted before XRPD testing, the court's holding would make **every** crystalline form, no matter how routinely obtained and readily measured, automatically patentable.

That is not the law.  This Court clearly rejected any notion that "equates unpredictability to patentability" in this manner in *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).  There, the Court held that "unpredictability" about final "properties" of a drug product is legally insufficient to avoid obviousness.  Measuring such properties, the Court explained, was "the work of a skilled artisan, not of an inventor." *Id.* at 1368.  That same analysis controls here.

The district court also relied on the mistaken assumption that producing the most stable crystal form involves substantial "trial and error" experimentation, because it depends on variables like the solvent, temperature, and cooling rate.  That is not correct.  While it may take substantial experimentation to identify *every metastable* form of a compound, identifying the most stable form is simple and straightforward, again, involving nothing more than an appropriate solvent and sufficient time.

Moreover, here, the key parameter—the use of ethanol as a solvent to produce Form I—was *already* disclosed in the prior art '855 patent, which expressly

details a process for making "white crystals" of armodafinil. And, of course, if a skilled artisan is motivated to use "a prior art process" to "create a product" claimed in a "subsequent patent, then such patent would have been obvious over the former disclosed process." *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359 (Fed. Cir. 2001). That holding likewise controls here.

All agree that Form I is armodafinil's most stable form, which, again, is almost invariably obtained using conventional techniques. In other words, obtaining Form I was literally unavoidable for any competent chemist following standard and routine procedures, particularly if they followed the '855 patent's suggestion to use ethanol. Cephalon is not entitled to a patent simply because it measured the result of that routine work with an XRPD machine.

Below, the district court ruled that the '855 patent did not anticipate. That may be (Defendants do not appeal that ruling). But even if the '855 patent's "white crystals" were not "necessarily and inevitably" Form I (A18), they **probably** were—and Form I **most certainly** would have been obtained and used by a person of ordinary skill in the art ("POSA") following the '855 patent's instructions to make a "pharmaceutical composition consisting essentially of [armodafinil]." The asserted claims of the '570 patent are obvious as a matter of law.

## STATEMENT OF THE ISSUE

The issue on appeal is whether it was obvious to identify—and measure the 3-D structure of—the most readily obtainable and stable crystalline form of a known compound with a known use where (1) the prior art teaches the use of ethanol to produce "white crystals" of the compound; (2) the use of ethanol will, in fact, produce the claimed crystal form under a wide variety of conventional conditions; and (3) a POSA would have been motivated and readily able to identify and use the claimed form, which all agree is the drug's most stable form.

In addition to the arguments below, Watson, Sandoz, and Apotex join and adopt the arguments in the Opening Brief of Defendant-Appellant Lupin Ltd. regarding obviousness and claim construction. *See* Fed. R. App. P. 28(i).

## STATEMENT OF THE CASE

These consolidated appeals concern the validity of the '570 patent—one of a series of patents used by Cephalon to extend its 34-year monopoly on the wakefulness drug compound armodafinil, which is marketed under the brand name Nuvigil®. After Defendants-Appellants Watson, Sandoz, Lupin and Apotex separately sought FDA approval to market generic versions of Nuvigil®, Cephalon filed multiple suits alleging infringement of the '570 patent. In December 2010, the actions were consolidated in the District of Delaware by order of the Judicial Panel on Multidistrict Litigation. A655-57.

Prior to trial, Defendants stipulated to infringement (A9348-52), and Cephalon agreed that the case should be decided based on claims 6 and 9 of the '570 patent (A11830). As a sanction for discovery violations, Cephalon was precluded from relying on secondary considerations. A46 n.36. Following a four-day bench trial in July 2012 and post-trial briefing, the district court issued a decision in March 2013, ruling that the asserted claims were not invalid as anticipated or obvious. A1-75 (to be reported at --- F. Supp. 2d ---, 2013 WL 1332523 (D. Del. 2013)). Defendants appeal.

## STATEMENT OF FACTS

**A.** **The claimed invention is the identification of the most stable crystalline form of a known compound for a known pharmaceutical use.**

1. Armodafinil—the active ingredient in Cephalon's Nuvigil® product—is the R-enantiomer of the racemic compound, modafinil.[1] A23382. Modafinil was patented by Cephalon's predecessor in 1979, and is the active ingredient in Cephalon's Provigil® product—a wakefulness drug that has been sold in the U.S. since 1998. A12333 425:18-21; A16714.

---

[1] A "racemic" compound has two components called "enantiomers." Enantiomers are chemically identical to each other, but with different spatial orientations; they are non-superimposable mirror images of each other, like a person's right and left hand. *See* A4. Modafinil is a racemic mixture containing equal amounts of R-enantiomers (*i.e.*, armodafinil) and S-enantiomers. A3.

Cephalon originally patented armodafinil in 1990, in the '855 patent, which claims not only the compound itself, but also pharmaceutical compositions "consisting essentially of [armodafinil]" for use as an arousing agent and a stimulant. A17032. As explained more fully below, the '855 patent also disclosed a detailed method for preparing armodafinil using ethanol to recrystallize in a process called "Preparation I." A17030 Col. 3:5-56. And it taught that the *result* of Preparation I is armodafinil "in the form of white crystals which are soluble in alcohols and acetone and insoluble in water." *Id.* Col. 3:51-54.

2.     A crystal is a solid in which individual molecules are arranged in a regularly repeating three-dimensional pattern with long-range order. A4644 ¶ 18; A12243 68:10-12. Most compounds can exist in multiple crystalline forms called polymorphs in which the molecules are arranged in different patterns. A12244 69:9-10; A12329 411:11-16, 412:4-12; A14822. Indeed, since the 1960s, it has been known that "*probably every organic medicinal can exist in different polymorphs.*" A15717 (emphasis added).

Each polymorph has a unique crystalline structure, and each is typically numbered in order of its appearance in the laboratory. A12244 70:2-4; A4644-45 ¶18. Polymorphs differ in thermodynamic stability, and can have different physical properties. A14763-64; A14668. To distinguish among different polymorphs, scientists use a routine technique called powder X-ray diffraction ("XRPD") in

which X-rays are directed to a powdered sample and diffracted in a particular pattern. A12244 71:11-18. In XRPD, each polymorph's unique diffraction pattern—a sort of "fingerprint"—is reported in a peak table and diffractogram. A12244 72:7-8. Thus, XRPD measures and reports a polymorph's intrinsic properties and enables a POSA to distinguish between different polymorphic forms. A49 n.44.

Armodafinil is polymorphic. It has ten known forms. A17900, A17904-08, A17926-30. "Form I"—the first armodafinil polymorph identified (A12244 71:1-2; A12324 389:5-9)—is armodafinil's most thermodynamically stable crystalline form. A12324 390:4-17; A12381 616:11-15; A1244 864:12-19; A17335; A17361; A18023.

3.     The '570 patent was filed in December 2003. A78. The asserted claims (claim 6 as it depends on claim 2, and claim 9) are directed to the use of "pharmaceutical compositions consisting essentially" of Form I armodafinil; those claims are identified by both name and XRPD fingerprint. *See* A5-9, A114 (claim 9: "…a Form I polymorph of(-)-modafinil …") (claim 2: the "laevorotatory enantiomer of modafinil [in a polymorphic form that produces a powder X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings: 8.54, 4.27, 4.02, 3.98 (Å)] wherein the polymorphic form produces a powder X-ray diffraction spectrum further comprising intensity peaks at the interplanar spacings: 13.40, 6.34, 5.01, 4.68, 4.62, 4.44, 4.20, 4.15, 3.90, 3.80, 3.43 (Å)").

Accordingly, the claimed invention is *not* the compound armodafinil or its use in a pharmaceutical composition. Rather, the asserted claims of the '570 patent add one and only one thing to the prior art '855 patent: use *Form I* armodafinil— that is, armodafinil in its most stable, most readily available crystalline form. The issue in these appeals is whether that direction was obvious in light of the prior art.

> **B.** **The prior art '855 patent disclosed armodafinil in the form of "white crystals," its synthesis using ethanol, and its use in "phar-maceutical compositions."**

The '855 patent, issued in 1990, not only claimed armodafinil (that is, the compound itself), but also: (1) expressly disclosed armodafinil in the form of "white crystals"; (2) taught the synthesis of armodafinil via "Preparation I"—a process involving recrystallization by ethanol; and (3) taught and claimed the use in "pharmaceutical compositions consisting essentially of" such armodafinil for treating wakefulness disorders in humans. A17030, Col. 3:5-56, A17032 Col. 8:26-29; A12265 150:5-16.

> **1.** **Crystalline armodafinil**

By disclosing armodafinil in the form of "white crystals," the '855 patent in-dicated the presence of at least one crystalline form. A12324 391:8-18. The dis-trict court stated that the term "white crystals" did not foreclose the possibility that the patent was referring to "a solvate, hydrate, a mixture of materials, or a different form of armodafinil." A55. But the patent describes the "white crystals" using the

chemical name and code number of *armodafinil* itself—(-)-benzhydrylsulfinylcetamide and CRL 40982 (A17029-30 1:61-63, 3:5-8, 3:50-52)—*not* a hydrate (which would require nomenclature such as "monohydrate" or "sesquihydrate") or a solvate (which would require identification of the incorporated solvent). *See, e.g.*, A110 Col. 31:39-32:30. And even if the district court were correct (it isn't), the solvate, hydrate, or mixture was still *crystalline*, which is the critical point here.

### 2.    Preparation I and recrystallization from ethanol

The '855 patent describes "Preparation I" as a four-step procedure for synthesizing and purifying armodafinil, with the last step identified as "recrystallization from ethanol." A12250 95:4-6, A12407 717:18-20, A17030 Col. 3:5-57.

Defendants' two experts repeatedly replicated Preparation I, and obtained Form I every single time. Twice, Dr. Hollingsworth replicated the four-step process as a POSA would have—and both times he obtained Form I armodafinil, as confirmed by XRPD (though one of his experiments produced both Form I and Form II). A12250-52 95:4-6, 96:23-25, 98:24-25, 100:17-25, 101:1-2, 103:6-7; A12257 123:17-21; A12407 717:18-20. Dr. Hollingsworth then completed several additional recrystallizations of armodafinil from ethanol, which is a routine method of increasing purity. A12254-55 111:20-21, 112:10-12, 112:22-113:3, 113:10-16, 21-24. He again obtained Form I every single time, as confirmed by XRPD.

A12253-55 106:6-7, 19, 109:9-12, 109:17-21, 110:8-14, 111:5-6, 113:19-114:4; A12421 773:22. Another defense expert, Dr. Lee, achieved the same results, twice performing Preparation I and twice obtaining Form I armodafinil. A12303 305:15-23; A12288 245:17-21; A12292 260:6-15.

In an effort to defeat an anticipation defense (which Defendants do not raise here), Cephalon hired two experts to conduct experimentation to attempt to show that Preparation I did not "necessarily" produce Form I. Each expert faithfully followed the first *three steps* of Preparation I, but *they omitted the last step of "recrystallization from ethanol." See* A12407 720:11-17. Based on the three steps they performed, the district court concluded that they used "reasonable experimental conditions that the court finds credible." A20; *see also* A19 n.19. Defendants' Dr. Lee used essentially the same experimental parameters for his first three steps but, as directed by the '855 patent, he performed the last step, recrystallization from ethanol (*see* A12296-98 277:3-8, 283:6-284:14, 281:25-287:3, 10-12; A12301 298:3-8), and obtained Form I armodafinil—as confirmed by XRPD analysis. A12298 286:1-287:3, 10-12; A12303 305:15-23; A12313 345:17-21; A12317 360:6-15.

In the district court, Cephalon never contested that Defendants' experiments were perfectly reasonable and conventional recrystallization experiments. Instead, for purposes of addressing Defendants' anticipation defense, Cephalon argued that

Preparation I could have been implemented in other ways such that Defendants' experiments "did not show that Preparation I in the '855 Patent *necessarily and inevitably*" produced Form I. A17 (emphasis added); *see also* A35 ("the plaintiffs assert that the defendants' experts' selection of ethanol grade was too narrow and insufficient to establish Form I as the inevitable product of Preparation I").

The district court agreed. A32-33. The court found that Defendants "failed to demonstrate that their experts' experiments were conducted consistent with Preparation I" in certain respects (A44), because, for instance, they used a different temperature (not an unreasonable one, just a different one) for dissolution of an intermediate. *See* A31-32; *see also* A33-38. The court similarly noted that the Defendant's experts were required to select variables not precisely defined in the '855 patent, such "as cooling rate, ethanol grade, and concentration" for the recrystallization from ethanol. A44. Based on those selections, the Court found their experiments did not represent that the "full scope of reasonable experimental possibilities," because there were "reasonable alternatives" that could lead to Form II instead of Form I. A44-45.

While these findings may be relevant to the "necessarily and inevitably" standard for anticipation, they are not relevant to obviousness, because obviousness turns on whether there was motivation and a reasonable likelihood of obtaining Form I armodafinil. Even if there were slight variations in the way a POSA

might have followed Preparation I, it remains undisputed that completely conventional recrystallization from ethanol—as the '855 patent teaches, and as a POSA would have performed—*will* produce Form I. Indeed, the record clearly establishes that recrystallization from ethanol will produce Form I armodafinil under *nearly any* reasonable set of conditions *nearly 90% of the time*. *See* A12259 130:19-22, A12661 138:18-139:1; A15013-57 (declarations submitted to PTO discussing a total of 34 successful recrystallizations using ethanol under a wide variety of conditions, where Form I resulted in 30 of those experiments); A97-98, 108, 114 Col. 5:41-45, 7:1-14, 27:23-52, claim 10 ('570 patent disclosure that Form I is produced from a recrystallization from absolute ethanol using a slow or rapid cooling rate, regardless of the starting concentration of ethanol).

In fact, Cephalon's own experimentation proves much the same thing—that Form I would have been easy for a POSA to obtain. For example, Cephalon conducted a conventional polymorph screen, which varied the solvent, but not the other recrystallization conditions. Of the 12 successful recrystallizations from the 13 different solvents used, Form I resulted 8 times. A18745, A18748, A18756, A18759; A18731, A18734; A17008, A17011. Cephalon also commissioned a high-throughput polymorph screen, comprised of 1,152 crystallization conditions, including 48 different solvents. A12381 615:1-11; A12433 820:13-18; A12444 861:3-11; A14404; A15014; A15740. Form I resulted from 948 of the 1,035 suc-

cessful recrystallizations. A12401 695:17-23; A14424; A15758; A7550-51 ¶ 10; A13561 ¶ 16; A17444. Cephalon reported these results to the FDA, stating that "more than 95% of the assigned crystals [were] Form [I]." A17335.

### 3. Pharmaceutical compositions

Finally, the '855 patent teaches to use the product of Preparation I (the "white crystals" discussed above) in "pharmaceutical compositions consisting essentially" of armodafinil to treat wakefulness disorders in people. A12263 148:4-13, A12334 429:23-430:3, A12342 460:1-4, A12396 675:11-14, 20-21, 675:23-676:9; A17031 Col. 6:44-49. The '855 patent also discloses that armodafinil was effective in human clinical trials, and has reasonable toxicity and better bioavailability than modafinil. A17031 Col. 5:28-32, 6:33-39, 45-57. In other words, the '855 patent discloses that crystalline armodafinil can be successfully formulated into a pharmaceutical composition of suitable purity, stability, and bioavailability for use in human clinical trials.

### C. The prior art taught that most drug compounds are polymorphic, that a polymorphic compound's most stable form should be used in pharmaceutical products, and two routine methods of identifying that most stable form.

1. Below, Cephalon attempted to raise an issue about whether one of ordinary skill could have predicted that armodafinil would be "polymorphic," meaning that it could exist in more than one crystal form. But that is beside the point. The '855 patent taught that armodafinil existed *in at least one crystalline form*, and

the claims asserted here involve only a single form—Form I—which is by far the most stable and easily obtained form.

In any event, it was entirely predictable that armodafinil would be polymorphic. As noted above, it has been known since the 1960s that "probably every organic medicinal can exist in different polymorphs." A15717. And in 1969, one "historically prominent scholar" (A61 n.55) advised: "Those who study polymorphism are rapidly reaching the conclusion that all compounds, organic and inorganic, can crystallize in different crystal forms or polymorphs." A14822; *see also* Lupin Br. 10-11 (collecting numerous prior art references making the same points).

Moreover, since well before Cephalon's priority date, "[s]ystematic investigation of a compound to determine whether it is prone to polymorphism ... [was] routine practice in pharmaceutical pre-formulation studies." A14680. Indeed, as far back as 1987, FDA guidelines have instructed drug developers to determine whether a compound exists in multiple polymorphic forms. A14761, 763.

There is good reason to find the most stable crystalline form (*see* A17033; A14669) because less stable (*i.e.,* "metastable") forms tend naturally to transform into the more stable form over time—which can be highly problematic if it happens during manufacture or storage of a pharmaceutical product. A14667; A14680-81; A14763-64; A14821; A14995; A15717. Case in point: In developing the drug ritonavir in 1996, Abbott Laboratories neglected to confirm the most sta-

ble form of the drug and proceeded to market with a less stable form.   Hundreds of

millions of dollars later, with a product already on the market, Abbott was forced

to issue a recall after discovering that its less stable form was converting to the

most stable form during manufacturing and/or storage.   A18569; A17033.   A

POSA therefore had every motivation to identify and obtain the most stable form

of armodafinil.[2]

2.   Long before the priority date, there were well-established and routine

procedures for obtaining the most stable form of crystalline armodafinil, including

a technique called "ageing."   A POSA in the early 2000s would have known that

"[a]n efficient method to discover the most stable polymorph is the technique of

solvent-mediated polymorphic transformation" (A17033-34), also known as "age-

ing."   Through this technique, crystals are allowed to remain in contact with a sol-

vent, which causes the metastable polymorphs to dissolve and recrystallize into a

more stable form.   A14681.   This process repeats until only the most thermody-

namically stable polymorphic form remains.   A12327-28 403:23-404:6; A14681;

---

[2] In rare circumstances, the most stable form of a compound may not be used for a drug product—if, for example, it is not sufficiently soluble.   A58.   In light of the teachings of the '855 patent, however, as well as prior art regarding the parent compound modafinil, that would not be the case here.   Upon identifying armodafinil's most stable form (as explained below), a POSA would have reasonably expected—and found—it to be sufficiently soluble and bioavailable to be effective in a pharmaceutical composition, making resort to less stable forms unnecessary.   *See* A12327 401:8-15, A12333 425:17-426:15.   The district court did not find otherwise.   *See* A66-68.

A17034. A POSA thus would have been virtually certain of obtaining armodafinil's most stable polymorph (*i.e.*, Form I) from a single experiment. A12328 405:16-24. That is particularly clear in light of the disclosures of the '855 patent—including, most notably, that ethanol was an appropriate solvent for use in ageing armodafinil. A17030 Col. 3:50-52.

Far from contradicting this, Cephalon's expert, Dr. Bernstein, conceded at trial that slurrying—a type of ageing involving mechanical mixing—is "often used" in industrial crystallizations and "leads to a conversion generally of a mixture of polymorphs to the most stable form." A12371 576:24-578:15. Dr. Bernstein also conceded that, "if the manufacturer wants to be sure they get the most stable form, they slurry it… in order to make sure that, in the end, the final product is the most stable form." A12371 577:15-19. Not surprisingly, Cephalon itself conducted ageing experiments to verify the most stable form of armodafinil—with every expectation that those experiments would produce that most stable form (that is, Form I), which they did. A17336; A18026.[3]

---

[3] During redirect, Cephalon's counsel tried to walk Dr. Bernstein back from this statement. In one highly leading (and misleading) line of questioning, Cephalon's counsel managed to secure agreement with the proposition that ageing could only be used to obtain the most stable polymorphic form already present. *See* A12371 576:22-578:10. But it is impossible to square this litigation-driven gloss with the reality of how ageing operates, and it is impossible to square with the prior art. Dr. Bernstein's coached response notwithstanding, it is beyond dispute that ageing can be used to discover and obtain the most stable polymorphic form of a substance.

Another routine technique from the early 2000s was simple polymorph screening, which was widely reported in the literature. *See, e.g.*, A15004; A14667; A14782. Routine polymorph screens entail little more than systematically re-crystallizing a substance using different solvents and then analyzing the results. A14667; A17033; A18571; *see also* A12328. They were conducted with limited experimentation (A12328 406:14-407:10; A12331 416:13-21), and would have readily produced the most thermodynamically stable form of a given crystalline compound (A12436 832:12-21).

### D. The district court's opinion

At trial, Defendants contended that the asserted claims of the '570 patent were anticipated by the '855 patent (because Form I armodafinil was the necessary and inevitable result of practicing Preparation I) and that it was obvious for a POSA to use Form I to make the claimed "pharmaceutical compositions," given the disclosures in the '855 patent and the other prior art discussed above. The district court disagreed in both regards.

The district court rejected Defendants' anticipation defense based on the finding that they failed to "meet their burden of demonstrating that Preparation I necessarily and inevitably results in Form I armodafinil or a composition consisting essentially thereof." A18. Depending on the precise conditions of a POSA's work, the court concluded, following Preparation I would not "necessarily" pro-

duce Form I. The court also believed Defendants were required to demonstrate that "all reasonable ways to practice Preparation I would necessarily result in Form I armodafinil." A32-33. Accordingly, because Defendants' experts only followed one way of practicing Preparation I, the court ruled that the experts' "limited testing and selection of variables" did not rise to the level of clear and convincing evidence of inherent anticipation. A44-45.

The district court also concluded that the claimed use of Form I was not obvious, principally based on the conclusion that "the crystal structure itself is fundamentally unpredictable." A53. But by focusing on the unpredictability of the *structure*, the court ignored the critical question—whether a POSA would have had a reasonable expectation of success in *obtaining* that form, the most stable one.

The district court nevertheless relied on this point repeatedly, both directly and indirectly, holding that the invention was not obvious because "it remains in general impossible to predict the structure of even the simplest crystalline solids from a knowledge of their chemical composition." A53 (citation omitted). For instance, although the prior art '855 patent taught the use of ethanol to make "white crystals" of armodafinil, the district court deemed it "impermissible hindsight" to rely on that teaching, because "a person of ordinary skill in the art of 2002 would not have known of the existence of Form I" as defined by XRPD. A71; *see also, e.g.*, *id.* ("the specific structure of Form I—i.e., the physical dimensions within the

crystal and corresponding interplanar XRPD limitations of Claim 6 and its properties—could not have been reasonably predicted"); A68 ("Form I would not have been obvious because there was no more than a general motivation to find new crystal forms of armodafinil with nothing directed to the unknown Form I itself."); *id.* ("the prior art did not suggest the particular structure of Form I").

The district court also relied on the fact that there are "no failsafe methods to predict the extent of polymorphism" (A52-53)—that is, the number of crystal forms of armodafinil that might exist—but the court did not explain why the *extent* of polymorphism was relevant. Indeed, it was *not* relevant, given the '855 patent's disclosure that at least one crystal form existed and the standard practice of identifying and presumptively using the most stable form of a polymorphic compound.

In the end, the district court conflated anticipation with obviousness; it concluded that the claims were not obvious because, in its opinion, none of the prior art "*necessarily* produced material suitable for a pharmaceutical composition consisting essentially of Form I." A69 (emphasis added). As a result, the district court did not faithfully apply the standard for obviousness—*i.e.*, whether a POSA would have been motivated and could have reasonably expected to obtain armodafinil's most stable form.

## SUMMARY OF ARGUMENT

The judgment should be reversed.  Every element of the claimed invention was explicitly disclosed in the prior art '855 patent with the sole exception of what form of armodafinil should be used.  That is, the '855 patent disclosed and touted the use of a pharmaceutical composition consisting essentially of crystalline armodafinil as an arousing agent and stimulant.  To this, the asserted claims of the '570 patent add *nothing* except an obvious clarification:  use Form I armodafinil— which is to say, *use that compound's most readily available, most stable form.* This is not a patentable insight.

To obtain the claimed invention, Cephalon did two things.  First, it obtained Form I.  The '855 patent, however, already disclosed recrystallization by ethanol as a method of obtaining pharmaceutical-grade armodafinil.  Under the law, obviousness requires only a "reasonable expectation of success," not "absolute predictability."  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).  Yet here, there was virtually no uncertainty:  The '855 patent specifically taught that ethanol *would* produce armodafinil in the form of "white crystals"—and the record shows both that a simple ageing experiment would have had a 98% chance of producing Form I, and that, under nearly any set of conditions, recrystallization from ethanol results in *Form I* armodafinil 90 times out of 100.

23

Add to this both the motivation to identify and obtain armodafinil's most stable form and the ability to do so using routine techniques, and settled law demands a finding of obviousness. Indeed, under this Court's precedent, if a skilled artisan "would have been motivated to use the teachings of a prior art process, in its normal disclosed operation, to create a product that a patentee claims in a subsequent patent, then such patent would have been obvious over the former disclosed process." *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359 (Fed. Cir. 2001). That principle controls here.

In reaching a contrary holding, the district court ruled that none of the prior art "*necessarily* produced material suitable for a pharmaceutical composition consisting essentially of Form I." A69 (emphasis added). But that is the standard for *anticipation*, not obviousness. As the evidence showed, a skilled artisan using completely conventional procedures, particularly using ethanol, would have found it difficult to *avoid* getting Form I.

The second thing Cephalon did to obtain the claimed invention was measure and report Form I's XRPD fingerprint. According to the district court, "the specific structure of Form I—i.e., the physical dimensions within the crystal and corresponding interplanar XRPD limitations of Claim 6 and its properties—could not have been reasonably predicted." A53. Quite true. But so what? These are inherent properties; all Cephalon did was measure and record them. As this Court has

24

held, "a rule of law equating unpredictability to patentability... cannot be the proper standard" where it would make *any* new development "separately patentable simply because the formation and properties of [the claimed invention] must be verified through testing." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

Merely *measuring* the product of a routine technique is not worthy of a patent, at least not in any sensible view of our patent system. The purpose of the obviousness inquiry is to distinguish true innovation that would "not be disclosed or devised but for the inducement of a patent," *Graham v. John Deere Co.*, 383 U.S. 1, 10-11 (1966), from "advances that would occur in the ordinary course without real innovation." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 419 (2007). Granting patent protection for the latter merely "retards progress," *id.*, and is not, as Thomas Jefferson originally wrote, "worth to the public the embarrassment of an exclusive patent." *Graham*, 383 U.S. at 10-11.

What is more, even if a POSA somehow managed to miss Form I when following the teachings of the '855 patent, the record establishes clearly and convincingly that a POSA would have been motivated to find *the most stable form of armodafinil* (which all agree is Form I)—and would have obtained and used that most stable form with a near certainty of success by following one of two routine

techniques. The district court's contrary ruling rests entirely on two clearly erroneous findings of fact.

First, the district court found that a skilled artisan would not reasonably expect that armodafinil is polymorphic. But the court ignored undisputed evidence showing that *virtually all compounds* are polymorphic. It also misinterpreted the '855 patent as indicating that the "white crystals" produced by Preparation I could be "a solvate, hydrate, a mixture of materials, or a different form of armodafinil." A55. The '855 patent on its face shows otherwise, as do several other statements made by Cephalon itself regarding that patent and Preparation I. A17029-30 Col. 1:61-63, 3:5-8, 3:50-52, A17032 Col. 7:19; A12441 850:16-851:21 (discussing A18768 71); A12441-42 852:14-854:25 (discussing A17006-16).

Second, the district court found that it would have required undue trial-and-error experimentation to identify armodafinil's most stable polymorphic form. A62, A70, A72. But the court ignored the '855 patent's specific teaching to use ethanol, which, again, will produce Form I under most conditions. Then it misunderstood two simple, well-known techniques that a POSA could have used to obtain the most stable form—ageing and screening. Based on a gross misreading of a key piece of prior art (the Gu reference), the district court concluded that ageing can only be used to *reproduce* the most stable form of a polymorph, not to *discover* it in the first place. A64-65. That was flatly incorrect. As for screening, the dis-

trict court confused a routine polymorph screen that would have been performed by a POSA in the early 2000s to identify the most stable polymorph, with a subsequently developed, high-throughput screening approach used to explore the extent of a given compound's polymorphism. A62-64.

In sum, the district court applied the wrong legal standard (conflating the anticipation standard with obviousness), asked the wrong question (focusing on the unpredictability of a crystal's specific 3-D structure, rather than the expectation of obtaining the most stable form of the crystal now known as "Form I" using ethanol), and made two clearly erroneous findings of fact. For any or all of these reasons, the judgment below should be reversed and the asserted claims of the '570 patent recognized for what they are: an obvious refinement of the invention disclosed and claimed in the '855 patent—and invalid as such.

## STANDARD OF REVIEW

The district court's findings of fact are reviewed for clear error and its legal conclusions *de novo*. *Abbott Labs. v. Baxter Pharm. Prods., Inc.,* 471 F.3d 1363, 1367 (Fed. Cir. 2006). Obviousness is ultimately a question of law, determined based on underlying factual questions including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness. *Graham*, 383 U.S. at 17. A factual finding is clearly erroneous when, "al-

though there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## ARGUMENT

Because Cephalon was precluded from submitting evidence of objective indicia, obviousness in this case turns on "whether a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006). In conducting this inquiry, a court must remain mindful that "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364.

The district court abandoned this well-settled framework, disregarded controlling precedent, and ignored the far-reaching implications of its reasoning. The court's principal error—the foundation of its entire opinion—was finding that obviousness is precluded by the mere fact that "[t]he specific structure of Form I … could not have been reasonably predicted" before XRPD testing. *E.g.*, A53.

As shown below, the district court's judgment should be reversed. *First*, an obviousness finding is mandated by the disclosures of the '855 patent and standard

crystallization protocols, which would have led directly and unavoidably to the claimed Form I. *Second*, the district court erred as a matter of law by nevertheless upholding the claims based on the unpredictability of Form I's crystal structure—a consideration that has no bearing on the obviousness inquiry, which turns instead on whether there was a reasonable probability of success in obtaining Form I, not predicting its inherent properties. *Third*, given the disclosures in (and the presumption of enablement that attaches to) the '855 patent, there can be no serious question that a POSA would have had a reasonable expectation of success in formulating a pharmaceutical product from armodafinil recrystallized using ethanol.

## I. Given the disclosures in the '855 patent and standard crystallization protocols, it was obvious to obtain and use Form I.

The prior art '855 patent disclosed the use of a pharmaceutical composition, consisting essentially of crystalline armodafinil, as an arousing agent and stimulant. To this, the '570 patent added literally nothing except that such a composition should be made with a particular form of armodafinil, Form I—armodafinil's most readily obtainable and most stable form.

### A. A POSA would have been highly motivated to identify and use armodafinil's most stable form.

As noted above, a skilled artisan would know that armodafinil, like virtually all drug compounds, was likely to be polymorphic. In a seminal publication on polymorphism, Dr. McCrone stated that "those who study polymorphism are rapid-

ly reaching the conclusion that *all* compounds, organic and inorganic, can crystallize in different crystal forms or polymorphs." A14822 (emphasis added). And another prior art reference discloses that "it is clear that probably every organic medicinal can exist in different polymorphs." A15717.

A skilled artisan also would have been aware of the need to determine whether armodafinil is polymorphic and, if so, to identify the most stable form of that polymorph. As far back as 1987, FDA guidelines have instructed drug developers to be cognizant of polymorphism and to determine whether a compound exists in multiple polymorphic forms. A14761. This is so because less stable forms naturally tend to transform into the more stable form over time—which can be highly problematic for drug products if it happens during manufacture or storage. A14667; A14680-81; A14763-64; A14821; A14995; A15717.

That is why there is an established presumption—of which a POSA would have been aware—for using the most stable form of a polymorphic compound in drug formulations. *E.g.*, A17033; A14669. Indeed, both sides' witnesses testified to the same effect: a skilled artisan in the early 2000s would have known that, all things being equal, the most stable form is preferred for drug products. A12326 396:5-8; A12381 617:2-8; A12435 827:11-16; A12438 840:22-841:11; A12444 864:20-865:10.

## B. A POSA had more than a reasonable expectation of success in obtaining armodafinil's most stable form.

Ordinarily, a court must focus on whether a POSA had a "reasonable expectation of success" in obtaining the claimed invention. *DyStar*, 464 F.3d at 1360. That standard is easily satisfied here.

As an initial matter, this Court has held that "prior art describing a process … may be highly relevant to patentability for a product that may be produced using the process." *LNP*, 275 F.3d at 1359. Elaborating, this Court explained that "if one of ordinary skill in the art would have been motivated to use the teachings of a prior art process, in its normal disclosed operation, to create a product that a patentee claims in a subsequent patent, then such patent would have been obvious over the former disclosed process." *Id.* The holding of *LNP* controls here.

The '855 patent discloses a process for recrystallizing armodafinil from ethanol that almost invariably—indeed, 90 times out of 100—produces Form I armodafinil. A POSA, motivated to find the most stable form of armodafinil, would have easily done so following the teaching of the '855 patent alone.

But a POSA had more than the prior art '855 patent; he or she also could draw upon two routine techniques for identifying and obtaining armodafinil's most stable form—ageing and polymorphic screening. A POSA would have had a reasonable expectation of success in employing either of these techniques.

31

### 1.    The prior art process disclosed in the '855 patent would have produced Form I.

Upon reading the '855 patent touting the enormous benefits of making a "pharmaceutical composition consisting essentially of [armodafinil]" in the form of "white crystals" using ethanol, a POSA would have been highly motivated to make crystalline armodafinil.  For all its focus on the unpredictability of XRPD patterns and polymorphism, the district court never focused on the dispositive point:  a POSA following virtually *any* conventional approach in its "normal operation," *LNP*, 275 F.3d at 1359, would have obtained Form I.  Indeed, he or she would have found Form I difficult to avoid—particularly when recrystallizing from ethanol.

The '855 patent specifically teaches that using ethanol for recrystallization *will* produce "white crystals."  A17030 Col. 3:49-52.  In other words, that method works to produce at least one solid crystal form.  And Cephalon's own experiments prove that using ethanol under a wide variety of conditions will produce Form I 90% of the time.  A15013-57.  Not surprisingly, then, the record shows that Form I may be obtained by crystallization involving slow *or* rapid cooling from ethanol, as well as other ethanol-based solvents.  *See* A97 Col. 5:41-45, A98 Col. 7:1-14, A108 Col. 27:23-52, A114 claim 10.[4]

---

[4] At trial, Plaintiffs' expert testified that "ethanol" in Preparation I could refer to either absolute ethanol or denatured ethanol.  A12419 765:14-773:1.

## 2. The prior art also teaches two routine techniques for obtaining Form I armodafinil.

Even without the '855 patent's teaching to use ethanol, a POSA would run a simple ageing experiment and/or a conventional polymorph screen as a matter of routine procedure, which would lead inevitably to Form I. Indeed, Cephalon's own experiments proved as much; they produced Form I almost every time using a wide variety of solvents under a wide range of conditions. A18745; A18748; A18756; A18759; A18731; A18734; A17008; A17011.

*Ageing.* As detailed more fully below, the prior art references and testimony in the record establish that ageing is an efficient method to discover the most stable polymorph that would be known to one skilled in the art. A12327 401:16-402:8, 402:13-15, 402:22-403:2.

*Screening.* As also detailed more fully below, polymorph screening is another well-known, readily practiced technique that would have been available to a POSA in search of armodafinil's most stable polymorph—a technique prior art instructed drug developers to perform as a matter of course. *See* A14666-67; A14680; A14763-65; A14782; A14995; A15004; A17033; Lupin Br. 53-56.

* * * *

In the end, regardless of what technique a POSA chose, he or she would have obtained Form I. That is because Form I is the product of virtually any conventional recrystallization procedure. *E.g.*, A17335. A POSA could not miss.

33

Despite this, the district court relied on the fact "researchers in the field could not have predicted … what recrystallization conditions would generate a *particular* crystalline form or solvate." A54 (emphasis added). But that is not the question. There is no requirement for predicting what precise conditions will produce which "particular" crystal, only whether there is a reasonable probability of making the most stable form of armodafinil. *See Pfizer*, 480 F.3d at 1367 (regardless of whether a technique "require[s] extensive time, money, and effort to carry out," the issue is whether "one skilled in the art would have had a reasonable expectation of success at the time the invention was made, and merely had to verify that expectation").

The district court also discounted the '855 patent's teaching to use ethanol, calling it "impermissible hindsight" because "a person of ordinary skill in the art of 2002 would not have known of the existence of Form I." A71. But regardless of whether a skilled artisan "knows" in advance about the XRPD-defined Form I, the fact remains that using ethanol under a wide variety of "normal" crystallization conditions will produce the very same crystal now known as Form I. That is dispositive under *LNP*.

### C. Fatally distracted by the unpredictability of polymorphism generally, the district court ignored clear evidence that a POSA would have had a reasonable expectation of success in obtaining Form I through routine experiments.

Rather than focusing on the indisputable fact that conventional procedures would have inevitably produced Form I, the district court was diverted by *the unpredictability of polymorphism generally*—that is, the number of polymorphic forms of armodafinil that might exist. A52-54. For instance, the district court relied on testimony from Dr. Bernstein explaining that polymorphism itself is "inherently unpredictable," and it quotes references stating that "[t]here are no failsafe methods to predict *the extent of polymorphism* of a given compound," *i.e.*, *how many* different crystalline forms a compound may take. A52-53 (citing and quoting A12351-53 496:3-503:2; A12355 511:17-25; A12364-65 548:1-551:14; A14980; A14169; A14187).

But the prior art '855 patent taught that at least *one* crystalline form existed for armodafinil—the "white crystals." That alone would have been enough to motivate a POSA to use the routine crystallization procedures that would have produced Form I more than 90% of the time. Even in the unlikely event the POSA somehow managed to initially pick conditions for Preparation I's recrystallization from ethanol that resulted in one of the other crystal forms, the POSA *still* would have produced Form I given the undisputed fact that checking for additional crystal

forms, and identifying the most stable one, was *part of the conventional drug development process* in 2002. This alone is dispositive.

The district court clearly erred in two additional ways when addressing this polymorphism issue. *First*, the district court found that "a skilled artisan would not have had a reasonable expectation of success that armodafinil is polymorphic in 2002." A52. Apparently the district court believed that, if a POSA was unfortunate enough to get something other than Form I in the first instance, he or she would have just stopped there and never obtained the "invention" of the most stable Form I. *Second*, the district court found that routine prior art techniques for identifying the most stable polymorphic form would have required undue trial-and-error experimentation. *E.g.*, A62. As we show below, these findings ignore undisputed evidence and are clearly erroneous in light of the record as a whole.

**1.    A POSA would have reasonably expected armodafinil to be polymorphic and would have been motivated to identify its most stable form.**

Contrary to the district court's conclusion, there was overwhelming and undisputed evidence showing that a POSA would have expected armodafinil to be polymorphic. Indeed, as noted above, Haleblian and McCrone discloses that "it is clear that probably every organic medicinal can exist in different polymorphs." A15717; *see also* A14822 (McCrone) (explaining that "those who study polymorphism are rapidly reaching the conclusion that *all* compounds, organic and inor-

ganic, can crystallize in different crystal forms or polymorphs" (emphasis added));
*see also* Lupin Br. 10-11 (discussing other, similar prior art references).

The district court did not address any of this prior art. Instead, the court cited testimony and prior art references discussing the unpredictability of the *extent* of polymorphism *generally*—meaning *how many* crystalline forms might be found. *See* A52-56. This was the sole basis of the court's determination that "researchers in the field could not have predicted whether [armodafinil] would exhibit polymorphism" *at all*. A54; *see also* Lupin Br. 42-43. But that conclusion neither follows from the evidence on which the district court relied, nor accounts for the overwhelming evidence that a skilled artisan would have reasonably expected armodafinil to be polymorphic.

The evidence clearly establishes that a POSA would not only have expected armodafinil, like virtually all drug compounds, to be polymorphic; he or she also would have been aware of the need to identify the most stable form of that polymorph. Given the reality that less stable crystals tend to convert to more stable forms over time—which can cause huge manufacturing problems and even health concerns (A14667; A14680-81; A14763-64; A14821; A14995; A15717)—FDA guidelines from as far back as 1987 instruct drug developers to determine whether a compound exists in multiple polymorphic forms. A14761. This also explains the

presumption for using the most stable form of a polymorphic compound in drug formulations, all other things being equal. *E.g.*, A17033; A14669.

The district court concluded nonetheless that a skilled artisan would not have been motivated to obtain the most stable polymorph of armodafinil—but its reasoning does not withstand scrutiny. The court cited testimony that some drug products employ metastable or amorphous forms of active pharmaceutical ingredients. A58. The exceptions, however, do not disprove the general rule that a stable form is the starting point. As the district court itself acknowledged, formulators resort to metastable forms *only* if and when the most stable form has some undesirable characteristic, which means *they still would seek out the most stable form for comparative purposes. Id.* Moreover, regardless of the form ultimately used, the prior art directs a skilled artisan to gain a "thorough understanding of the polymorph characteristics" to select the best form to use. *See* A14958. The existence of drug products that *use* a metastable form thus does not alter the motivation to *identify* the most stable form. As a result, a POSA clearly would have been motivated to identify and try to use armodafinil's most stable form.

The district court also stated that a person of ordinary skill would not have been motivated to obtain the most stable form because "the 'most stable' form of a crystal does not refer to a specific material, but, instead, is a relative term that refers to the lowest energy crystalline form *known at a given time*" and it is possible

that "more stable forms of a crystal can be identified after significant testing." A57-58 (emphasis added).  As an example, the court pointed to the case of the Abbott drug ritonavir, which converted to a more stable form during that drug's manufacturing process.  *Id.*

In *Pfizer*, however, this Court held that no "reasonable fact-finder" could accept expert testimony that "the number of acceptable anions are 'unlimited.'"  480 F.3d at 1362.  "Of course, new salts can always be made or attempted.  However, irrefutable evidence shows that a skilled chemist at the time would simply make *known* pharmaceutically-acceptable salts of whatever active ingredient with which he or she was working at the time."  *Id.*  The same is true of polymorphs:  *of course* new forms "can always be made or attempted."  But the question is what a POSA would have obtained through conventional procedures in their "normal operation."  The answer is Form I.

The possibility that a more stable form may be discovered later does not alter the imperative to try to determine the most stable form now.  Indeed, the significant adverse consequences associated with a change in polymorphic form would provide ample motivation for a person of ordinary skill to do so.  *See* A14669; A17033;  A12326 396:5-8, 398:10-13, 399:25; A12381 617:2-8.  In other words, far from teaching away from the claimed invention, the exceptional case of ri-

tanovir—and the catastrophic commercial consequences Abbott suffered from failing to ascertain the most stable polymorph—only proves the wisdom of the rule.

> **2.** **The district court clearly erred in concluding that trial-and-error experimentation would have been necessary to identify the most stable form of armodafinil.**

The district court also clearly erred in finding that the most stable form of armodafinil could have been identified only by "undue" trial and error experimentation. Again, the court thought this "necessary because polymorphs are unpredictable." A62; *see also* A70, A72. To be sure, trying to comprehensively survey the field and identify *metastable* forms may require trial-and-error experimentation. But to obtain the most stable form of any given polymorph, there were two well-known, simple, and direct paths—ageing and screening. Using either of these techniques, our motivated POSA would have obtained Form I armodafinil with no trouble.

*Ageing.* As noted above, the record establishes that a POSA would have known to conduct a routine ageing experiment (also known as "solvent-mediated transformation") to obtain the most stable polymorph of a crystalline compound. A12327-28 401:16-8, 404:11-20. The district court's contrary conclusion (A64-65) depends on a snippet of expert testimony, a clear misreading of one piece of prior art (Gu), and disregard for both Dr. Cima's testimony and numerous other pieces of prior art.

*First*, the record establishes that ageing is an efficient method to discover the most stable polymorph that would be known to one skilled in the art. A12327 401:16-402:8, 402:13-15, 402:22-403:2. According to the district court, Dr. Bernstein testified that ageing experiments "can, at best, convert a mixture of forms to the most stable form already present in the mixture, but not necessarily to the most stable form overall"—an answer supplied from counsel's leading (or, more accurately, misleading) question. A65; A12371 577:20-578:9. From this, the district court concluded that a POSA would need to *have* Form I "available in advance" and, thus, could not use this process to *discover* Form I. A65.

But, in fact, Dr. Bernstein conceded that slurrying—a form of ageing using mechanical mixing—is "often used" in industrial crystallizations and "leads to a conversion generally of a mixture of polymorphs to the most stable form," *regardless of whether the most stable form was in the initial mixture. See* A12371 576:24-578:15. Dr. Bernstein testified that slurrying is used in "many industrial processes" to ensure that "the final product is the most stable form." A12371 576:22-577:19.

It is also impossible to square the district court's finding—*i.e.*, that ageing cannot be used to produce the most stable form of a polymorph—with the reality of how ageing works. Ageing works by allowing a substance to remain in contact with a solvent, which causes any metastable polymorphs to dissolve and recrystal-

41

lize into a more stable form—again, regardless of whether the most stable form was part of the initial mix.  A14681.  This process is repeated until only the most thermodynamically stable polymorph remains.  *Id.*; A17034.  Ageing does not merely allow the most stable form present in a mixture to *reproduce* itself; rather, it works to *produce* the most stable form possible through the use of a solvent.

*Second*, the district court misunderstood a key piece of prior art (the Gu reference) and ignored additional art confirming that routine ageing experiments would have been used successfully here.  The district court cast aside this evidence because, in its view, Gu requires "pre-seeding" the mixture with the most stable polymorph and therefore "does not disclose any general applicable method to obtain the most stable form."  A64-65.  And yet this finding is belied by the article's plainly stated teaching that solvent-mediated polymorphic transformation (*i.e.,* ageing) is "[a]n efficient method *to discover* the most stable polymorph."  A17033-34 (emphasis added); *see also* A12327 401:16-403:2.  If Gu required pre-seeding, as the district court mistakenly thought, then there would be no way to "discover" the most stable form, because that form would need to be known already and present in the solution.

Gu discloses crystal-growth-rate experiments that employed pre-seeding but *only to bypass one initial step* in order to study factors influencing the *rate* of transformation of metastable forms to the most stable form.  A17034-35.  In other

words, Gu employed pre-seeding as a short cut, not a necessary step. The district court also neglected other experiments from Gu demonstrating the effects of temperature and agitation on polymorphic transformation—experiments that resulted in transformation of the metastable form into the most stable form *without pre-seeding*. *See* A17034-35, A17043-44. In short, it was erroneous for the district court to conclude that routine ageing experiments *require* pre-seeding. A65.

Other prior art references—references entirely overlooked by the district court—confirm the court's error. For example, the Caira publication contains a basic description of the ageing process that does *not* involve pre-seeding: (1) the first form to crystallize "is the thermodynamically least stable (most soluble) form"; (2) that form "*subsequently dissolves and transforms into a more stable one*"; and (3) "[t]he cycle continues until only the thermodynamically stable (least soluble) polymorph remains." A14681 (emphasis added). Caira does not mention pre-seeding, and no expert testified that Caira's process would have required it. A12327 403:3-404:10. Likewise, according to Guillory, pre-seeding is an option, not a requirement. A14825.

The high likelihood of successfully obtaining the most stable polymorph with limited experimentation only increases when considering that the '855 patent expressly discloses solvents—including ethanol—in which crystalline armodafinil is soluble. A17030 Col. 3:50-52. It is undisputed that a POSA would have known

to use the solvents in which armodafinil was soluble to conduct routine ageing experiments. A12328 404:11-20. And Dr. Cima testified that a skilled artisan, knowing that armodafinil is crystalline and soluble in certain solvents, would have had "a 98 percent chance" of finding the most stable form of armodafinil by conducting routine ageing experiments. A12328 405:16-24. That, surely, is a reasonable expectation of success. In finding to the contrary—that obtaining the most stable polymorph of armodafinil would require "trial-and-error experimentation"— the district court committed clear error.

*Screening.* Also as noted above, polymorph screening is another well-known technique—practiced as a matter of course in the early 2000s—that would have been available to a POSA to make armodafinil's most stable polymorph. *See* A14666-67; A14680; A14763-65; A14782; A14995; A15004; A17033. In rejecting the usefulness of this technique, the district court said that polymorph screening would require "hundreds to thousands of experiments that analyze the effects of various parameters." A62. But this too was clearly erroneous.

As more fully explained in Lupin's brief, the district court confused a routine polymorph screen available in the early 2000s with a subsequently developed, high-throughput screening approach. *See* Lupin Br. 23-24, 52-60. High-throughput screens—intended to investigate the *extent* of the polymorphic landscape—may indeed entail a high volume of experimentation to determine each

polymorph and pseudopolymorph.  A12331 417:24-418:15; A12337 443:22-444:2; A17574.  But the record clearly shows that the routine polymorphic screening *that would have been practiced at the pertinent time* would have readily yielded the most stable polymorphic form*,* requiring, at most, only a couple dozen recrystallization experiments.  A12331 416:16-417:14; *see also* A12439 841:12-19 (explaining that a POSA would not have had to employ any special recrystallization parameters or conditions to obtain Form I armodafinil through routine polymorph screening).

The references cited in the district court's decision—all of which relate to high-throughput screening—confirm that the district court missed this distinction.  *See* A63-64 (citing A14980; A17582; A14559); *see also* A55 (citing A14166).  And the evidence regarding the routine polymorph screening that would have performed at the relevant time, including Cephalon's own experimental data, confirms that a skilled artisan would have had every expectation of obtaining Form I armodafinil using that technique.  *See also* Lupin Br. 23-24, 52-60.

## II.  The district court erred as a matter of law by upholding the asserted claims based on the unpredictabilty of Form I's 3-D structure, which Cephalon determined by a routine XRPD measurement.

The correct obviousness inquiry here is whether a skilled artisan in the early 2000s would have been motivated to obtain and use the most stable and readily available crystalline form of armodafinil.  The answer, clearly, is yes.  The district

court reached the opposite conclusion only by focusing on the legally irrelevant fact that a chemist cannot "predict" a crystal's 3-D structure before running XRPD. That error alone warrants reversal.

## A. The district court's decision rests on the legally irrelevant fact that Form I's crystal structure was not predictable.

The district court's rejection of Defendants' obviousness defense rested primarily, if not entirely, on its legally irrelevant observation about the impossibility of predicting XRPD patterns.  Given the central importance of this error to the district court's decision—and the reality that it infected the court's view on virtually every factual issue—there is every reason to believe the district court would have reached the opposite conclusion if this error were corrected.

Throughout its opinion, the court underscored repeatedly that "it remains in general impossible to predict the structure of even the simplest crystalline solids from a knowledge of their chemical composition."  A53 (quoting A16728).  For instance, the district court cited Dr. Cima's testimony that the specific structure of Form I could not have been reasonably predicted.  But, in the process, the district court disregarded his explanation that the particular crystal structure—the XRPD fingerprint—is "irrelevant to a person of skill in the art reading the '855 patent and deciding" whether that person has "a motivation and … a reasonable chance of success" in finding armodafinil's most stable form.  *See* A53-54; A12335 435:15-436:9.

Similarly, in its "conclusion" section on obviousness, the court's principal finding was that the "the prior art did not suggest the particular structure of Form I and there was no suggestion of the structure or method of making Form I armodafinil in the alleged prior art." A68. In deciding a variety of issues in its short "conclusion," the court then repeatedly relied, both directly and indirectly, on this point that Form I's crystal structure would have been "unknown":

- "As Dr. Bernstein explained, a skilled artisan could not have predicted the particular structure of Form I …." *Id.*

- "Here, for the reasons detailed above, Form I would not have been obvious because there was no more than a general motivation to find new crystal forms of armodafinil with nothing directed to the unknown Form I itself." *Id.*

- "For a patent challenger to establish obviousness, it is insufficient to allege a general motivation to discover an undefined solution that could take many possible forms." *Id.*

- "The prior art did not suggest how to make Form I armodafinil consistent with the asserted claims," which require a crystal that matches Form I's XRPD pattern. A69.

- "A person of ordinary skill in the art in 2002 would not have known of the existence of Form I, and could not have known the method to produce Form I" using ethanol—something that would be possible "only after the '570 Patent … identified Form I" A71.

Given the manifest and central importance of this issue to the district court's decision, a complete reversal is warranted if the Court agrees that the district court erred by holding that obviousness is precluded by the inability to predict specific XRPD patterns without regard for whether the actual polymorphic form itself is obvious. And the district court clearly did err.

### B.  It is settled law that patentability may not be based on the fact that the properties of Form I required testing to verify.

A patent is not justified based on the mere inability to predict in advance precise measurements of a drug's properties—such as a compound's melting point, its solubility quotients, its bioavailability levels, or its crystal structure. Merely measuring the product of routine experimentation, using well-established technology, is not worthy of a patent. It is not an invention, but rather routine work. If the district court's contrary reasoning were correct, *each and every* crystal of a known compound would be patentable, separately and *per se*, by the first person to measure its crystal structure because chemists can *never* predict XRPD patterns in advance. That is not and cannot be the law.

48

To be clear, Defendants are *not* saying that new crystals are *never* patentable. Some might be, perhaps based on unexpected results or the need for an unconventional method of production. But not Form I armodafinil—not when the prior art expressly disclosed the production of "white crystals" with ethanol, when Form I is the most stable form, which is presumptively used in "pharmaceutical compositions," when routine techniques to obtain the most stable form were readily available, when Form I is almost invariably produced using ethanol or any other crystallization method, and when Cephalon offered no unexpected results (it was precluded from doing so and would not have been able to do so anyway).

The district court's contrary analysis cannot be squared with *Pfizer*. In that case, this Court specifically held that "unpredictability" as to the final "properties" of a drug product is legally insufficient to avoid obviousness. 480 F.3d at 1368. The question in *Pfizer* was whether a patent on a rare "salt form" of a known compound, amlodipine, was invalid as obvious. 480 F.3d at 1364. The "besylate" salt form of a drug amlodipine—used in only 0.25% of FDA-approved drugs—turned out to be more useful than other salt forms of that drug because of a "highly desirable combination of physicochemical properties, including good solubility, stability, non-hygroscopicity, and processability." *Id.* at 1356.

In an effort to avoid obviousness, Pfizer argued that that there was no reasonable expectation of success in using the besylate salt specifically with amlodi-

pine because: (1) "it was generally unpredictable as to whether a particular salt would form," and (2) even if the salt formed, "*it was generally unpredictable as to … what its exact properties would be.*" *Id.* at 1364 (emphasis added). This is precisely the rationale of the district court in this case. *See, e.g.*, A54 ("the evidence presented shows that person of skill would not know how to make a specific polymorph or predict its properties").

Likewise, the district court in *Pfizer* had found that the "skilled artisan would have had no expectation of success in making [the claimed salt] because there was no reliable way to predict the influence of a particular salt species on the active part of the compound." 480 F.3d at 1364. This Court reversed: "We cannot reject the district court's finding that in 1986, it was generally unpredictable as to whether a particular salt would form and what its exact properties would be"—but "*a rule of law equating unpredictability to patentability, applied in this case, would mean that any new salt … would be separately patentable, simply because the formation and properties of each salt must be verified through testing.* This cannot be the proper standard since the expectation of success need only be reasonable, not absolute." *Id.* (emphasis added).

So too here, the district court's judgment must be reversed, even though it is surely correct as a factual matter that "the specific structure of Form I—i.e., the physical dimensions within the crystal and corresponding interplanar XRPD limita-

50

tions of Claim 6 and its properties—could not have been reasonably predicted." A53. These are inherent properties of Form I; all Cephalon did was measure and record them. As *Pfizer* held, unpredictability does not equate to patentability—and the fact that "the formation and properties of [a claimed invention] must be verified through testing" does not make the invention patentable. 480 F.3d at 1364. Such testing is the "the work of a skilled artisan, not of an inventor." *Id.* at 1368.

A contrary rule "would mean that ***any*** new salt … would be separately patentable, simply because the formation and properties of each must be verified through testing." *Id.* at 1364 (emphasis added). That result is no more acceptable with respect to crystals than salts.[5]

Purporting to distinguish *Pfizer*, the district court concluded, "the prior art did not direct persons of skill in the field to the specific conditions to use for seeking new polymorphs of armodafinil and none necessarily produced material suitable for a pharmaceutical composition consisting essentially of Form I, as required by Claims 6 and 9." *See* A69. In fact, the prior art *did* provide the critical information—use ethanol as a solvent. Even Plaintiffs' expert Dr. Myerson agreed that absolute ethanol was a reasonable choice of solvent for recrystallizing armodafinil.

---

[5] The district court said: "Notably, in *Pfizer, Inc. v. Apotex, Inc.*, the Federal Circuit concluded that the nonobviousness of crystal forms is distinct from the obviousness of a pharmaceutically acceptable salt." A68-69. In point of fact, although *Cephalon* said this in its post-trial brief (A11967), *this Court* said no such thing. Nowhere does *Pfizer* mention, much less distinguish, crystal forms or polymorphs.

A12420 769:1-4 ("when a preparation simply lists ethanol, a chemist will choose absolute ethanol to avoid potential adverse side effects caused by the presence of water or a denaturant impurity") (quoting Dr. Myerson's expert report).

And from there, as explained above, the experimentation necessary to obtain Form I is routine, not open-ended or trial-and-error. Nor is it necessary for purposes of *obviousness*, as opposed to inherent anticipation, that the prior art "necessarily produce[]" Form I. A69. As admonished in *Pfizer* and any number of this Court's other precedents, obviousness turns on a *reasonable* expectation of success—not absolute predictability. *E.g.*, *Pfizer*, 480 F.3d at 1364; *Brown & Williamson*, 229 F.3d at 1125.

In sum, the district court missed the mark in concluding that a POSA "would not know how to make a specific polymorph or predict its properties" (A53-54), and that the prior art (as opposed to routine experimentation) did not "necessarily" produce Form I (A69). The POSA here is not *building* a polymorphic form the way an engineer designs a new bridge; instead, he is simply looking to *identify* the most stable form of armodafinil to practice the invention disclosed and touted by the prior art. It thus makes no difference whether a POSA could have known in advance the XRPD fingerprint for Form I. The crystal structure is what it is. What makes the use of Form I desirable and obvious is not the arrangement of the atoms, but rather that it is the most stable, most readily obtainable form.

## III. A POSA would have had a reasonable expectation of success in making the claimed composition.

Once it is established that obtaining Form I is obvious, the asserted claimed logically *must be* invalid, since literally the only difference between the prior art '855 patent and the asserted '570 patent is the use of Form I. But the district court did not see it that way. Instead, it compounded its error by requiring that "the prior art … *necessarily produce[]* material suitable for a *pharmaceutical composition* consisting essentially of Form I." A69.

The first problem, as noted above, is that the court used the wrong legal standard. "*Necessarily produce[]*" is an anticipation standard. *E.g.*, *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004) (for inherent anticipation, the prior art "must have sufficiently described and enabled at least one embodiment that necessarily featured or resulted in the [claimed] subject matter"). Obviousness, by contrast, requires that the prior art, together with the "the inferences and creative steps that a person of ordinary skill in the art would employ" would motivate a POSA to pursue the claimed invention with a *reasonable expectation of success*. *KSR*, 550 U.S. at 418. As the Supreme Court has made clear, the standard is a reasonable expectation of success, not certainty.

Another problem is that the district court's formulation analysis suffers from the same far-reaching implications as its XRPD analysis. The district court identified *nothing* unusual about using Form I in a pharmaceutical composition—just the

53

routine steps those of ordinary skill and creativity handle every day at pharmaceutical companies. In other words, if the district court were right, *every* new formulation of an otherwise unpatentable compound would suddenly be patentable. That is not the law.

Here, the '855 patent teaches and commends the use of "pharmaceutical compositions consisting essentially of [armodafinil]," and further teaches that the pharmaceutical grade armodafinil necessary for such compositions is crystalline and obtained by recrystallization using ethanol. Therein lies both motivation and expectation of success. Indeed, the path to success has three simple steps.

*First*, as discussed above, the '855 patent expressly disclosed that crystalline armodafinil could be successfully formulated into an effective pharmaceutical composition for use in humans. A12263 148:4-13, A12334 429:23-430:3, A12342 460:1-4, A12396 675:11-14, 20-21, 675:23-676:9; A17031 Col. 5:28-32, 6:33-39, 6:44-49. And nobody ever challenged the indisputable fact that there are manufacturing advantages to using the most stable crystal form. A12312 342:1-21; A12325 395:2-19.

*Second*, a POSA would have reasonably expected from the '855 patent that Form I armodafinil would be sufficiently soluble and bioavailable to be effective in a pharmaceutical composition. The '855 patent expressly teaches that armodafinil "has valuable therapeutic properties compared with" modafinil, and that it "has a

better bioavailability than" modafinil. A17029 Col. 1:61-65; A17031 Col. 6:34-35. Based on these teachings alone, a POSA would have reasonably expected that crystallized armodafinil would have made a pharmaceutical product superior to Cephalon's commercial modafinil tablets, Provigil®. A12333 425:1-426:15.

*Third*, a POSA would have had a reasonable expectation that routine purification techniques could be used to render armodafinil suitable for use in a pharmaceutical composition. The evidence on this point was both overwhelming and undisputed: A POSA would have known how to purify the armodafinil by using ageing or slurrying to produce a pharmaceutical composition. Gu, for example, expressly disclosed that ageing may be used "to eliminate the less stable polymorph from a polymorphic mixture so as to ensure the phase purity." A17034. The fact that purification was a routine process, not an inventive endeavor, was confirmed by the testimony of Defendants' expert, Dr. Cima. *See* A12322 383:16-21; A12334-35 430:16-432:16; A12337 440:19-441:7; A12341 458:4-20. As he explained, "a person skilled in the art knows how to deal with impurities," and such a person does "it day in and day out in drug development." A12341 458:18-20.

Not only did Cephalon fail to rebut this testimony, but its own expert, Dr. Bernstein, conceded that slurrying—a form of ageing using mechanical mixing—is used in "many industrial processes" to ensure that "the final product is the most stable form." A12371 576:22-577:19. And if that were not enough, Cephalon ad-

mitted before trial that "impurities are routinely characterized and controlled in the pharmaceutical industry." A11582.

The district court could reach a contrary conclusion only by applying an improper legal standard, *i.e.*, anticipation's "necessarily produce[s]" standard rather than obviousness's "reasonable expectation of success" standard, as already discussed. Making bad matters worse, noting the "many steps required" to convert the substance disclosed by the '855 patent into "a tablet of armodafinil," the district court said there was "no evidence of how these steps could affect the material's crystal form." A67. In point of fact, there was *ample* evidence that the most stable form of a polymorph is selected for a pharmaceutical composition *precisely because* it is unlikely to convert to another polymorph during the manufacturing and storage process. *See* A14669; A14680-81; A14763-64; A14821; A14995; A15717; *see also* A12444-45 864:20-865:10; A12438-39 840:22-841:11. Again, a skilled artisan need only have a reasonable expectation of success—and here, the prior art '855 patent already expressly disclosed pharmaceutical quality armodafinil that was used in human clinical trials. A17031 Col. 6:50-56.[6]

---

[6] The district court also erred in its claim construction: The claims do not require that Form I be the *only* form of armodafinil in the pharmaceutical composition. *See* Lupin Br. 67-71. Even if they did, that would not change the result; a formulator of ordinary skill could have easily purified armodafinil to a single form. But the district court's expectation-of-success analysis is all the more untenable when the claims are properly construed.

In sum, a POSA would have reasonably expected to successfully produce a pharmaceutical composition consisting essentially of Form I armodafinil. The '855 patent expressly disclosed how to prepare a polymorphic form of armodafinil that is sufficiently soluble and bioavailable for use in a pharmaceutical composition—*recrystallization from ethanol*. Moreover, a POSA would have known how to perform routine purification techniques to make Form I armodafinil usable in a pharmaceutical composition. The district court erred by disregarding evidence that such a reasonable expectation existed, and applying instead an incorrect legal standard of absolute predictability.

\* \* \* \*

With these clear factual errors set aside, the import of the district court's analysis is that (1) identifying the most stable polymorph of a known substance is somehow inventive, and (2) a skilled artisan would not have reasonably expected that he could use the most stable form of this substance—one with a known pharmacological use—to make a pharmaceutical composition. This is indefensible. The district court's holding of non-obviousness should be reversed.

## CONCLUSION

For these reasons, the Court should reverse, or in the alternative vacate, the district court's judgment that the asserted claims of the '570 patent are not invalid due to obviousness.

Dated:  August 14, 2013                    Respectfully submitted,


/s/ Robert Breisblatt          /s/ Jeffrey R. Gargano          /s/ James F. Hurst
ROBERT BREISBLATT              JEFFREY R. GARGANO               JAMES F. HURST
CRAIG KUCHII                   PETER M. SIAVELIS                MICHAEL K. NUTTER
ROBERT T. SMITH                WAN-SHON LO                      KEVIN E. WARNER
*Katten Muchin*                *McDermott Will &*              WILLIAM P. FERRANTI
*Rosenman LLP*                 *Emery LLP*                      *Winston & Strawn LLP*
*525 West Monroe Street*       *227 West Monroe Street*        *35 West Wacker Drive*
*Chicago, Illinois 60661*      *Suite 4400*                     *Chicago, Illinois 60601*
*(312) 902-5480*               *Chicago, Illinois 60606*        *(312) 558-5600*
*Robert.Breisblatt*            *(312) 372-2000*                 *mnutter@winston.com*
*@kattenlaw.com*               *slo@mwe.com*

                                                                *Counsel for Watson*
*Counsel for Apotex, Inc.*     *Counsel for Sandoz, Inc.*       *Laboratories, Inc.*

# ADDENDUM

# ADDENDUM

Memorandum (D. Del. March 30, 2013) ..................................................A1

Order (D. Del. March 30, 2013) ...........................................................A74

Judgment (D. Del. March 30, 2013) ....................................................A76

U.S. Patent No. 7,132,570, Entitled "Method for the Production
of Crystalline Forms and Crystalline Forms of Optical Enanti-
omers of Modafinil" (issued Nov. 7, 2006) ...........................................A7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ARMODAFINIL PATENT LITIGATION INC. ('722 PATENT LITIGATION) | ) ) ) | MDL No. 10-md-2200 (GMS) |
| | ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,          Plaintiffs, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 10-cv-007 (GMS) |
| WATSON LABORATORIES, INC.,          Defendant. | ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,          Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 10-cv-055 (GMS) Civil Action No. 11-cv-782 (GMS) |
| SANDOZ, INC.,          Defendant. | ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,          Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 10-cv-210 (GMS) |
| LUPIN LIMITED,          Defendant. | ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,          Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 10-cv-695 (GMS) Civil Action No. 10-cv-1078 (GMS) |
| APOTEX, INC.,          Defendant. | ) ) ) | |

# MEMORANDUM

## I. INTRODUCTION

In this consolidated patent infringement action, plaintiffs Cephalon, Inc. and Cephalon France (collectively, "the plaintiffs" or "Cephalon") allege that pharmaceutical products proposed by defendants Apotex, Inc., Lupin Limited, Sandoz, Inc., and Watson Laboratories, Inc. (collectively, "the defendants"), infringe the asserted claims of the patents-in-suit. (D.I. 1.) The court held a four-day bench trial in this matter on July 17 through July 20, 2012. (D.I. 304-307.) Presently before the court are the parties' post-trial proposed findings of fact and conclusions of law concerning the validity of the patents-in-suit.[1] (D.I. 314; D.I. 319.)

Pursuant to Federal Rule of Civil Procedure 52(a), and after having considered the entire record in this case and the applicable law, the court concludes that: (1) the asserted claims of the patents-in-suit are not invalid as anticipated under 35 U.S.C. § 102(b); and (2) the asserted claims of the patents-in-suit are not invalid as obvious under 35 U.S.C. § 103. These findings of fact and conclusions of law are set forth in further detail below.

## II. FINDINGS OF FACT

### A. The Parties[2]

---

[1] The defendants stipulated to infringement of the asserted claims of the patents-in-suit. (D.I. 258 at ¶ 3; Pretrial Order at ¶¶ 40-43.) The court also notes that the defendants had alleged that certain claims of the '570 Patent lacked written description. However, the defendants did not include this defense as an issue for trial in the Pretrial order, which excluded it from the case. *See* Pretrial Conference (June 25, 2012) Tr. at 42:13-15. In addition, the plaintiffs note that, after trial, in an email correspondence dated July 27, 2012, counsel for Watson confirmed on behalf of all defendants that "[d]efendants are no longer asserting lack of inventorship as a defense to the '570 patent-in-suit." Accordingly, the court does not address these issues in this Memorandum.

[2] Prior to trial, the parties submitted an exhibit of uncontested facts in conjunction with their Pretrial Order. (D.I. 258.) The court takes most of its findings of fact from the parties' uncontested facts. Where necessary, the court has overruled objections to the inclusion of these facts. The court has also reordered and renumbered some paragraphs, corrected some spelling and formatting errors, and made minor edits for the purpose of concision and clarity that it does not believe alters the meaning of the paragraphs from the Pretrial Order. Otherwise, any differences between this section and the parties' statement of uncontested facts are unintentional.

The court's findings of fact with respect to matters that were the subject of dispute between the parties are included in the Discussion and Conclusions of Law section of this opinion, preceded by the phrase "the court finds" or "the court concludes."

1.     Plaintiff Cephalon, Inc. ("Cephalon") is a Delaware corporation having its corporate offices and principal place of business at 41 Moores Road, Frazer, Pennsylvania 19355.

2.     Plaintiff Cephalon France ("Cephalon France") is a societe par action simplifiee ("SAS") under the laws of France, is a wholly-owned subsidiary of Cephalon, Inc., and is located at 20 Rue Charles Martigny, 94701 Maisons-Alfort Cedex, France.

3.     Defendant Watson Laboratories, Inc. ("Watson") is a corporation organized and existing under the laws of Nevada, with a principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

4.     Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of Colorado, with a principal place of business at 506 Carnegie Center, Suite 400, Princeton, New Jersey 08540.

5.     Defendant Lupin Limited ("Lupin") is a corporation organized and existing under the laws of India, with a principal place of business at B/4 Laxmi Towers Bandra Kurla Complex, Bandra (E), Mumbai 400 051, India.

6.     Defendant Apotex, Inc. ("Apotex") is a corporation organized and existing under the laws of Canada, with a principal place of business at 150 Signet Drive, Toronto, Ontario M9L 1T9, Canada.

7.     Apotex, Lupin, Sandoz, and Watson will be collectively referred to as "defendants."

**B. Background**

8.     Armodafinil     is     a     chemical     compound     known     as     (-)-2-[R-(-diphenylbenzhydrylsulphinyl)]acetamide and has the following chemical structure:



9.     Armodafinil     is     also     known     by     other     names,     including     2-[(R)-(diphenylmethyl)sufinyl]acetamide, CRL 40982, (-)-benzhydrylsulfinylacetamide, (-)-modafinil, and the levorotatory or laevorotatory enantiomer of modafinil.

10.     Armodafinil is also known as the R-enantioer of modafinil. Modafinil is a racemic mixture containing equal amounts of both the R-enantiomer and S-enantiomer of modafinil.

11.     Enantiomers have different three-dimensional spatial arrangements that make them non-superimposable mirror images of each other, much like a person's right and left hand.

12.     Enantiomers may have identical physical properties (such as melting point, weight, and density) and, therefore, cannot necessarily be distinguished from each other based on measurements of these properties. However, they may be differentiated by their biological properties, and can be differentiated by their optical activity.

13.     Substances that can rotate polarized light are said to be optically active because they interact with light and can rotate polarized light.

14.     Enantiomers that rotate plane-polarized light clockwise are said to be dextrorotatory (from the Latin *dexter*, "right") or (+). Those that rotate plane-polarized light counterclockwise are called levorotatory or laevorotatory (from the Latin *laevus*, "left") or (-).

15.     The R-enantiomer of modafinil (i.e., armodafinil) is also called (-)-modafinil because it rotates plane-polarized light counterclockwise.

### C.     The Patent-in-Suit

16.     United States Patent No. 7,132,570 ("the '570 Patent"), entitled "Methods for the Production of Crystalline Forms and Crystalline Forms of Optical Enantiomers of Modafinil," naming Olivier Neckebrock and Pierre Leproust as inventors, was issued on November 7, 2006.

17.     Cephalon holds approved New Drug Application ("NDA") No. 21-875 for armodafinil tablets in 50 mg, 100 mg, 150 mg, 200 mg, and 250 mg dosage strengths.

18.     Cephalon sells 50 mg, 100 mg, 150 mg, and 250 mg dosage strengths in the United States under the tradename Nuvigil®.

19.     Nuvigil® is indicated to improve wakefulness in patients with excessive sleepiness associated with obstructive sleep apnea, narcolepsy, and shift work sleep disorder.

20.     Polymorphic Form I armodafinil was chosen for Nuvigil® for its favorable aggregate of properties, including solubility and stability.[3]

21.     Pursuant to 21 U.S.C. § 355 and attendant FDA regulations, the '570 Patent is listed in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book") for Nuvigil®.

### 1.  The Asserted Claims

---

[3] *See In re Armodafinil Litigation* Transcript ("Tr.") at 639:12-18, 641:1-23, 676:10-18 (Mallamo). The court finds Dr. John Mallamo's testimony as to the reason Form I was selected to be credible.

22.     Cephalon originally asserted claims 1-9 of the '570 Patent against each of the defendants.[4]

#### i.   *'570 Patent, Claim 1*

23.     Claim 1 states: A laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings: 8.54, 4.27, 4.02, 3.98 (Å).

#### ii.   *'570 Patent, Claim 2*

24.     Claim 2 states: The laevorotatory enantiomer of modafinil according to Claim 1, wherein the polymorphic form produces a powder X-ray diffraction spectrum further comprising intensity peaks at the interplanar spacings: 13.40, 6.34, 5.01, 4.68, 4.62, 4.44, 4.20, 4.15, 3.90, 3.80, 3.43 (Å).

#### iii.   *'570 Patent, Claim 3*

25.     Claim 3 states: A laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising reflections at 15.4, 31.1, 33.1 and 33.4 degrees 2$\Theta$.

#### iv.   *'570 Patent, Claim 4*

26.     Claim 4 states: The laevorotatory enantiomer of modafinil according to Claim 3, wherein the polymorphic form produces a powder X-ray diffraction spectrum comprising reflections at 9.8, 20.8, 26.4, 28.3, 28.7, 29.9, 31.6, 32, 34.1, 35.1 and 39 degrees 2$\Theta$.

#### v.   *'570 Patent, Claim 5*

27.     Claim 5 states: A pharmaceutical composition comprising a laevorotatory enantiomer of modafinil according to any one of Claims 1 to 4.

#### vi.   *'570 Patent, Claim 6*

28.     Claim 6 states: A pharmaceutical composition consisting essentially of a laevorotatory enantiomer of modafinil according to any one of Claims 1 to 4.

#### vii.   *'570 Patent, Claim 7*

29.     Claim 7 states: A Form 1 polymorph of (-)-modafinil.

#### viii.   *'570 Patent, Claim 8*

30.     Claim 8 states: A pharmaceutical composition comprising a Form 1 polymorph of (-)-modafinil according to Claim 7.

_____

[4] *See infra* ¶¶ 63-64.

5

### ix. *'570 Patent, Claim 9*

31. Claim 9 states: A pharmaceutical composition consisting essentially of a Form 1 polymorph of (-)-modafinil according to Claim 7.

32. The court held a *Markman* hearing on July 14, 2011 and, on July 25, 2011, issued an Order construing the disputed terms. (D.I. 172.)

33. The court construed disputed term "A laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising . . ." in Claims 1 and 3 to mean "A crystal form of Armodafinil having the claimed powder X-ray diffraction features." (*Id.* at 1.)

34. The court construed disputed term ". . . intensity peaks at the interplanar spacings . . ." in Claims 1 and 2 to mean: "Peaks in the powder x-ray diffraction pattern corresponding to the claimed crystal interplanar spacings with variances associated with X-ray diffraction spectroscopy." (*Id.* at 2.)

35. The court construed disputed term ". . . reflections at . . ." in Claims 3 and 4 to mean: "Peaks in the powder x-ray diffraction pattern, using chromium radiation, corresponding to the claimed value with variances associated with X-ray diffraction spectroscopy, or corresponding values based on another radiation source." (*Id.*)

36. The parties agreed prior to the *Markman* hearing that disputed term "A form I polymorph of (-)-modafinil" in Claims 5 and 8 means: "A composition comprising the specified pharmaceutically active component and optionally one or more pharmaceutically acceptable ingredients." (*Id.* at 3.)

37. The parties decided prior to the *Markman* hearing that the disputed term "A pharmaceutical composition consisting essentially of . . ." in Claims 6 and 9 means: "A composition consisting of the specified pharmaceutically active component and optionally unlisted pharmaceutically acceptable ingredients that do not materially affect the basic and novel properties of the specified pharmaceutically active component." (*Id.*)

### 2. The Accused Products

### i. *ANDA No. 200-156 Submitted by Watson*

38. Under 21 U.S.C. § 355(j), Watson submitted to the FDA ANDA No. 200-156 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 150 mg and 250 mg dosage strengths.

39. Watson amended its ANDA No. 200-156 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 50

6

mg, 100 mg, and 200 mg dosage strengths (collectively, with respect to all five dosage strengths, "the Watson proposed generic armodafinil products").

40.　　Watson filed ANDA No. 200-156 to obtain approval to manufacture, use, market, and sell the Watson proposed generic armodafinil products in the United States before the expiration of the '570 Patent.

41.　　Watson's ANDA No. 200-156 contains a certification, pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV), alleging that the '570 Patent is invalid, unenforceable, and/or not infringed.

42.　　By letter dated November 24, 2009 ("Watson's Notice Letter"), Watson notified Cephalon that it had filed ANDA No. 200-156 seeking approval to market the Watson proposed generic armodafinil products, and that it was providing information to Cephalon pursuant to 21 U.S.C. § 355(j)(2)(B)(ii).

### ii. *ANDA No. 200-511 Submitted by Sandoz*

43.　　Under 21 U.S.C. § 355(j), Sandoz submitted to the FDA ANDA No. 200-511 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 50 mg, 150 mg, and 250 mg dosage strengths.

44.　　Sandoz amended its ANDA No. 200-511 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 100 mg and 200 mg dosage strengths (collectively, with respect to all five dosage strengths, "the Sandoz proposed generic armodafinil products").

45.　　Sandoz filed ANDA No. 200-511 to obtain approval to manufacture, use, market, and sell the Sandoz proposed generic armodafinil products in the United States before the expiration of the '570 Patent.

46.　　Sandoz's ANDA No. 200-511 contains a certification, pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV), alleging that the '570 Patent is invalid, unenforceable, and/or not infringed.

47.　　By letters dated December 15, 2009 and July 27, 2011 (collectively, "Sandoz's Notice Letter"), Sandoz notified Cephalon that it had filed and amended ANDA No. 200-511 seeking approval to market the Sandoz proposed generic armodafinil products, and that it was providing information to Cephalon pursuant to 21 U.S.C. § 355(j)(2)(B)(ii).

### iii. *ANDA No. 200-751 Submitted by Lupin*

48.　　Under 21 U.S.C. § 355(j), Lupin submitted to the FDA ANDA No. 200-751 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 50 mg, 100 mg, 150 mg, 200 mg, and 250 mg dosage strengths (collectively, "the Lupin proposed generic armodafinil products").

49.     Lupin filed ANDA No. 200-751 to obtain approval to manufacture, use, market, and sell the Lupin proposed generic armodafinil products in the United States before the expiration of the '570 Patent.

50.     Lupin's ANDA No. 200-751 contains a certification, pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV), alleging that the '570 Patent is invalid, unenforceable, and/or not infringed.

51.     By letter dated February 5, 2010 ("Lupin's Notice Letter"), Lupin notified Cephalon that it had filed ANDA No. 200-751 seeking approval to market the Lupin proposed generic armodafinil products, and that it was providing information to Cephalon pursuant to 21 U.S.C. § 355(j)(2)(B)(ii).

### iv.  *ANDA No. 20-1514 Submitted by Apotex*

52.     Under 21 U.S.C. § 355(j), Apotex submitted to the FDA ANDA No. 20-1514 to obtain approval for the commercial manufacture, use, marketing, and sale of generic armodafinil products in the United States in 50 mg, 150 mg and 250 mg dosage strengths (collectively, "the Apotex proposed generic armodafinil products").

53.     Apotex filed ANDA No. 20-1514 to obtain approval to manufacture, use, market, and sell the Apotex proposed generic armodafinil products in the United States before the expiration of the '570 Patent.

54.     Apotex's ANDA No. 20-1514 contains a certification, pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV), alleging that the '570 Patent is invalid, unenforceable, and/or not infringed.

55.     By letter dated July 6, 2010 ("Apotex Notice Letter"), Apotex notified Cephalon that it had filed ANDA No. 20-1514 seeking approval to market the Apotex proposed generic armodafinil products, and that it was providing information to Cephalon pursuant to 21 U.S.C. § 355(j)(2)(B)(ii).

### D.  Procedural History

56.     Cephalon filed its Complaint for patent infringement against Watson on January 5, 2010, in what was labeled Civil Action No. 10-cv-0007 (GMS), alleging that Watson infringes the '570 Patent. (10-cv-0007 (GMS), D.I. 1.)

57.     Cephalon filed its Complaint for patent infringement against Sandoz on January 22, 2010, in what was labeled Civil Action No. 10-cv-055 (GMS), alleging infringement of the '570 Patent and other Cephalon patents. (10-cv-055 (GMS), D.I. 1.)

58.     Cephalon filed its Complaint for patent infringement against Sandoz on September 6, 2011, also alleging infringement of the '570 Patent in what was labeled Civil Action No. 11-cv-782 (GMS). (11-cv-782 (GMS), D.I. 1.)

59.     Cephalon filed is Complaint for patent infringement against Lupin on March 16, 2012, alleging infringement of the '516 and '570 Patents, in what was labeled Civil Action No. 10-cv-210 (GMS). (10-cv210 (GMS), D.I. 1.)

60.     Cephalon filed its Complaint for patent infringement against Apotex on August 18, 2010, alleging infringement of the '516 and '570 Patents, in what was labeled Civil Action No. 10-cv-695 (GMS), as well as on August 19, 2010, in what was labeled Civil Action No. 10-cv-1078 (GMS). (10-cv-695 (GMS) (D.I. 1); 10-cv-1078 (GMS) (D.I. 1.).)

61.     On December 18, 2010, these actions were centralized in the District of Delaware via the United States Judicial Panel on Multidistrict Litigation's Transfer Order. (10-md-2200 (GMS) (D.I. 1).)

62.     On November 23, 2011, the court granted the parties' joint motion to consolidate case 11-cv-782 into the multidistrict litigation. (10-md-2200 (GMS) (D.I. 219).)

63.     On March 31, 2012, the above-captioned defendants stipulated to infringement of the asserted claims of the patent-in-suit in the parties' Pretrial Order. (D.I. 259 at ¶¶ 40-43; *see also* D.I. 258.)

64.     On July 11, 2012, Cephalon informed the court that, in an effort to streamline presentation of the evidence, it agreed that the defendants' right to enter the market with respect to the '570 Patent with their proposed armodafinil ANDA products, "will stand or fall based upon the outcome of this litigation with respect to claim 6 (as it depends upon claim 2) and claim 9 of the '570 Patent." (D.I. 295.) Thus, Cephalon limited its presentation of the evidence at trial to those claims. (*Id.*)

65.     The court held a four-day bench trial in this matter on July 17, 2012 through July 20, 2012. (D.I. 304-307.)

66.     On December 28, 2012, the plaintiffs filed a Motion to Amend the Caption (D.I. 322) to include Teva Sante SAS as a party-plaintiff, following Teva Pharmaceutical Industries Ltd.'s acquisition of Cephalon, Inc. (*Id.* at 2.) The court granted this motion on February 5, 2013. (D.I. 325.)

## III.   DISCUSSION AND CONCLUSIONS OF LAW

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. The parties have consented to personal jurisdiction and venue in this court for the purpose of adjudicating the present dispute. (D.I. 259 at 11.) After having considered the entire record in this case, the substantial evidence in the record, the parties' post-trial submissions, and the applicable law, the court concludes that: (1) the asserted claims of the patents-

in-suit are not invalid as anticipated under 35 U.S.C. § 102(b); (2) the asserted claims of the

patents-in-suit are not invalid as obvious under 35 U.S.C. § 103; and (3) the plaintiffs' Rule 52(c)

motion is granted and the defendants' Rule 52(c) motion is denied. The court's reasoning follows.

### A.     Anticipation

The defendants contend that the asserted claims of the '570 Patent are invalid as inherently

anticipated by Preparation I of the '855 Patent. Specifically, the defendants assert that a person of

ordinary skill in the art "will necessarily and inevitably obtain Form I armodafinil from following

the prior art Preparation I process." (D.I. 319 at 7.)

### 1.     <u>The Legal Standard</u>

"[I]nvalidity by anticipation requires that the four corners of a single[] prior art document

describe every element of the claimed invention, either expressly or inherently, such that a person

of ordinary skill in the art could practice the invention without undue experimentation." *Advanced*

*Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1271, 1282 (Fed. Cir. 2000). The Federal Circuit

recently discussed the standards for inherent disclosure in *Verizon Services Corp. v. Cox Fibernet*

*Virginia, Inc.*, 602 F.3d 1325 (Fed. Cir. 2010):

> "[A] prior art reference may anticipate without disclosing a feature of the claimed
> invention if that missing characteristic is necessarily present, or inherent, in the
> single anticipating reference." However, a patent claim "cannot be anticipated by
> a prior art reference if the allegedly anticipatory disclosures cited as prior art are
> not enabled." "The standard for what constitutes proper enablement of a prior art
> reference for purposes of anticipation under section 102, however, differs from the
> enablement standard under section 112." It is well-settled that utility or efficacy
> need not be demonstrated for a reference to serve as anticipatory prior art under
> section 102.

*Id.* at 1337 (internal citations omitted). In sum, inherent anticipation "requires that the missing

descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior

art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (quoting *In*

*re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)). "A reference includes an inherent characteristic if that characteristic is the 'natural result' flowing from the reference's explicitly explicated limitations." *Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001). The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981) (quoting *Hansgirg v. Kemmer*, 102 F.2d 212, 214 (C.C.P.A. 1939)). To be inherent, an undisclosed feature must "necessarily and inevitably" flow from practice of what is disclosed. *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1371, 1378 (Fed. Cir. 2003).

Therefore, if the teachings of the prior art can be practiced in a way that yields a product lacking the allegedly inherent property, the prior art in question does not inherently anticipate. *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995) (finding no inherent anticipation where testing evidence demonstrated that the prior art example could yield crystals of either the claimed polymorph or a different polymorph). Whether a prior art reference anticipates a patent claim is a question of fact and must be proven by clear and convincing evidence.[5] *See Advanced Display Sys.*, 212 F.3d at 1281.

### 3. The Parties' Contentions and Discussion

The defendants maintain that the asserted claims of the '570 Patent are inherently anticipated because, as compared to claim 6 of the '855 Patent, the asserted claims recite only the interplanar spacings and 2-theta values intrinsic to Form I armodafinil. (D.I. 319 at 6.) Thus, the defendants contend that the only question at trial was "which polymorphic form of armodafinil inherently results from performing Preparation I of the '855 Patent." (*Id.*) The defendants argue

---

[5] "Clear and convincing evidence is evidence that places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 631 (D. Del. 2009) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

that their experts, Drs. Mark Hollingsworth and Albert Lee, performed Preparation I of the '855

Patent as persons of ordinary skill in the art in the late 1990s and early 2000s[6] and obtained Form

I armodafinil, thus proving anticipation by clear and convincing evidence.

Specifically, the defendants detail that Dr. Hollingsworth completed two reproductions of

Preparation I and many additional recrystallizations from ethanol, as set out in Preparation I in the

'855 Patent, and then confirmed that his experiments produced Form I armodafinil each time using

the "gold standard"[7] XRPD analysis.[8] (Id. at 7.) The defendants assert that Dr. Hollingsworth

performed each step of the four step process outlined in Preparation I[9] and, therefore, produced

more credible results than the plaintiffs' experts, who, the defendants allege, performed only three

steps of the Preparation on Cephalon's instructions.[10] (Id. at 7-8.) The defendants highlight that

---

[6] (D.I. 319 at 7-8 (citing Tr. at 95:4-6, 96:23-25, 98.24-25, 100:17-101:2, 103:6-7, 123:17-21 (Hollingsworth)).) The defendants also note that, while the parties' experts offered different views as to the definition of a person of ordinary skill in the art, their experts agreed that their opinions are not dependent on the definition the court adopts. (Id. at 7 n.1.) Thus, the defendants' experts' testimony with respect to the issue of validity remain unchanged even if the court adopts, as it does, the plaintiffs' experts' definition of a person of ordinary skill in the art. (Id.) See infra Section III.B.2.

[7] (Id. at 7 (citing Tr. at 82:5-9, 106:6-7 (Hollingsworth)).) Dr. Hollingsworth testified that he determined that the crystalline armodafinil he obtained at the end of Preparation I was Form I by comparing the XRPD data he generated for each sample to the characteristic peaks of Form I disclosed and claimed in the '570 Patent. (Id. at 9 (citing Tr. at 106:6-7, 109:9-12, 109:17-21, 110:8-14, 111:5-6 (Hollingsworth); Tr. at 773:22 (Myerson); DTX-163:6-7, .13; DTX-225A.5, .389-.390, .448, .459, .596; JTX-40.41, .47; JTX-41.53).)

[8] Armodafinil polymorphs may be characterized and differentiated by a variety of analytical techniques. The technique used by the experts in this case and called for in the '570 Patent is X-ray power diffraction, otherwise known as XRPD. The XRPD technique detects the intensity of x-rays reflected off of a sample that is rotated through various angles and produces a pattern, or fingerprint, that is unique to a particular crystal form. (D.I. 314 at 4 (citing PTX-585-51, -60; Tr. at 607:23-608:1 (Bernstein)).) XRPD directly represents the physical dimensions—for instance, the interplanar spacings within the crystal structure. (Id. (citing Tr. at 505:20-507:7 (Bernstein)).) Melting point is another way to distinguish between one polymorph and another. (Id. (citing JTX-26-30 to 31; Tr. at 658:13-62:24 (Mallamo)).)

[9] Specifically, the defendants outline Preparation I as including: (1) step (a), which, in the overall synthesis, separates the two enantiomers of modafilic acid by reacting the enantiomers with a complexing agent and is conducted four times (D.I. 319 at 8 (citing Tr. at 971:1-21 (Hollingsworth)); (2) step (b), which, through performing the step four times, liberates the R-modafilic acid from the complex created in step (a) (id. (citing Tr. at 98:13-17, 98:24-25, 99:6-7 (Hollingsworth); JTX-39.33 et seq., .59 et seq., .85 et seq.; JTX-40.35 et seq.)); (3) step (c), which provides for the conversion of the product of step (b) into its methyl ester (id. (citing Tr. at 100:3-9, 100:17-101:14-16 (Hollingsworth); JTX-39.77 et seq.; JTX-40.77 et seq.)); and (4) step (d), which is to be performed twice, and converts the methyl ester into armodafinil and purifies the resulting armodafinil by "recrystallization from ethanol" (id. at 8-9 (citing Tr. at 101:21-102:1, 102:12-14, 103:7, 106:1-2 (Hollingsworth); JTX-103.3 col. 3, l. 50, col. 3, ll. 5-9; JTX-39.107 et seq.; JTX-40.91 et seq.)).)

[10] The defendants assert that the plaintiffs' experts, Drs. Smith and Selbo, did not accurately perform Preparation I as a person of ordinary skill in the art because they were instructed by Cephalon to perform a truncated

12

Dr. Hollingsworth did not end his analysis after he completed two replications of Preparation I, but instead performed two additional recrystallizations from ethanol and obtained Form I armodafinil both times. (*Id.* at 9 (citing Tr. at 111:20-21, 112:10-12, 112:22-113:3, 113:10-15 (Hollingsworth); DTX-163.9-.10; DTX-255A.487, .501; JTX-40.57).) He also performed an additional ethanol recrystallization after completing the second synthesis and, once more, obtained Form I armodafinil according to his XRPD examination. (*Id.* (citing Tr. at 113:19-114:4 (Hollingsworth); DTX-163.16; DTX-255A.6, .380-.382, .625; JTX-41.67).) Thus, Dr. Hollingsworth performed, over the course of his two replications of Preparation I, five recrystallizations from ethanol and, per his analysis, obtained Form I armodafinil each of those five times. (*Id.*)

The defendants further assert that Dr. Hollingsworth's work demonstrates that Form I armodafinil results even before a person of ordinary skill in the art fully completes Preparation I. Specifically, the defendants detail that Dr. Hollingsworth's testing and XRPD analysis demonstrates that he obtained Form I after the methanol evaporation part of step (d) in both reproductions of Preparation I, as well as after the ether wash part of step (d) in both preparations. (*Id.* at 10 (citing Tr. at 115:15-22, 116:7-14, 116:10-117:17 (Hollingsworth); DTX-163.3, .18; DTX-255A.1, .3, .4, .387-.388, .423-.425, .562-.563, .578-.580; JTX-40.23).) In sum, the defendants contend, with respect to Dr. Hollingsworth's testing, that they have proven by clear and convincing evidence that Form I armodafinil necessarily flows from the replication of Preparation I.[11]

---

method. (*Id.* at 11 (citing Tr. at 127:1-13 (Hollingsworth); Tr. at 277:3-8, 18-21 (Lee); Tr. at 720:11-17 (Selbo)).) Specifically, and as described in greater detail below, the defendants contend that Cephalon told its experts not to perform the "critical ethanol recrystallization part of step (d)" because they knew "that Dr. Hollingsworth's experiments showed that Form I inevitably results from a faithful and complete replication of Preparation I." (*Id.* (citing Tr. at 710:22-711:7, 720:10-17 (Selbo)).)

[11] Specifically, Dr. Hollingsworth performed XRPD analysis on nine samples at various stages of step (d) and obtained Form I armodafinil each time over the course of his two Preparation I replications. (*Id.* at 10 (citing Tr.

13

Moreover, the defendants note that Dr. Lee also replicated Preparation I twice following the laboratory work Cephalon's experts, Drs. Smith and Selbo, prepared. The defendants assert, however, that Dr. Lee completed Preparation I beyond the plaintiffs' truncated method, and obtained Form I armodafinil both times. (*Id.* at 10-12.) Specifically, the defendants contend that step (d) of Preparation I involves three parts: (1) dissolving the substance in methanol and treating with ammonia gas; (2) evaporating the methanol and washing with ether; and (3) recrystallizing from ethanol to obtain crystals. (*Id.* at 11 (citing JTX-103.3 col. 3, ll. 43-57).) The defendants maintain that Drs. Smith and Selbo performed the first two parts of step (d), but failed to complete the ethanol recrystallization step on Cephalon's instruction. (*Id.* (citing Tr. at 721:19-23 (Selbo)).) Dr. Lee, however, synthesized crystalline armodafinil twice using Drs. Smith and Selbo's methods, including heating to 70-90 degrees Celsius in step (b) and then finished the Prepation by performing ethanol recrystallization as a person of ordinary skill in the art. (*Id.* (citing Tr. at 277:3-8, 283:6-284:14, 286:1-287.3, 298:3-8 (Lee); DTX-212).) Dr. Lee confirmed that his samples were armodafinil by sending them to Dr. Robie, an expert in XRPD analysis, who searched two databases of known crystal materials for matches to the patterns of the samples and identified both as Form I. (*Id.* at 11-12.) This finding, the defendants argue, confirms Dr. Hollingsworth's conclusion that Form I armodafinil naturally and inevitably results from Preparation I.

Finally, the defendants contend that their inherent anticipation position is supported by: (1) the Kofler hot bar analyses disclosed in the '855 Patent; (2) non-instantaneous melting point data listed at the end of Preparation I; and (3) three declarations submitted to the PTO during prosecution of the '570 Patent. (*Id.* at 12-16.) With regard to the first, the defendants maintain that Form I inevitably results from Preparation I when the melting point analysis disclosed in the

---

at 118:4 (Hollingsworth); DTX-163.3-.4, .6-.7, .9-.10, .11, .13, .16; DTX-255A.1, .3-.6, .380-.382, .387-.390, .423-.425, .430-.435, .448, .459, .487, .501., .562-.564, .578-.580, .596, .625; JTX-40.23, .41, .47, .57; JTX041.53, .67).)

14

'855 Patent, which would have been determined by using a Kofler hot bar,[12] is performed. (*Id.* at 12-13 (citing Tr. at 142:16-20, 143:2-144:30 (Hollingsworth)).) The '855 Patent provided a 153-154 degrees Celsius instantaneous melting point range for the armodafinil produced by Preparation I. (*Id.* at 13 (citing JTX-103.3 col. 3, 1. 55).) According to Dr. Hollingsworth, if any form(s) of armodafinil resulted from Preparation I, it would necessarily convert to Form I during the instantaneous melting point measurement, such that the polymorph would become Form I. (*Id.* (citing Tr. at 145:20-22 (Hollingsworth)).) The data Cephalon provided in the '570 Patent's file history confirms this assertion, the defendants argue, because that information demonstrated that Forms II and IV converted to Form I at temperatures well within the Kofler hot bar's operating range. (*Id.* (citing Tr. at 143:18-144:12 (Hollingsworth)).)

Second, the defendants contend that the non-instantaneous melting point data confirms that Preparation I results in Form I armodafinil. Specifically, the defendants note that, during the prosecution of the '570 Patent, Cephalon provided the PTO with a comparison of the instantaneous melting point data at the end of Preparation I (153-154 degrees Celsius), to the instantaneous melting points observed with its own Form I armodafinil (156-164 degrees Celsius), to show that the product of Preparation I was not Form I armodafinil. (*Id.* at 14 (JTX-103.3 col. 3, 1. 55; JTX-38.28-.29, n.7).) However, the defendants argue that Cephalon did not "disclose to the PTO that the Kofler hot bar used to measure the instantaneous melting point is an archaic 'museum piece.'" (*Id.* (citing Tr. at 185:16-18 (Hollingsworth); Tr. at 337:18-21 (Lee)).) Dr. Hollingsworth observed the non-instantaneous melting points after the ethanol recrystallization steps from his first reproduction of Preparation I ranged from 150.4-153.8 degrees Celsius, which is in the same

---

[12] As Dr. Hollingsworth explained, the Kofler hot bar is a metallic strip along which temperature increases from one end to the other. (*Id.* at 13 (citing Tr. at 143:2-11 (Hollingsworth)).) The operator spreads the material to be analyzed on the bar, observes where along the bar the material melts, and notes the temperature at that point on the bar. (*Id.*)

range as the non-instantaneous melting points of Cephalon's data for Form I armodafinil. (*Id.* (citing Tr. at 139:15-24 (Hollingsworth); Tr. at 782:5-7, 782:14-783:12 (Myerson); JTX-40.63, .65; JTX-38.29 at n.7; JTX-40.19, .63, .65, .67; JTX-41.69).) Dr. Lee found similar results. (*Id.* (citing Tr. at 304:17-21 (Lee)).) Moreover, the defendants detail that the plaintiffs' experts did not use the Kofler hot bar to analyze armodafinil's melting point, and instead used more accurate equipment to test their samples. (*Id.* (citing Tr. at 185:16-18, 192:12-18 (Hollingsworth); Tr. at 303:16-18 (Lee); JTX-48.20; Tr. at 777:18-23 (Myerson)).) Therefore, the defendants assert that, according to the most reliable melting point data available, the crystals that result from following Preparation I are Form I armodafinil and the PTO did not have this information available when considering the '570 Patent's claims. (*Id.* at 14-15.)

. Finally, the defendants allege that the three declarations submitted to the PTO during the '570 Patent prosecution by Drs. Blomsma, Peterson, and Mallamo support the conclusion that Form I armodafinil naturally and inevitably results from Preparation I. In particular, the defendants note that of the thirty-four experiments described in these declarations that resulted in crystals, thirty, or nearly ninety-percent, unambiguously resulted in Form I armodafinil. (*Id.* at 15 (citing Tr. at 130:19-22 (Hollingsworth)).) While, as the defendants acknowledge, the experiments contained in these declarations were not faithful reproductions of Preparation I and, therefore, are not directly probative of the anticipation question, they do demonstrate that "even under conditions that in some instances differed markedly from Preparation I, Form I armodafinil resulted almost all of the time." (*Id.* (citing Tr. at 131:2-7 (Hollingsworth); JTX-38.1-.45).) Moreover, the four experiments that did not result in Form I were sufficiently dissimilar from Preparation I and, therefore, "provide no useful evidence regarding what crystal form is made by following

16

**A16**

Preparation I."[13] (*Id.*) The defendants detail that Drs. Peterson and Mallamo's declarations referenced experiments similarly demonstrating the ease with which Form I armodafinil is made and that those experiments that did not result in Form I were outside the scope of Preparation I, such that these declarations reinforce Dr. Hollingsworth's conclusion.[14]

Conversely, the plaintiffs argue that, in view of the relevant law and consistent with the evidence presented in Cephalon's PTO declarations, testing did not show that Preparation I in the '855 Patent necessarily and inevitably produces a pharmaceutical composition consisting of "the specified pharmaceutically active component"—Form I armodafinil—and other pharmaceutically acceptable ingredients, as required by the asserted claims. (D.I. 314 at 8.) Rather, the plaintiffs maintain that the defendants' testing "showed that mixtures of polymorphic forms and various uncharacterized impurities result" from reproducing Preparation I and, further, that the defendants' experiments were flawed and insufficient because they departed from the express method taught in the '855 Patent and are not representative of its full scope. Therefore, the plaintiffs argue, the defendants have not proven inherent anticipation by clear and convincing evidence.

---

[13] Specifically, the defendants note that Dr. Blomsma admitted that the work done by third party Crystallics and represented in his declaration, were not reproductions of Preparation I and, instead, were results obtained from a "high-throughput polymorph screen." (*Id.* at 15 (citing Tr. at 820:8-18, 822:25-823:6, 824:15-19 (Blomsma); Tr. at 137:12-13 (Hollingsworth); JTX-38.2).) Additionally, the two experiments Dr. Blomsma described in his declaration that did not result in Form I, did not replicate Preparation I. In particular, the first experiment was conducted at a scale 4,000 times smaller than that of Preparation I and the second experiment used an exotic cooling rate of 300 degrees celcius per minute. (*Id.* (citing Tr. at 137:12-138:17 (Hollingsworth); Tr. at 692:7-15, 695:24-696:6 (Mallamo); JTX-38.8 (Ex. No. 3).)

[14] The defendants note that Dr. Peterson's declaration references five experiments, four of which resulted in Form I armodafinil being produced. (*Id.* at 16 (citing Tr. at 136:9-11 (Hollingsworth); JTX-38.13-.15).) The one experiment that resulted in a different polymorphic form was "outside the scope of Preparation I because the starting material was spiked with racemic modafinil, a clear departure from Preparation I." (*Id.* (citing Tr. at 136:11-13, 18-21 (Hollingsworth); JTX-38.14 at ¶ 7).) Therefore, the defendants assert, the experiments described in Dr. Peterson's declaration are not probative of whether Form I necessarily results from Preparation I. (*Id.* (citing Tr. at 137:1-7 (Hollingsworth)).) In addition, the defendants state that Dr. Mallamo's declaration discloses similar results, as it detailed obtaining Form I armodafinil in seven of eight recrystallizations. (*Id.* (citing Tr. at 131:17-18 (Hollingsworth); Tr. at 695:1-3 (Mallamo); JTX-38.41-.42).) Again, the one experiment that did not result in Form I, the defendants maintain, was outside the scope of Preparation I because it employed a rapid cooling rate and a mixture of ethanol with toluene, a solvent that a person of ordinary skill in the art would not have understood the term "ethanol" to embrace. (*Id.* (citing Tr. at 131:18-132:14 (Hollingsworth); JTX-38.42).)

17

In consideration of the record and the relevant law, the court concludes that the defendants have not met their burden of demonstrating that Preparation I of the '855 Patent necessarily and inevitably results in Form I armodafinil or a composition consisting essentially thereof and, therefore, have not proved invalidity by inherent anticipation. The court reaches this conclusion for three reasons. First, the court finds that the defendants have not demonstrated clearly and convincingly through their experts' experiments and testing that the performance of Preparation I necessarily and inevitably results in Form I armodafinil.[15] Second, the court concludes that the defendants have failed to show by clear and convincing evidence that the result of performing Preparation I meets the requirements of the asserted claims of the patent-in-suit.[16] Third, the court concludes that the defendants have not demonstrated clearly and convincingly that their reproductions of the '855 Patent's Preparation I were consistent with how a person of ordinary skill in the art would have performed the Preparation and, therefore, have not proven that their experts' experiments accurately demonstrate that Form I armodafinil inevitably results from Preparation I.[17]

a.      **Whether Preparation I of the '855 Patent Inherently Produces Form I Armodafinil or a Composition Consisting Essentially Thereof**

The evidence presented at trial demonstrates that the Preparation of Form I and a "recrystallization from ethanol" can yield different forms, mixtures of forms, and unknown impurities, depending on the variables selected in conducting the Preparation.[18] In fact, and as the

---

[15] See infra Section III.A.3.a.

[16] See infra Section III.A.3.b.

[17] See infra Section III.A.3.c.

[18] The court notes that, as was established at trial, many organic compounds, including active pharmaceutical ingredients ("APIs") used in drug products, exist as solids, and some exist in more than one solid state form. For instance, some compounds can be formed into multiple, different crystal structures—a phenomenon known as "polymorphism." See JTX-32-2; JTX-26-3, -4; JTX-23-2; see also Tr. at 499:2-18 (Bernstein). Some solid compounds also may be crystalline solvates, meaning that their crystal structure is uniquely based on the inclusion of both the compound and a solvent. See Tr. at 526:4-15 (Bernstein). The term "crystallization" or "recrystallization"

18

court details below, the defendants' experimental evidence yielded mixtures of forms that contained impurities. Based on the evidence before it, the court concludes that the defendants' evidence fails to clearly and convincingly demonstrate that Form I armodafinil claimed in the '570 Patent necessarily results from Preparation I.

As detailed above, Dr. Hollingsworth carried out two experiments, Run 1/2 and Run 3/4, to perform Preparation I and conducted XRPD testing on the armodafinil he produced. (*Id.* (citing Tr. at 91:2-4, 106:3-7 (Hollingsworth)).) Dr. Hollingsworth testified that Run 1/2 generated pure Form I armodafinil. (*Id.* (citing Tr. at 106:8-19 (Hollingsworth); Tr. at 748:25-749:19 (Myerson); PDX-5-14).) Dr. Hollingsworth's second experiment, Run 3/4, was conducted after the first recrystallization from ethanol and produced Form I accompanied by some other unknown crystalline impurities and, after a second recrystallization from ethanol, produced a mixture of Form I and Form II. (*Id.* at 9-10 (citing Tr. at 195:16-200:7 (CDX-1 to 4), 249:23-251:13 (CDX-5, CDX-6) (Hollingsworth); Tr. at 748:25-749:19 (PDX-5-14).) In addition, Dr. Hollingsworth testified that he performed XRPD testing on samples that were produced at two intermediate points along step (d)—after the methanol evaporation and after the ether wash—and concluded that both samples contained Form I.[19] (*Id.* at 10 (citing Tr. at 114:23-117:17 (Hollingsworth)).)

---

refers to a process whereby a molecule in solution undergoes a change in phase that results in the formation of a solid. The court finds credible Drs. Bernstein and Blomsma's testimony with respect to the definition and nature of crystallization or recrystallization. *See, e.g.,* Tr. at 583:19-585:19 (Bernstein); *see also* Tr. at 823:7-824:2 (Blomsma). Thus, the court finds that, for a compound that exhibits polymorphism or forms solvates, different conditions of crystallization can yield different polymorphs and, due to this unpredictability in the process, even crystallizations under seemingly identical conditions might yield different crystal forms.

[19] The court notes here that it finds that the intermediate, incomplete results fail to establish that practice of Preparation I necessarily and inevitably produces Form I. Specifically, Dr. Hollingsworth testified that he did not heat the solution to 30-40 degrees Celsius for dissolution as called for in step (b) and discussed in this section. As Drs. Smith and Selbo explained in connection with their own reasonable experiments and in testimony the court finds credible, these intermediate products were not the result of an accurate reproduction of Preparation. Moreover, for the Run 3/4 material after methanol evaporation, Dr. Hollingsworth acknowledged that he did not have the particular peaks for Form I claimed in the '570 Patent. *See* Tr. at 247:10-248:16 (Hollingsworth). Moreover, this product was subjected to extensive vacuum drying, which was neither taught in Preparation I nor done in Run 1/2. These inconsistent in the performance of Preparation I do not demonstrate the inherency of Form I armodafinil by clear and convincing evidence.

19

However, in his second Run 3/4 recrystallization, Dr. Hollingsworth used a slightly higher solute concentration of about 13.8% and obtained a mixture that was mostly[20] Form II armodafinil, instead of Form I, which he obtained in other experiments using a 9.6% solution. (*Id.* (citing Tr. at 195:16-200:4, 208:4-7, 210:5-12 (Hollingsworth); Tr. at 748:25-749:19 (Myerson)).) Drs. Myerson and Bernstein credibly testified that Dr. Hollingsworth's formation of Form II and unknown crystals confirms that small variations in procedure can yield very different polymorphic results. (*Id.* (citing Tr. at 730:17-731:4 (Myerson); Tr. at 535:17-537:2 (Bernstein)).) Dr. Hollingsworth also acknowledged that his mixture of Forms I and II is not a composition containing only one pharmaceutically active form of armodafinil, as is required by the asserted claims of the '570 Patent.[21] (*Id.* (Tr. at 253:15-254:12 (Hollingsworth)).)

Cephalon's experts, Drs. Smith and Selbo, performed a synthesis of armodafinil up to the same points as Dr. Hollingsworth in step (d), using different, but reasonable experimental conditions that the court finds credible,[22] and found their products to be amorphous, non-crystalline forms. (*Id.*) Therefore, while Dr. Hollingsworth found that the methanol evaporation and ether wash steps produced Form I, Drs. Smith and Selbo concluded that these steps do not necessarily and inevitably produce Form I. (*Id.* (citing Tr. at 716:14-19 (Selbo)).) Moreover, while the defendants' expert, Dr. Lee, attempted to reproduce Drs. Smith and Selbo's work and completed Preparation I through the final recrystallization step—at which point he found Form I with unknown impurities—Dr. Robie did not analyze Dr. Lee's intermediate products after the methanol evaporation and ether wash. (*Id.* (citing Tr. at 277:3-8, 309:18-25, 317:8-25; 361:10-13, 361:23-362:12 (Lee)).) Dr. Lee also stated on cross-examination that he did not follow Drs. Smith

---

[20] Dr. Myerson testified that Dr. Hollingsworth's second Run produced approximately ninety-percent Form II armodafinil and only ten-percent Form I. *See* Tr. at 730:17-22 (Myerson).

[21] *See infra* Section III.A.3.b.

[22] *See* Tr. at 710:6-717:7, 713:20-716:19 (Selbo); *see also* PTX-174; PTX-175.

20

and Selbo's procedures exactly, but instead made some "variations in heating rate, colling time[,] and the use of filter paper. (*Id.* (citing Tr. at 292:6-11 (Lee)).)

In view of the foregoing, the court concludes that the defendants have not demonstrated that the Form I armodafinil claimed in the '570 Patent inevitably results from performing Preparation I because it is clear from the evidence presented that variations in the Preparation I process—variations not detailed in that Preparation—lend to different outputs, some of which are inconsistent with the asserted claims.[23] *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d at 1047-48 (finding no inherent anticipation where the testing evidence demonstrated that the prior art in question could yield crystals of the claimed polymorph or a different polymorph).

The court finds that this conclusion is further reinforced by the declarations Drs. Mallamo, Peterson, and Blomsma submitted to the PTO in connection with the '570 Patent. Specifically, Dr. Mallamo's declaration detailed various experiments demonstrating that, depending on the conditions used, a "recrystallization in ethanol" does not necessarily produce Form I armodafinil. (*Id.* at 10 (citing Tr. at 633:9-14, 644:16-645:10, 655:4-9, 657:11-16, 660:21-661:22 (Mallamo); JTX-120-5 at ¶ 18).) In addition, other testing described in the declarations reported that the instantaneous melting point of the product in the '855 Patent was inconsistent with Form I armodafinil, which would indicate that they result in different products. (*Id.* at 10-11 (citing JTX-120-6 at ¶ 20; *see also* Tr. at 738:18-739:16 (Myerson)).) In view of the foregoing, the court disagrees with the defendants' assertion that, as Dr. Hollingsworth opined, the declarations are invalid and support a finding of anticipation. Rather, the court finds that Dr. Hollingsworth's testimony regarding the Mallamo declaration are predicated on an overly narrow interpretation of "ethanol."[24] In addition, the court finds Dr. Hollingsworth's argument that Drs. Peterson and

---

[23] *See infra* Section III.A.3.b.
[24] *See infra* Section III.A.3.c.i.

21

Blomsma's declarations are invalid to be unpersuasive. Specifically, these declarations detail that a wide variety of conditions for recrystallization from ethanol can result in multiple polymorphic forms, which, the court concludes, supports the plaintiffs' assertion that there is lack of predictability for Form I over the '855 Patent. (*Id.* at n.10 (citing JTX-120-5 at ¶¶ 16-18).)

<blockquote>

**b.**          **Whether the Product of Preparation I of the '855 Patent Meets the Requirements of the Asserted Claims of the '570 Patent**

</blockquote>

Claims 6 and 9 must be considered with the limitations of the claims from which they depend—Claims 1-4 and 7. The defendants claim that, rewritten to include these limitations, the asserted claims are:

> 6.          A pharmaceutical composition consisting essentially of a laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings: 8.54, 4.27, 3.98, 13.40, 6.34, 5.01, 4.68, 4.62, 4.44, 4.20, 4.15, 3.90, 3.80, 3.43 (Å).
> 9.          A pharmaceutical composition consisting essentially of a Form I polymorph of (-)-modafinil.

(D.I. 319 at 29.) Dr. Hollingsworth explained that, while the language of the claims appear to be different, they cover "essentially the same thing." (*Id.*) Specifically, the XRPD data incorporated in Claim 6 is that of Form I armodafinil, which is expressly recited in Claim 9. (*Id.* (citing Tr. at 78:23-79:8, 79:19-24 (Hollingsworth); Tr. at 388:14-25 (Cima)).) According to the defendants, the elements of Claims 6 and 9 combine to require: (1) a pharmaceutical composition; (2) consisting essentially of; and (3) Form I armodafinil. The defendants also assert that Claims 6 and 9 allow for the presence of more than one pharmaceutically active component. (*Id.* at 29.) Specifically, the defendants maintain that the language "unlisted pharmaceutically acceptable ingredients" encompasses other ingredients, including other active components of armodafinil, so

long as they "do not materially affect the basic and novel properties" of Form I. (*Id.* (citing Tr. at 155:7-12 (Hollingsworth).)

The defendants further support this claim by noting that the '570 Patent states that the invention "relates to the use of" armodafinil Forms II-IV "for the manufacture of a medication" and that "pharmaceutical compositions according to this invention may also contain another crystalline form of (-)-modafinil . . . in particular [F]orm I and/or another active ingredient . . . as a mixture with one or more other polymorphic forms of modafinil" such as Forms II through V. (*Id.* (citing JTX-1.24-.25 col. 12, ll. 64-col. 13, ll. 2, col. 13, ll. 9-32).) Thus, the defendants argue, the '570 patent teaches that "unlisted pharmaceutically acceptable ingredients" encompasses a mixture of Form I with armodafinil's other polymorphic forms. (*Id.* at 31-32 (citing Tr. at 151:3-9, 154:3-11, 155:7-12 (Hollingsworth)).)

Conversely, the plaintiffs maintain that asserted Claims 6 and 9, taken together, specify pharmaceutical compositions with an active component "consisting essentially of" Form I armodafinil, meaning that Form I must be the only pharmaceutically active crystal form of armodafinil present in the compositions, and that any additional ingredients be pharmaceutically acceptable. (D.I. 314 at 7 (citing Tr. at 256:5-14 (Hollingsworth); Tr. at 756:6-16 (Myerson)).) The plaintiffs also state that unasserted Claims 5 and 8 of the '570 Patent recite a composition "comprising" Form I armodafinil, which would allow for other active ingredients and forms of armodafinil. (*Id.* (citing JTX-1-38 at 40:33-35 & 40:38-39; *see* D.I. 172).) Finally, the plaintiffs assert that, as it is "specified" in Claims 4 and 7, Claims 6 and 9 require that Form I armodafinil be "'the,' as in only, pharmaceutically active component present in the claimed compositions." (*Id.* at 11 (citing Tr. at 255:11-19, 256:12-14 (Hollingsworth)).) Thus, because Form II is

23

pharmaceutically active, its presence is excluded from Claims 6 and 9. (*Id.* (citing JTX-1-24; JTX-12-10).)

With respect to both parties' arguments, the court first notes that, contrary to each sides' references to the "court's construction" of the terms in question, it did not construe the terms "pharmaceutical composition comprising" or "pharmaceutical composition consisting essentially of." Rather, the parties informed the court via letter on July 13, 2011 that the parties had conferred and agreed on the meaning of these two disputed terms. (D.I. 143.) Therefore, the parties' arguments—and particularly those of the defendants, who repeatedly reference how the court construed "pharmaceutical composition consisting essentially of" to allow for more than one pharmaceutically active form of armodafinil—strike the court as misleading. Because the parties reached agreement on the meaning of these terms before the *Markman* hearing, the court did not construe these terms and made note of this point in its July 25, 2011 Order construing the disputed terms of the '570 Patent. (D.I. 172 at 3.) The court also did not have the benefit of reviewing the record or the parties' arguments in connection with these terms and the parties do not meaningfully present such support for their opposing positions in their Proposed Findings of Fact and Conclusions of Law.

In consideration of the record before it, the court agrees with the plaintiffs that the term "pharmaceutical composition consisting essentially of," requires, as specified in Claims 4 and 7, that Form I armodafinil be the only pharmaceutically active component present in the claimed composition. In reaching this conclusion, the court considers, as the plaintiffs suggest, that the definition of this term states "composition consisting of the specified pharmaceutically active component." The court finds that the use of "the" in the parties' construction indicates "only." As noted above, unasserted Claims 5 and 8 of the '570 Patent recite a composition "comprising" Form

24

**A24**

I armodafinil, which, as compared to Claims 6 and 9, would allow for other active ingredients and forms of armodafinil. (D.I. 314 at 7 (citing JTX-1-38 at 40:33-35 & 40:38-39).) Notably, even the defendants' expert, Dr. Hollingsworth, agreed that the term "pharmaceutical composition consisting essentially of" refers to the "specified pharmaceutically active component," which is Form I.[25] The court concludes that the defendants' experiments have failed to show that a composition "consisting essentially of" Form I armodafinil is the necessary and inevitable result of Preparation I. Specifically, Dr. Hollingsworth's Run 3/4 experiment showed either mixtures of Form I with other unknown crystalline material or, when using a higher concentration of solute, mostly Form II armodafinil. Thus, the defendants' testing demonstrates that a reasonable "recrystallization from ethanol" does not inevitably and necessarily produce a product within the scope of the asserted claims.[26]

---

[25] In particular, Dr. Hollingsworth testified:
Q: And you saw and you reviewed that there were, in fact, two different claims in the '570 Patent. There was Claim 5 that called for a pharmaceutical composition comprising Form I, and there was Claim 6, a pharmaceutical composition consisting essentially of Form I. Correct?
A: That's correct.
Q: And the Court's definition of pharmaceutical composition comprising was construed to mean a composition comprising the specified pharmaceutically active component. Do you see that?
A: Yes.
Q: And in the rest of the claim, the specified pharmaceutically active component is Form I, armodafinil; is that correct?
A: Yes, that's correct.
Q: Okay. And so that claim would have included Form I armodafinil even if there was some other crystal form of Form I armodafinil; right?
A: Yes, I agree.
Q: Okay. But the definition of, in Paragraph 6, a pharmaceutical composition consisting essentially of is construed differently to mean, a composition consisting of the specified pharmaceutically active component. Do you see that?
A: Right, I see that.
Q: Okay. You understand the difference between comprising and consisting of?
. . . .
A: Yes. I see how the Court has construed.
Q: And the pharmaceutically active component in Claim 6 and 9 is Form I armodafinil; is that correct?
A: Yes.
Tr. at 255:4-256:15 (Hollingsworth).
[26] As noted, Dr. Hollingsworth's Run 3/4 resulted in a product consisting of 90% Form II armodafinil and only 10% of Form I. *See supra* note 20.

In addition to the foregoing arguments, the plaintiffs note that Claims 6 and 9 recite a "pharmaceutical composition." (*Id.* at 12.) In light of this requirement, the plaintiffs assert that the defendants have failed to prove invalidity because they have not demonstrated that the product of Preparation I is suitable for pharmaceutical use. (*Id.* (citing Tr. at 541:5-542:8 (Bernstein); Tr. at 756:11-16 (Myerson); PTX-36-2 at ¶ 6).) The plaintiffs note that even the defendants' expert, Dr. Cima, acknowledged that one would need to prove that the amount and type of any impurities in an armodafinil product intended for human use are safe.[27] (*Id.* (citing Tr. at 457:15-18, 459:1-11 (Cima)).) Because the defendants "made no effort to determine the type or quantity of impurities in the samples from their experiments, or determine if they were pharmaceutically acceptable, the plaintiffs assert that the defendants have not proven by clear and convincing evidence that the result of Preparation I meets the "pharmaceutical composition" requirement of Claim 6. (*Id.*)

In response, the defendants maintain that the plaintiffs' argument is unfounded and "misses the point." (D.I. 319 at 32.) Specifically, the defendants state that their experts made armodafinil according to the Preparation I and determined that it was Form I. (*Id.*) Therefore, according to the defendants, whether the particular crystals Drs. Hollingsworth and Lee made via Preparation I could be directly formulated into a pharmaceutical composition is irrelevant to the anticipation analysis because the '855 Patent expressly discloses that armodafinil produced by Preparation I was used in the tablets or capsules in human clinical trials and that it has therapeutic efficacy. (*Id.* at 5-6; at 33 (citing Tr. at 298:20-23 (Lee)).) Therefore, the defendants maintain that because Form I armodafinil can be obtained with the purity level necessary for human consumption by

---

[27] Specifically, Dr. Cima noted that, "you have to prove, before administering to humans, that the amount of impurities and the type of impurities are safe. All pharmaceutical products have impurities in them. But what happens before you administer it to a human is that you establish in some way—it could be toxicology experiments in animals, two species, that sort of thing—you establish that these are going to be safe." Tr. at 459:1-11 (Cima).

26

performing Preparation I, the impurities contained in Drs. Hollingsworth and Lee's experiment results do not need to be identified, as performance of Preparation I will result in a product that is a pharmaceutical composition. (*Id.* at 33 (citing *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991) (recognizing that a single reference may anticipate where the "common knowledge of technologists is not recorded in the reference")).)

Moreover, the defendants note that the "therapeutic" and "pharmaceutical" compositions claimed in the '855 Patent are presumed enabled. (*Id.* (citing 35 U.S.C. § 282).) The '855 Patent, according to the defendants, "does not describe any purification of armodafinil beyond step (d) of Preparation I" and, therefore, "Form I armodafinil made according to Preparation I is either pharmaceutically acceptable as-is, or techniques to further purify the product of Preparation I were so well-known and routine that they need not be expressly described." (*Id.* at 27 (citing Tr. at 383:16-21, 430:16-432:16, 458:7-20 (Cima)).) Specifically, and in support of the latter, the defendants note that the '855 Patent does not contain explicit instructions regarding purification or formulation techniques—yet still enables claims to pharmaceutical compositions "consisting essentially of" armodafinil—demonstrates the routine nature of the purification process. (*Id.* (citing Tr. at 150:22-151:21 (Hollingsworth); JTX-103.5 col. 7, ll.18-col. 8, ll. 29, claims 1-6).) Thus, the defendants argue that the plaintiffs are incorrect in asserting that the '855 Patent does not anticipate the '570 Patent because the defendants did not prove that Preparation I is suitable for use in a pharmaceutical composition. (*Id.* at 33.)

The court disagrees, and concludes that the defendants have not proven anticipation by clear and convincing evidence. As noted, the defendants contend that the claimed pharmaceutical compositions can contain additional components, such as impurities, that do not affect the basic and novel properties of Form I and that different solid state forms of armodafinil and chemical

27

impurities would not affect those properties. (D.I. 314 at 12 (citing Tr. at 154:3-155:12 (Hollingsworth)).) However, Drs. Bernstein and Myerson's testified credibly that different solid state forms and/or impurities can, in fact, affect the properties of Form I and the ultimate result of Preparation I.[28] *See* Tr. at 539:22-540:19 (Bernstein). The defendants' expert, Dr. Cima, agreed with Dr. Bernstein that the product of Preparation I will contain impurities, such as unreacted starting materials, reaction byproducts, or unreacted chemicals. (D.I. 314 at 12 (citing Tr. at 457:19-458:2 (Cima); Tr. at 540:20-541:1 (Bernstein)).)

Here, as the plaintiffs note, Dr. Hollingsworth's XRPD analysis from Run 3/4 after the first ethanol recrystallization—the number of ethanol recrystallization required by the '855 Patent[29]—

---

[28] Dr. Bernstein agreed with Professor Guillory's chapter, "Generation of Polymorphs, Hydrates, Solvates, and Amorphous Solids, Polymorphism" in *Pharmaceutical Sciences*. *See* JTX-027. Specifically, Dr. Bernstein testified:

> Q: If we go to Page 21 of the exhibit, which is Page 201 of the article, and highlight 1, to the end of the paragraph, can you read what is written here and explain, Professor?
> A: "The presence of impurities can have a profound effect on the growth of crystals. Some impurities can inhibit growth completely and some may enhance growth." Again, you get both sides of the coin. "Still others may exert a highly selective effect, acting only on certain crystallographic faces and thus modifying the crystal habit." Crystal habit is the shape of a crystal. "Some impurities can exert an influence at very low concentrations, less than one part per million, whereas others need to be present in fairly large amounts to have any effect."
> Q: Do you agree with Professor Guillory that impurities can have a profound effect on growth of crystals?
> A: They certainly do.
> Q: Referring to the '855 Patent, Preparation I, would there have been impurities in the material crystalized in that product?
> A: At the end of the synthesis, certainly.
> Q: Does the '855 Patent characterize the type and amount of impurities in its product?
> A: No, not at all.
> Q: Is that silence with respect to impurities reflected in the literature?
> A: Yes.
> . . . . .
> A: This is a U.S. patent application 2010/0234468.
> Q: And does this application address, reflect on information or lack of information of the '855 Patent with respect to impurities?
> A: . . . . Yes, it does. . . . The first line in Section 6 refers to the '85 Patent. . . . The Patent does not disclose or provide any information on purifying the resultant compounds or even allude to the likelihood of the presence of impurities in the final compounds or in the chiral intermediates or the effect of the impure intermediates on the purity of the final compounds.

Tr. at 539:22-542:1 (Bernstein).

[29] *See* JTX-1-3 at 3:50. The plaintiffs note that, unlike Preparation I's reference to only one "recrystallize[ation] from ethanol," Cephalon's work routinely involved two recrystallizations in order to get a more pure product. *See* Tr. at 740:9-742:7 (Myerson); JTX-10303 at 3:50

28

showed the presence of three peaks that could not be attributed to the Form I fingerprint. (*Id.* (citing Tr. at 249:23-251:13 (Hollingsworth); PTX-411).) Dr. Hollingsworth testified that he believed those peaks to represent a chemical impurity, but that he did not know the amount or identity of the impurity. (*Id.* at 12-13 (citing Tr. at 251:9-24 (Hollingsworth); Tr. at 746:7-12 (Myerson)).) In addition, Dr. Lee did not test his experimental products, Samples 10 and 12S, for impurities and, instead, sent them to Dr. Robie for XRPD testing. This testing indicated that, for Samples 10 and 12S, there were five and nine XRPD peaks, respectively, and that the impurities did not match to Form I armodafinil's fingerprint. (*Id.* at 13 (citing Tr. at 364:19-365:23 (Robie)).) Drs. Lee and Robie did not seek to identify these impurities, however, and did not test to determine the quantity of the impurities in the Preparation I product. (*Id.* (citing Tr. at 365:24-366:10, 366:15-18 (Robie)).) Dr. Robie did not know whether or how these impurities would impact the mixture, as he is not an expert in polymorph identification, and did not opine on whether the product was a pharmaceutical composition. (*Id.* (citing Tr. at 366:19-22, 366:23-367:5, 367:9-11 (Robie)).)

In consideration of Dr. Bernstein and Dr. Myerson's convincing and credible testimony—particularly their testimony related to the impact of impurities—the court finds, with respect to Drs. Hollingsworth and Lee's experiments, that the defendants have not demonstrated clearly and convincingly that the product of Form I will inevitably and necessarily produce a "pharmaceutical composition" as required by the asserted claims.

**c.**       **Whether the Defendants Demonstrated That Their Experiments Were Accurate and Obtained the Same Product Described in Preparation I of the '855 Patent**

As discussed above, the court finds that the evidence presented establishes that Preparation I and a recrystallization from ethanol can yield different forms, mixtures of forms, and unknown

29

impurities, depending on how one performing the Preparation selects numerous variables not specified in the '855 Patent. The plaintiffs' and defendants' witnesses agreed that the '855 Patent does not mention or describe polymorphism, or any polymorphic form of armodafinil. (*Id.* at 8-9 (citing Tr. at 157:5-7, 234:9-17 (Hollingsworth); Tr. at 307:8-11 (Lee); Tr. at 537:3-6, 630:8-12 (Bernstein); Tr. at 648:6-8, 653:18-654:4 (Mallamo)).) Moreover, Preparation I does not disclose the crystallization conditions needed to make any particular polymorph, such as the solvent, the cooling rate, and the concentration—all factors which, according to Drs. Bernstein and Myerson's credible testimony—can affect the result.[30] (*Id.* at 9 (citing Tr. at 564:19-566:19 (Bernstein); Tr. at 745:3-7, 750:10-12, 764:2-7 (Myerson); Tr. at 157:14-158:11 (Hollingsworth); JTX-7-3 Tbl. 1).) Dr. Myerson also agreed with Dr. Bernstein that Preparation I of the '855 Patent did not specify such details as "reaction time, filtration temperature, the washing conditions, [or the] dry conditions," all of which will impact the "impurity profile" of the resulting product.[31] *See* Tr. at 731:5-734:25 (Myerson). Likewise, the defendants' expert, Dr. Hollingsworth, agreed on cross-

---

[30] *See supra* note 18.

[31] Specifically, Dr. Myerson explained, in testimony the court finds credible, as follows:

> Q: What would the principal consequence be of variation in [the Preparation I] steps, in your opinion?
> A: I think what we would see is a difference in the impurity profile. So in each step, you are getting a particular product, you are going to get unreacted species that are left over that you haven't used, as well as side products that are impurities. So the impurities will be unreacted species and these side products. By changing the conditions in a step, that impurity profile will change. Now, this has a cascading effect, because the product of one step is used as the starting material in the next step. So you are starting with something with a different impurity profile, and that will cascade through the process, and the whole process will change.
> Q: Does that matter for the impurities in the final recrystallization step?
> A: . . . . Impurities can have profound effects on recrystallization. They can inhibit the formation of crystals completely, they can cause amorphous material to come out, or they can change the polymorphic form of the crystallization.
> . . . . .
> Q: [I]f impurities had blocked the formation of Form I in the '855 Preparation I procedure, what would have happened, if you know?
> A: You would have gotten a different polymorph form or an amorphous form.
> Q: And how, if at all, would the properties or characteristics of that form vary from Form I?
> A: They would have completely different properties and characteristics.

Tr. at 732:7-734:25 (Myerson).

examination that "impurities in [a] system" "can matter." (*Id.* at 12 (citing Tr. at 163:22-25 (Hollingsworth)).) In view of the foregoing, and for the reasons detailed below, the court concludes that the defendants have failed to prove anticipation by clear and convincing evidence because they have not established that their Preparation I experiments were accurate and produced the material intended by the '855 Patent's Preparation. Therefore, the defendants have not shown that the Form I armodafinil claimed in the asserted claims of the '570 Patent is, in fact, the necessary and inevitable result of performing Preparation I.

i.   The Defendants' Experts' Performance of Preparation I

The plaintiffs contend that the defendants' inherent anticipation defense fails because their experts failed to follow Preparation I as written or consider the range of variables that would have been reasonably available to skilled artisans. In particular, the plaintiffs assert that defects in following Preparation I and/or selecting the method for performing Preparation I, render the results insufficient in establishing the necessary and inevitable result of that Preparation.

First, the plaintiffs note that the defendants did not correctly follow step (b) of the '855 Patent which states that "the (-)-bezhydrylsulfinylacetate of (-)-α-methylbenzylamine (17 g) obtained in this way is dissolved in 800 ml of warm water (30-40 degrees Celsius)." *See* JTX-103-3 at 3:22-24. The '855 Patent also states elsewhere that this step should be performed at 30-45 degrees Celsius. *See id.* at 2:31-32. However, Drs. Hollingsworth and Lee testified that they did not perform Preparation I as written and, instead, used higher temperatures of 70 and 90 degrees Celsius. *See* Tr. at 234:18-235:10 (Hollingsworth); Tr. at 312:24-313:6 (Lee). Dr. Hollingsworth testified that, in his opinion, dissolution at the stated 30 to 40 degrees Celsius may be impossible, but that he had not fully tested his theory and the experiment forming the foundation

for Preparation I could have used 30 to 40 degrees Celsius. *See id.* at 238:8-22, 236:1-9 (Hollingsworth).

The plaintiffs contend that the defendants' experts' decision to use a different temperature is significant because, even using a melting point test method different from what is specified in the '855 Patent, Dr. Hollingsworth and the other experts obtained a product that had a "very wide range" of melting points inconsistent with the narrow melting point reported in the '855 Patent. (D.I. 314 at 18 (citing Tr. at 237:18-238:7 (Hollingsworth); Tr. at 780:7-19 (Myerson)).) Therefore, because they did not follow the stated procedure in step (b) and did not obtain the reported melting point, the defendants' experiments, the plaintiffs argue, cannot be considered probative of whether Preparation I would inherently or naturally result in Form I armodafinil by the required clear and convincing standard. In view of the foregoing credible arguments, the court agrees. *See Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*, No. 10-20526-CIV, 2011 WL 6792653, at *5 (S.D. Fla. Nov. 8, 2011) ("Thus, because Dr. Adlington did not follow the explicit disclosure of Example I of the Mehta patent, his experiment is simply not probative of the issue of inherent anticipation").

Second, the plaintiffs assert that the defendants did not test a representative range of conditions in conducting their Preparation I experiments. Specifically, Preparation I has four major synthetic steps, but allows skilled artisans the selection of conditions used to carry out the many steps listed. *See* JTX-103-3 at 3:5-56. However, instead of testing a variety of conditions, the defendants' experts chose to use a "narrow set of experimental conditions," which, the plaintiffs allege, is legally insufficient to demonstrate inherency. (D.I. 314 at 19.) The court agrees and concludes that the defendants have not demonstrated that all reasonable ways to practice

Preparation I would necessarily result in Form I armodafinil consistent with the limitations of the asserted claims.

For instance, in step (a), the reaction time, reaction temperature, and recrystallization conditions are not specified; in step (b), the reaction time, filtration temperature, washing conditions, and drying conditions are not specified; and in step (c), the filtration conditions, washing conditions, and drying conditions are not specified. *See* Tr. at 307:25-308:4 (Lee); Tr. at 731:5-732:6 (Myerson). Further, step (d) leaves entirely open the specific experimental conditions for "recrystallize[ation] from ethanol," and does not specify the form of the crude product to be recrystallized, the identity, and quantity of the impurities in the crude product, the grade of ethanol, the amount of solvent, the starting temperature, the cooling rate, the final temperature, or the drying conditions. *See* Tr. at 566:20-567:9 (Bernstein); Tr. at 654:5-11 (Mallamo); Tr. at 308:5-19 (Lee); Tr. at 839:15-840:21 (Coquerel); JTX-120-3 at ¶ 9.

Thus, one reproducing Preparation I would need to make several decisions, unsupported by the '855 Patent, and, as the testimony at trial demonstrated, there are a variety of reasonable conditions that can be used for crystallization and the specific conditions of crystallization selected can affect the solid state ultimately formed. *See* Tr. at 542:17-543:2, 564:19-21 (Bernstein); PTX-585-49; JTX-120-5 at ¶¶ 17, 18. Indeed, the plaintiffs' and defendants' experts agreed that, depending on the choices made, the resulting product will contain different kinds and/or amounts of impurities, which can affect whether and which final solid state form—crystals, solvates, or amorphous compound—will result. *See* Tr. at 157:14-158:11, 163:22-25 (Hollingsworth); Tr. at 732:7-23 (Myerson); 533:22-535:16 (Bernstein). Specifically, the plaintiffs contend that solvent composition, concentration, and cooling rate can impact the final solid state form. For the reasons detailed in the discussion below, the court agrees.

33

**A33**

With regard to the defendants' experts' selection of the concentration of armodafinil used in the recrystallization step, the plaintiffs persuasively argue that their selection was inconsistent with the prior art and affected the product they obtained. The defendants used only one concentration in all but one of their recrystallizations—a recrystallization that yielded a different result—such that their testing does not necessarily contemplate the full scope of Preparation I. As the testimony presented made clear, standard textbooks indicate that the "MINIMUM AMOUNT(!)" of solvent, i.e., a larger percentage or concentration of solute, should be used in recrystallizations. Tr. at 746:13-748:5 (Myerson); JTX-97-6. In fact, Cephalon's scientists routinely use a 20% concentration. *See* JTX-38-41, -42 (Examples Nos. 5/2502, 1/0054(a), 1/0920, and ON II/149E Step a); Tr. at 164:1-165:11 (Hollingsworth). Even Dr. Hollingsworth testified that skilled artisans might select a range of concentrations to use and that the 20% concentrations shown in the PTO declarations were reasonable. (D.I. 314 at 21 (citing Tr. at 167:15-21, 168:15-20, 167:9-14 (Hollingsworth); JTX-38-41, -42).)

Despite the availability of this range, the defendants' experts did not use ·a 20% concentration. Rather, Dr. Hollingsworth used a 9.6% concentration, which was not the minimum amount of solvent taught by the prior art, despite the fact that the '570 Patent and the PTO declarations noted that Form I is preferentially obtained using a lower concentration solution. (*Id.* (citing Tr. 159:1-3, 160:23-161:2, 165:21-166:6, 178:14-22 (Hollingsworth); 748:13-20 (Myerson)).) Similarly, defendants' counsel instructed Dr. Lee to use the same 9.6% concentration that Dr. Hollingsworth used to obtain some amounts of Form I. (*Id.* (citing Tr. at 309:7-12, 319:16-320:5 (Lee)).) Notably, the one time that Dr. Hollingsworth used a 13.8% solution in his second recrystallization in Run 3/4, he obtained a mixture of crystalline forms that was predominately Form II armodafinil, demonstrating that reasonable variations in Preparation I can yield different

34

polymorphs of armodafinil. (*Id.* (citing Tr. at 195:16-197:25, 207:12-208:7 (Hollingsworth)).)
Thus, because a person of ordinary skill in the art could have reasonably selected among various
levels of solution concentration in performing Preparation I and the defendants' experts tested this
Preparation using primarily one selection, the court finds that the defendants have not
demonstrated clearly and convincingly that Preparation I inevitably results in Form I armodafinil
consistent with the asserted claims.[32]

Similarly, the plaintiffs assert that the defendants' experts' selection of ethanol grade was
too narrow and insufficient to establish Form I as the inevitable product of Preparation I.
Specifically, the plaintiffs note that step (d) of Preparation I calls for "recrystalliz[ation] from
ethanol" without specifying a particular grade. (D.I. 319 at 21 (citing JTX-103-3 at 3:50).) As the
trial testimony established, ethanol is available in several grades, including azeotropic (i.e.,
containing water), denatured (i.e., containing an additive), and absolute (i.e, pure or 100%). Tr. at
761:1-15 (Myerson). Drs. Hollingsworth and Lee used only absolute ethanol, which, the
defendants assert was reasonable because Cephalon's "own data confirms that recrystallizing
armodafinil from ethanol would result in the most stable form (Form I) a substantial majority of
the time. (D.I. 319 at 35 (citing JTX-38.8-.9; JTX-38.13-.14 at ¶¶ 4-5, .41-.42; Tr. at 798:7-799:17
(Peterson); JTX-123.19-125.19).)

However, as the plaintiffs correctly point out, "ethanol" can be interpreted more broadly
than just absolute ethanol and, in fact, the '570 Patent describes more than one type of ethanol,
including absolute ethanol, azeotropic ethanol, and denatured ethanol. *See* JTX-1-32 at 27:24-43;

---

[32] The defendants do not meaningfully contest the plaintiffs' argument, except to simply contend that their
experts' selection of concentration was "reasonable" and that a person of ordinary skill in the art would have, as Dr.
Hollingsworth, conducted a small-scale crystallization to determine a suitable concentration of armodafinil for the
recrystallization part of step (d). (D.I. 319 at 35.) Thus, because their experts used suitable concentrations in
performing Preparation I, the defendants argue that their selections were reasonable and do not undermine their
anticipation argument. (*Id.*)

*see also* PTX-101-13 at 4:7-10; PTX-100-1 at Abstract; PTX-124-13; Tr. at 217:62 18:5, 219:15-221:2 (Hollingsworth). This broader definition of ethanol is also reflected in organic chemistry laboratory texts. *See* PTX-589-8; JTX-56-6 at Tbl. 3-2. Also, notably, Louis Lafon, the inventor of the '855 Patent, distinguished the term ethanol from "absolute ethanol" in other patents. *See* PTX-139-3 at 4:45-47; PTX-139-5 at 7:1-3, 53-55; PTX- 139-6 at 9:46-48. Therefore, a narrow interpretation of ethanol as synonymous with absolute ethanol is not the "sole, universally accepted definition." (D.I. 319 at 22.) As Dr. Myerson explained in testimony the court found credible, the proper interpretation of ethanol depends upon the totality of the circumstances and includes consideration of, for instance, whether the case involves a polymorph patent specifically discussing solvent mixtures. *See* Tr. at 765:14-773:1. To this end, the court finds that the documents on which Dr. Hollingsworth relied to limit ethanol to absolute ethanol can reasonably be distinguished because, unlike the context of those references, ethanol is not used in the '855 Patent for a therapeutic purpose or as an excipient. (D.I. 319 at 22 n.22 (citing Tr. at 210:13-212:5; JTX-1165; JTX-28-3).)

Here, the '570 Patents and Cephalon's experiments show that the different polymorphic forms of armodafinil can result from recrystallization from different grades of ethanol, such that, for example, the use of denatured ethanol can, under some conditions, lead to Form II armodafinil. (*Id.* at 22 (citing JTX-1-32 at 27:23-47; JTX-1-33 at 29:30-51; JTX-1204 at ¶ 13; Tr. at 657:11-658:5 (Mallamo)).) Thus, the court finds that the defendants have failed to establish, based on their testing of only one type of ethanol, that Form I will necessarily and inevitably result from Preparation I.[33]

---

[33] The defendants note that Cephalon's own data confirms that recrystallizing armodafinil from ethanol would result in the most stable form, Form I, a "substantial majority of the time." (*Id.*) Specifically, the defendants note that, leaving aside the fact that they did not concern reproductions of Preparation I, the declarations submitted during the prosecution of the '570 Patent demonstrate that the Form I polymorph is obtained in almost every recrystallization

36

Moreover, regarding cooling rates, Preparation I does not specify the method or rate of cooling of the armodafinil/ethanol solution during the "recrystallize[ation] from ethanol" in step (d). Although the cooling method used affects the cooling rate and, therefore, the polymorphic form of the recrystallization product, the defendants' experts' used only one of the multiple reasonable cooling methods available. (*Id.* at 23 (citing Tr. 157:16-158:7, 226:20-227:10 (Hollingsworth); Tr. at 750:10-752:12 (Myerson); Tr. at 565:8-566:19 (Bernstein); JTX-27-13).) Specifically, Dr. Hollingsworth used a very slow cooling, which resulted in an overall temperature change of about 0.3 degrees Celsius per minute cooling and, on instruction of counsel, Dr. Lee used a slow cooling as well, resulting in an average cooling rate of 0.55 degrees Celsius. (*Id.* (citing Tr. at 750:10-752:14 (Myerson); Tr. at 179:1-181:3 (Hollingsworth); Tr. at 324:24-327:4, 327:9-11 (Lee); DTX-212-12 ll. 2-9).)

Notably, Drs. Hollingsworth and Lee were familiar with the '570 Patent before they conducted their experiments. The '570 Patent explains that a crystallization using ethanol and slow-cooling at a rate of 0.6 degrees Celsius per minute or less is preferred to crystallize Form I

---

of armodafinil from ethanol. (*Id.*) The defendants note that the data in the declarations shows that other forms of armodafinil were produced only where extreme conditions inconsistent with the standard recrystallization disclosed in the '855 Patent were used. (*Id.*) Further, the defendants refer to the fact that, in a conventional polymorph screen performed by Cephalon/Lafron around 2000, Form I armodafinil was obtained from a wide variety of recrystallization conditions. (*Id.* at 36 (citing Tr. at 845:23-846:4, 852:14-853:18, 854:13-25, 856:6-857:1 (Serrure); Tr. at 872:23-873:5 (Neckebrock)).) In particular, the defendants detail that the screen demonstrated that recrystallization of armodafinil from ethanol, even under extreme conditions outside of the '855 Patent, almost inevitably results in Form I armodafinil. (*Id.* (citing DTX-51A.6, .9, .17, .20; DTX-51.4, .7; JTX-101.3, .6).) A high-throughput screen—which is not a conventional screen—performed by Crystallics BV at Cephalon's request provides, the defendants argue, further evidence that Form I armodafinil results from a wide range of recrystallization conditions. (*Id.* (citing Tr. at 615:1-11 (Bernstein); Tr. at 820:13-18 (Blomsma); Tr. at 861:3-11 (Rose); JTX-38.2 at ¶ 3; JTX-62.1, .21).) The defendants highlight that Form I was made in 948 out of the 1,035 successful recrystallizations conducted and that 177 of the recrystallizations were unsuccessful because the resulting material could not be identified. Thus, the defendants argue, based on the result of the Crystallics screen, Cephalon reported to the FDA "more than 95% of the assigned crystals were [Form I]" and that "scale-up recrystallization studies only produced Form [I] along with additional solvate." (*Id.* at 37 (citing JTX-123.19; JTX-125.19; JTX-14.10).)

The court disagrees, however, with the defendants' contention that these results show that "nearly any set of conditions that could be described as 'recrystallization' of armodafinil (from ethanol or solvents) will produce the most stable polymorph—Form I" and that this data "refutes criticism that Drs. Hollingsworth and Lee tested only a narrow set of recrystallization conditions" (*id.*) for the reasons detailed above. *See supra* notes 13, 14 and accompanying text.

armodafinil. (*Id.* (citing Tr. at 159:1-19 (Hollingsworth); Tr. at 281:18-20 (Lee); JTX-1-21 at 5:50, -22 at 7:1-6).) However, the evidence at trial established that there were multiple, reasonable cooling methods available to skilled artisans at the time of the '855 Patent. For instance, standard references taught that a person of ordinary skill in the art could have "set aside" the recrystallized solution "to cool until crystals are formed," or more rapid cooling could be used. *See* JTX-56-8; JTX-15-8. In fact, the testing Cephalon submitted to the PTO indicated the use of bench top, room temperature cooling as well as more rapid cooling via an ice bath. *See* JTX-120-19 (Example No. 05/2505); JTX-120-20. Dr. Hollingsworth testified that different cooling methods are appropriate under certain circumstances and Dr. Lee testified that bench top cooling was reasonable. *See* Tr. at 176:2-177:2 (Hollingsworth); Tr. at 321:11-323:18 (Lee). Moreover, while Drs. Hollingsworth, Lee, and Cima testified that the defendants' experts' selections were reasonable and, indeed, the standard operating procedure considering the purpose of recrystallization, there was also literature available at the time that encouraged the use of rapid cooling to obtain fine crystals. *See* Tr. at 125:11-19, 172:23-173:14, 176:2-177:2 (Hollingsworth); Tr. at 298:18-23 (Lee); Tr. at 393:19-394:15 (Cima); *see also* JTX-15-8. Thus, because the defendants' use of only slow cooling is not representative of the full possible scope contemplated by the '855 Patent, the court finds their experiments insufficient to prove the inherency of Form I armodafinil.

ii. The Form I and Preparation I Melting Points

In addition to the foregoing, the court concludes that the defendants have not demonstrated that the products they obtained through their Preparation I experiments were Form I or an accurate result, because Drs. Hollingsworth and Lee did not measure the melting point of their final products in the manner specified in the '855 Patent. Specifically, and as referenced above in connection with the defendants' arguments, Preparation I reports an instantaneous melting point

38

**A38**

of 153 to 154 degrees celcius for the final armodafinil product and provides a way to confirm whether a particular substance is the same as the Preparation product. *See* JTX-103-3 at 3:55. The instantaneous melting point reported in Preparation I was measured using a Kofler hot bar device, which the defendants' experts dismissed as a "museum piece." (D.I. 319 at 14 (citing Tr. at 185:16-18 (Hollingsworth); Tr. at 337:18-21 (Lee)).) However, as Drs. Bernstein and Mallamo convincingly explained, determination of the instantaneous melting point is particularly important for compounds like armodafinil that degrade upon slow heating. (D.I. 314 at 14.)

Moreover, the instantaneous melting point is of particular importance in the instant case because, as Dr. Mallamo explained, the instantaneous melting point reported in the '855 Patent suggests that the Preparation does not result in Form I armodafinil because, using the Kofler hot bar, Form I armodafinil has an instantaneous melting point of 159 degrees Celsius or higher, while pure Form II armodafinil has an instantaneous melting point of 156 degrees Celsius. (*Id.* (citing JTX-120-5 to 6 at ¶¶ 19, 20; JTX-120-22; JTX-120-22; Tr. at 658:16-659:17 (Mallamo)).) Instantaneous melting points of Form I/Form II mixtures ranged from 156 to 160 degrees Celsius. (*Id.* (citing JTX-120-22).) Thus, importantly, none of the pure polymorphic forms or mixtures of polymorphic forms had instantaneous melting points approaching the 153 to 154 degrees Celsius data points recorded for the product of Preparation I.[34] Based on this information, Dr. Mallamo concluded, and the court agrees, that "the data supports a conclusion that the [armodafinil] described in Preparation I of the [] '855 [P]atent is NOT the claimed Form I [armodafinil]" of the '570 Patent. (*Id.* at 15 (citing JTX-120-6 at ¶ 20 (emphasis in original); Tr. at 700:1-701:2 (Mallamo)).) Dr. Myerson also reviewed the information presented and derived the same conclusion. (*Id.* (citing Tr. at 738:18-739:16 (Myerson)).)

---

[34] In fact, the instantaneous melting point reported for the product of Preparation I was closer to the data point for Form II than Form I armodafinil. (D.I. 314 at 15.)

This conclusion is further supported by the fact that the defendants presented no evidence indicating that Form I has an instantaneous melting point of 153 to 154 degrees Celsius, the range reported by Preparation I. (*Id.*) Notably, even Dr. Hollingsworth agreed that the instantaneous melting point reported in the '855 Patent does not appear to correspond to the instantaneous melting point reported for Form I, a conclusion with which Dr. Myerson agreed. (*Id.* (citing Tr. 263:13-264:3 (Hollingsworth); Tr. at 773:23-774:10, 776:7-777:14 (Myerson)).) In addition, neither Dr. Hollingsworth nor Dr. Lee used a Kofler hot bar to measure the instantaneous melting point of their samples and, instead, used capillary methods to determine melting point. (*Id.* (citing Tr. at 185:12-21 (Hollingsworth); Tr. at 303:16-18, 336:23-337:24, 328:7-9 (Lee)).) These capillary methods, however, are different from the Kofler hot bar method in that they involve a non-instantaneous, gradual heating of the sample in a measuring procedure that could take as long as ten to fifteen minutes. (*Id.* (citing Tr. at 192:24-193:4 (Hollingsworth); Tr. at 564:10-14 (Bernstein)).) In addition, absolute values of melting points obtained using different instrumentation cannot be directly compared. (*Id.* (citing JTX-120-7 n.7).)

Moreover, the court finds credible the plaintiffs' contention that the use of instantaneous melting point is particularly important for armodafinil. Specifically, Drs. Mallamo and Myerson detail that the Kofler hot bar "procedure is clearly rapid and is very useful for substances which tend to decompose upon gradual heating." (*Id.* at 16 (citing PTX-147-10).) Research at Cephalon confirmed that non-instantaneous methods using slow heating rates—such as differential scanning calorimetry—were not appropriate for armodafinil because armodafinil can degrade during these slower melting tests.[35] (*Id.* (citing JTX-111-1; Tr. at 659:18-660:14, 706:4-16 (Mallamo); Tr. at

---

[35] While the defendants' expert, Dr. Lee, alleged that he did not observe any decomposition of the samples, the plaintiffs persuasively note that Dr. Lee did not actually observe any of the melting point determinations in his experiments, such that his lack of observation is not dispositive on this point. (*Id.* at 16 n.17 (citing Tr. at 327:17-328:9 (Lee)).)

737:12-738:13, 778:15-22 (Myerson)).)  In fact, the court notes that this conclusion is consistent with the data presented to the PTO, which shows that Form I can exhibit widely variant "melting points"—melting points from 146.9 to 157 degrees Celsius—when measured by capillary melting point tests.  (*Id.* (citing JTX-120-7 n.7, -23; Tr. at 659:2-17 (Mallamo)).)  In reaching this finding, the court also notes that, because Dr. Lee only measured two different armodafinil samples using one method, his testing does not contradict the fact that Form I armodafinil can exhibit widely variant melting points using the capillary method.  (*Id.* at 16 n.18 (citing Tr. at 336:21-337:4 (Lee); Tr. at 659:2-17 (Mallamo); JTX-210-7 n.7, -23).)  Dr. Hollingsworth's melting point test also exhibits this wide variability.  (*Id.* (citing Tr. at 139:10-140:22 (Hollingsworth)).)  Thus, because neither Dr. Hollingsworth nor Dr. Lee attempted to correlate and calibrate their melting points to the instantaneous melting point reported in the '855 Patent, and as Dr. Myerson credibly testified, "absolute [melting point] values obtained using different instrumentation cannot be directly compared," the defendants have failed to demonstrate the accuracy of their experiments.

The court further notes that it reaches this conclusion despite Dr. Hollingsworth's assertion that various polymorphic forms of armodafinil produced from Preparation I would have converted to Form I during testing on a Kofler hot bar.  *See* Tr. at 142:21-146:1 (Hollingsworth). Specifically, the court finds that this contention is refuted by the fact that the instantaneous melting points of Form II and of the mixtures involving Form II and IV could be discretely measured and recorded as data points.  (D.I. 314 at 15 n.15 (citing JTX-120-22).)  Moreover, Dr. Hollingsworth's conclusion is further undermined by his own testimony that he has never used or seen a Kofler hot bar, and that any product converted to Form I on the hot bar would not be a "pharmaceutical composition" and, thus, would not meet the limitations of asserted Claims 6 and 9.  (*Id.* (citing Tr. at 191:14-192:7, 189:2-9 (Hollingsworth)).)

ii.     The Preparation I and Form I Yields

The court further concludes that the defendants have failed to demonstrate that their experts

produced Form I by performing Preparation I and, further, that their experiments were accurate

because their yields differed from the yield listed in Preparation I. Specifically, the court finds

that the '855 Patent indicates that the "overall yield" for Preparation I—after completing all steps

of (a) to (d)—is 32%. *See* JTX-10303 at 3:51; *see also* Tr. at 649:21-650:3 (Mallamo); Tr. at

736:8-23 (Myerson). Specifically, the '855 Patent states yields of 42% from step (a), about 100%

from step (b), 85% from step (b), and step (d) must have a yield of about 90%. (D.I. 314 at 16

(citing Tr. at 332:3-17 (Lee); Tr. at 650:4-14 (Mallamo)).) Dr. Mallamo testified that such a yield

is consistent with his experience. *See* Tr. at 650:4-14 (Mallamo).

However, in Dr. Hollingsworth's experiments, he had an overall yield of 8.2% for Run 1/2

and an overall yield of 9% for Run 3/4. *See* Tr. at 735:3-9, 735:17-736:3 (Myerson). Clearly, Dr.

Hollingsworth's yields are far lower than the 32% overall yield reported in Preparation I. In

addition, Dr. Lee had an overall yield of 7.4% for Run I (Sample 10) and an overall yield of 3.2%

for Run 2 (Sample 12S). (D.I. 314 at 17 (citing Tr. at 333:12-20 (Lee)).) Dr. Lee acknowledged

on cross-examination that, if Preparation I requires a 32% yield, a point with which Dr. Lee

disagreed, then the difference between his yield and the required yield was much greater than could

be accounted for by reasonable experimental error. (*Id.* (citing Tr. at 329:3014, 333:21-25 (Lee)).)

In response to the plaintiffs' assertion that the defendants' experts generated yields lower

than those required for Preparation I, the defendants note that the '570 Patent, which discusses

Preparation I of the '855 Patent in detail, explains that the "overall yield" at the end of Preparation

I is 5.7%, a figure much closer to defendants' experts' yields. (D.I. 319 at 38 (citing JTX-1.19 col.

2, ll. 5-13; JTX-40.37; Tr. at 301:7-12, 343:9-15 (Lee)).) The defendants also note that the '570

42

**A42**

Patent discloses that the 25% overall yield of the synthesis process described therein is "markedly greater than that obtained in U.S. Patent No. 4,927,855." *See* JTX-1.25 col. 14, ll. 35-43; Tr. at 342:7-23 (Lee). The defendants further maintain that, because Cephalon has not filed a Certificate of Correction correcting the allegedly inaccurate yield numbers, the plaintiffs are simply making the argument to challenge anticipation and assert that their experts' performance of Preparation I confirms this. (D.I. 319 at 38-39.)

The plaintiffs contend, however, that the figures detailed in the '570 Patent are, in fact, inaccurate and that the overall yield of Preparation I was 32%, not the 5.7% reported in the '570 Patent specification. *See* Tr. at 686:16-20, 690:12 (Mallamo). Dr. Mallamo acknowledged this error in testimony at trial and noted that he was not aware of the mistake in the '570 Patent when he submitted his declaration to the PTO. *See id.* at 686:25-687:19, 689:12-14 689:23-690:12, 705:14-20. Dr. Mallamo further testified that a step (d) yield of only 32% would be inconsistent with Cephalon's actual experience of obtaining a very high yield using the step (d) chemistry. *See id.* at 650:4-14). In addition, the plaintiffs note that other patent literature discussing the '855 Patent also accepts 32% as the overall yield for all of Preparation I, rather than as the yield for only step (d). *See* PTX-124-3:1-11; PTX-123-3:1-14. The court found Dr. Mallamo's testimony to be credible. Nevertheless, mistakes in the '570 Patent regarding the yield of Preparation I are irrelevant here because they do not pertain to the Form I composition claims at issue. (D.I. 314 at 17 (citing Tr. at 785:18-787:10 (Myerson)).)

As the difference in yields relates to anticipation, Dr. Myerson credibly testified that such low yields are problematic because they suggest different impurity profiles. *See* Tr. at 735:17-736:7 (Myerson). This is important because, as Dr. Hollingsworth testified, the "presence of impurities can have a profound effect on the growth of crystals." (D.I. 314 at 17 (citing Tr. at

43

163:22-25, 227:11-23 (Hollingsworth)).) Dr. Myerson also confirmed this point in the context of Preparation I. (*Id.* (citing Tr. at 732:3-734:16 (Myerson)).) In light of Dr. Mallamo's testimony and the evidence before it, the court concludes that the yield percentage the defendants' experts obtained from their reproduction of Preparation I does not alone demonstrate anticipation by clear and convincing evidence and does not shift the court's overall anticipation conclusion.

### 4. **Conclusion**

In view of the foregoing, the court concludes that the defendants have failed to demonstrate inherent anticipation by clear and convincing evidence. As noted, the defendants' experts' experiments did not show that the result of Preparation I is a product in which Form I armodafinil is the only active pharmaceutical ingredient, as at least one experiment resulted in the formation of a Form I/Form II product. For the reasons stated above, the court concludes that the claim construction "consisting essentially of the specified pharmaceutically active ingredient"—a construction on which the parties agreed and the court did not construe during *Markman*—requires that Form I be the only pharmaceutically active ingredient.

Importantly, however, even assuming that the claim term allows for the presence of another pharmaceutically active ingredient, the court finds that the defendants have failed to demonstrate that their experts' experiments were conducted consistent with Preparation I or that their selection of such variables as cooling rate, ethanol grade, and concentration, realized the full scope of reasonable experimental possibilities in Preparation I. Specifically, because the '855 Patent does not disclose many details for its procedure, skilled artisans would have to use their judgment to complete the experiment. As detailed above, the evidence presented at trial demonstrated that several reasonable selections were available to one of skill in the art and that even slight differences in procedure may lead to differences in the form of armodafinil produced. The defendants' experts,

44

however, used a limited set of testing parameters, which, after reading the '570 Patent, they would have understood to favor the formation of Form I. *See Glaxo Group*, 376 F.3d at 1348-49. This limited testing and selection of variables, where reasonable alternatives were available, does not show clearly and convincingly that Form I armodafinil is the necessary and inevitable result of Preparation I.

Finally, the court notes that the '855 Patent was before the PTO during prosecution of the '570 Patent. The PTO originally rejected the pending Form I armodafinil claims as either anticipated by or obvious in part over the '855 Patent. *See* JTX-2-1412 to 1414. After Cephalon responded, however, the PTO withdrew the rejection (1) acknowledging that the '855 Patent "is silent regarding the conditions that were used to perform the recrystallization," (2) noting that "Applicants have established by way of declarative evidence that recrystallization of [armodafinil] from ethanol, as taught by the Lafon '855 Patent, leads to the production of various polymorphic forms of the compound, depending upon the particular conditions employed to perform the recrystallization, and (3) concluding that "it cannot be said that practicing the teachings of the Lafon patent would necessarily result in a polymorphic form of [armodafinil] as recited in the instant claims." PTX-122-2 to 3; *see also* Tr. at 757:22-759:11 (Myerson). While the PTO did not have the defendants' experts' testing to consider, that testing only involved a limited set of conditions that do not refute the testing Cephalon provided. Moreover, Cephalon presented evidence to the PTO showing that Form I armodafinil does not have an instantaneous melting point consistent with the melting point of Preparation I, and the defendants did not provide any rebuttal testing of this fact. Thus, the court finds that the evidence presented to the PTO and the PTO's decision to allow asserted Claims 6 and 9 further demonstrates that the defendants have not proven inherent anticipation by the required standard.

45

## B. Obviousness

The defendants challenge the validity of each of the asserted claims as obvious in light of the prior art. The court finds, for the reasons that follow, that the defendants have failed to prove by clear and convincing evidence that the patent-in-suit is, in fact, obvious.

### 1. The Legal Standard

35 U.S.C. § 103(a) provides that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law that is predicated on several factual inquiries. *See Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997). Specifically, the trier of fact is directed to assess four considerations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unsolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results.[36] *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

A party seeking to challenge the validity of a patent based on obviousness must demonstrate by "clear and convincing evidence" that the invention described in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. Importantly, in determining what would have been obvious to one of ordinary skill in the art, the use of hindsight is not permitted. *See KSR Intern. Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007) (cautioning the trier of fact against "the distortion caused by hindsight bias" and "arguments reliance on ex post reasoning" in determining obviousness). In *KSR*, the Supreme Court rejected

---

[36] The court precluded Cephalon from relying on secondary considerations as sanction for its discovery violations. *See* D.I. 225 at 2; D.I. 293.

the rigid application of the principle that there should be an explicit "teaching, suggestion, or motivation" in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art, in order to find obviousness. *See KSR*, 550 U.S. at 415. The *KSR* Court acknowledged, however, the importance of identifying "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in a way the claimed new invention does in an obviousness determination." *Takeda Chem. Indus. v. Alphapharm Pty. Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (citation omitted).

"Obviousness does not require absolute predictability of success," but, rather, requires "a reasonable expectation of success." *See Medichem S.A. v. Rolado, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988)). To this end, obviousness "cannot be avoided simply by a showing of some degree of unpredictablily in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Moreover, while the Federal Circuit has noted that pharmaceuticals can be an "unpredictable art" to the extent that results may be unexpected, it also recognizes that, per *KSR*, evidence of a "finite number of identified, predictable solutions" or alternatives "might support an inference of obviousness." *See Eisai Co. Ltd. v. Dr. Reddy's Labs. Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008).

## 2. The Level of Ordinary Skill in the Art

A person of ordinary skill in the art with respect to the patent-in-suit would have either: (1) a bachelor's degree in chemistry, chemical engineering, or related disciplines and either: (a) at least three years of experience related to organic synthesis, active pharmaceutical ingredient ("API") manufacturing and formulation, or detection and/or evaluation of solid state forms in the pharmaceutical industry, or (b) an advanced degree in chemistry, chemical engineering, or related

47

disciplines[37]; or (2) training as a chemist (or similar field) involved in the discovery, preparation, and/or characterization of crystal/polymorphic forms and having an advanced degree in organic chemistry, chemical engineering, or a related field, or equivalent work experiences such as at least a bachelor of science degree and about two to three years of experience preparing and characterizing crystal/polymorphic forms.[38] The court concludes that the parties' definitions of a person of ordinary skill in the art do not differ in a meaningful way.[39]

### 3. The Scope and Content of the Prior Art and Differences Between the Claimed Subject Matter and the Prior Art

As a threshold matter, it is important to identify what the asserted claims cover. As detailed above, the asserted Claims 6 and 9 of the patent-in-suit cover a pharmaceutical composition with an active component consisting essentially of Form I armodafinil. Armodafinil is not a naturally occurring compound and was invented by Cephalon and claimed in the '855 Patent, which is directed to that molecule. *See* JTX-103-1 at Abstract. As discussed, Preparation I of the '855 Patent discloses how to synthesize armodafinil.[40] *See id.* In May 2000, Cephalon employee and named inventor of the '570 Patent, Oliver Neckebrock, performed a series of recrystallization experiments that determined that armodafinil exhibits polymorphism. *See* Tr. at 636:3-638:4, 644:16-645:10 (Mallamo); Tr. at 874:10-875:13, 879:5-21 (Neckebrock); PTX-135-4. These experiments revealed two crystal forms, designed Form I (Type I or α) and Form II (Type 2 or β).[41] *See* PTX-572-19. In June 2005, Cephalon filed U.S. Patent Application No. 10/539,918 ("the

---

[37] The plaintiffs' identification of a person of ordinary skill in the art is derived from Dr. Bernstein's testimony. *See* Tr. at 545:11-547:15 (Bernstein).

[38] D.I. 259 at Ex. 3.

[39] The parties' experts testified that their obviousness conclusions would remain the same regardless of which definition of a person of ordinary skill in the art the court adopts. *See supra* note 6.

[40] Polymorphs of man-made compounds such as armodafinil must be synthesized by human effort because they do not exist in nature. *See* Tr. at 503:4-9 (Bernstein).

[41] In August 1989, Cephalon employee Pierre Leproust synthesized a solid state form of armodafinil that, as a result of Mr. Neckebrock's experiments, was eventually identified as Form I. Tr. at 645:11-25 (Mallamo); Tr. at 803:16-804:16 (Leproust); PTX-132-10 (Ref. 05/2502); PTX-392.

48

'918 Application") with the PTO, claiming priority to a French application filed in December 2002.[42] The application describes five different polymorphic forms of armodafinil (Forms I, II, III, IV, and V), as well as two solvates of armodafinil. *See* JTX-2-12 to -14. The application also includes XRPD fingerprint information for Form I, including interplanar spacings, reflection values, relative intensities, and the results of single crystal x-ray analysis. *See, e.g.*, JTX-1-19 to 20 at 2:48-3:10, -38 at 40:1-10. Cephalon later filed an Amendment that provided claims covering the armodafinil Form I polymorph. *See* JTX-71-2 to 3.

Both at trial and in their post-trial briefings, the defendants focused their obviousness arguments on the assertion that the '855 Patent, combined with other references the PTO did not consider,[43] invalidates the asserted claims of the patent-in-suit. Specifically, the defendants argue that a skilled artisan would have: (1) been motivated to identify the most stable polymorph of armodafinil—Form I—for use in a pharmaceutical composition; (2) expected to obtain the most stable polymorph of armodafinil using well known and merely routine techniques and predictable steps; (3) known that the D-spacings and 2-Theta values recited in the asserted claims are intrinsic to Form I and would have been measured using routine techniques;[44] and (4) been motivated to

---

[42] Based on the work of Mr. Leproust and Mr. Neckebrock, and the priority date of the French application, the date of invention for the claims of the '570 Patent is prior to December 20, 2001. The defendants argued at trial that the plaintiffs used "erroneous patent evergreening techniques to extend its PROVIGIL/NUVIGIL monopoly." (D.I. 319 at 2-3.) The court rejects this argument, however, in light of its anticipation and obviousness findings.

[43] The defendants note that they presented numerous references at trial not considered by the PTO, including, for example JTX-24, JTX-32, JTX-57, and JTX-94. (*Id.* at 40 n.9.) These references were presented at trial to provide greater detail as to the state of the art in the early 2000s.

[44] The defendants assert, as a part of their obviousness argument, that the D-Spacings and 2-Theta values recited in the asserted claims are intrinsic to Form I armodafinil and, therefore, do not constitute an invention. (*Id.* at 25 (citing Tr. at 382:12-18, 389:1-3 (Cima)).) Specifically, the defendants note that, upon obtaining armodafinil's most stable form, a person of ordinary skill in the art would have known to conduct XRPD testing to properly characterize the polymorph and would have recorded these properties. (*Id.*) Therefore, the defendants contend that the plaintiffs cannot use these values to distinguish the asserted claims from the prior art.

Notably, both the plaintiffs' and defendants' experts agree that the actual crystal structure of a polymorph and the XRPD values associated with the crystal structure are inherent characteristics of the polymorph. (*Id.* citing Tr. at 71:8-73:11 (Hollingsworth); Tr. at 382:12-18, 421:8-25 (Cima); Tr. at 607:23-608:5 (Bernstein)).) The plaintiffs, however, reference these values in connection with their argument that the crystal structure and recrystallization are unpredictable to the extent that a skilled artisan would not have a reasonable expectation of success in identifying and/or obtaining Form I. The plaintiffs do not assert that the measured values are, themselves,

make a pharmaceutical composition consisting essentially of Form I armodafinil. (D.I. 319 at 17-26.)

The plaintiffs, in response, presented testimony that a person of skill in the art did not have prior art disclosures of armodafinil to have predicted whether armodafinil would crystallize in polymorphic forms or what the structure of any of those forms would be, much less have a basis to have predicted Form I. In sum, the plaintiffs assert that the fundamental unpredictability of polymorphism and the uniqueness of armodafinil would not have allowed a skilled artisan to have a reasonable expectation of success that armodafinil is polymorphic. Because these arguments dominated the parties' invalidity arguments at trial, the court will focus its discussion on whether the development and use of Form I armodafinil in a pharmaceutical composition would have been obvious to a skilled artisan in 2002 based on the '855 Patent and the other references discussed at trial.

### a. Whether Obtaining Form I Armodafinil Would Have Been Obvious to a Person of Skill in the Art in 2002

The defendants assert that a skilled artisan in 2002 would have been motivated to obtain armodafinil's most stable polymorph—Form I—because the therapeutic effectiveness of armodafinil would have been well known in the art. (D.I. 319 at 17.) The defendants present several arguments in support. First, the defendants note that the '855 Patent expressly discloses the synthesis of crystalline armodafinil and teaches its therapeutic use in pharmaceutical compositions for administration to humans. (*Id.* (citing JTX-103.1-.5 Abstract, col. 2, ll. 61-66, col. 3, ll. 5-57, col. 6, ll. 44-67, col. 8, ll. 26-29; Tr. at 381:11-12, 388:7-9, 429:23-430:7 (Cima)).) In addition, the '855 Patent specifically discloses that those compositions "consist essentially of"

---

the invention. Therefore, the court addresses this aspect of the defendants' obviousness argument in connection with its discussion of the level of predictability in the crystallization and polymorphism fields. *See* Section III.B.3.a.

armodafinil. (*Id.* (citing JTX-103.5, claims 2-6; Tr. at 383:6-9, 425:13-403:7 (Cima); Tr. at 623:18-20 (Bernstein)).) Second, the defendants argue that, because armodafinil was known to be crystalline, a skilled artisan would have known that, like all crystalline compounds, armodafinil has a most stable polymorph. (*Id.* (citing Tr. at 390:21-23, 436:18-21, 437:5-6, 467:16-18 (Cima)).) The defendants' obviousness expert, Dr. Michael Cima, testified that the stable form of a polymorph has the lowest thermodynamic energy and that less stable forms naturally tend to transform into the most stable form over time. *See* Tr. at 390:6-20, 453:20-23 (Cima).

Third, the defendants contend that, by the early 2000s, it was well known in the art that the most stable polymorph "is by far and away the preferred in a marketed [drug] formulation." (D.I. 319 at 18 (citing Tr. at 396:5-8 (Cima); Tr. at 827:11-16 (Besselievre); Tr. at 840:22-841:11 (Coquerel); Tr. at 864:20-865:10 (Rose)).) In addition to Dr. Cima's testimony in support of this contention, the defendants also identified several references stating, collectively, that the most stable polymorphic form is the preferred form for drug formulation.[45] (*Id.*) Identification of the most stable polymorph is crucial, the defendants charge, because of "the significant adverse consequences associated with a change in the polymorphic form during [development,] manufacture[,] or storage." (*Id.* (citing Tr. at 617:2-8 (Bernstein); Tr. at 396:5-8, 298:10-13, 399:2-5, 453:20-23 (Cima); JTX-104.1; JTX-21.4; JTX-5.1-.5).)

---

[45] Specifically, the defendants referenced: Bryn, S. et al, *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, Pharm. Res. 12(7):945-954 (1995) (JTX-021); Chemburkar et al., *Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development*, 4 Organic Process & Research Development, 413-417 (2000) (JTX-0005); Gu, Chong-Hui et al., *Polymorph Screening: Influence of Solvents on the Rate of Solvent-Medicated Polymorphic Trnasformation* 90 (11) Journal of Pharmaceutical Sciences 1878-1890 (2001) (JTX-104) ("Usually, the most stable polymorphic form is preferred in a market formulation . . ."; "'Overlooking the most stable polymorph may cause a failure of a marketed product due to phase transformation during storage . . ."); Guillory, J. Keith, *Generation of Polymorphs, Hydrates, Solvates, and Amorphous Solids*, Polymorphism in Pharmaceutical Sciences 183-226 (Harry G. Brittain, ed., 1999) (JTX-27) ("It is essential to ascertain whether the crystalline material . . . is thermodynamically stable before conducting pivotal trials, since a more stable form may be obtained subsequently, and it may be impossible to produce the metastable form in future synthesis."); Morissette et al., *High-Throughput Crystallizations: Polymorphs, Salts, Co-Crystals and Solvates of Pharmaceutical Solids* 56:275-300 (2004) (JTX-0007).

Moreover, the defendants note that skilled artisans would have known to obtain and use the most stable form for drug development and manufacture because of Abbott Laboratories' ("Abbott") experience with its drug ritonavir, wherein Abbott failed to confirm that it had the most stable polymorphic form of the API and proceeded to market a less stable form. (*Id.* (citing JTX-5.1; PTX-585.130 at pp. 248-49).) Because the less stable form converted to the most stable form during manufacturing, Abbott was forced to reformulate its product after spending hundreds of millions of dollars to develop and market the product, allowing time for competitors to take over the market. (*Id.* at 18-19 (citing JTX-104.1; Tr. at 395:21-397:18 (Cima)).) Thus, the defendants assert that a person of skill in the art would have had a commercial motivation to identify and use the most stable polymorphic form of armodafinil in a pharmaceutical composition and, because Form I is the most stable polymorph of armodafinil, a skilled artisan would have been led directly to Form I. (*Id.* at 19.)

However, in consideration of the evidence presented at trial and for the reasons that follow, the court disagrees and concludes that the defendants have not proven by clear and convincing evidence that obtaining Form I armodafinil would not have been obvious to a person of skill in the art in 2002. As the plaintiffs' expert, Dr. Bernstein, explained in testimony the court finds credible, polymorphism is inherently unpredictable and, based on the unique nature of armodafinil, a skilled artisan would not have had a reasonable expectation of success that armodafinil is polymorphic in 2002. (D.I. 314 at 31 (citing Tr. at 496:3-503:2, 511:17-25, 547:16-18, 548:1-551:14, 562:16-563:17, 586:9-588:22 (Bernstein)).) Notably, the unpredictable nature of polymorphism was discussed in publications at the time and, in fact, in some of Dr. Cima's publications. For instance, publications at the time discussing polymorphic crystallization experiments noted that: "[t]here are

52

**A52**

no failsafe methods to predict the extent of polymorphism of a given compound"[46]; "[u]nlike salts, which for the most part can be prophetically claimed based on an understanding of the chemical structure of the compound and its ionization constants, the existence and identity of . . . polymorphs have defied prediction"[47]; and "[t]he large number of crystallization trials performed in these experiments reflects the reality that nucleation rate has an extremely non-linear dependence on the experimental conditions, and as such, the probability of a chance occurrence of a particular form is increased by a [high throughput] approach."[48]

The unpredictability of crystallization and polymorphism was also detailed in other publications and known by people actually working in the field at the time. (*Id.* at 32 (citing Tr. at 551:12-14 (Bernstein); Tr. at 823:23-824:12 (Blomsma); Tr. at 836:23-837:4, 843:9-18 (Coquerel)).) For example, a 2001 paper by Dr. Zaworotko, one of the defendants' experts who submitted an expert report on their behalf, characterized efforts to predict crystal structures as "continu[ing] to represent a challenge of the highest level of scientific and technological importance," given that "it remains in general impossible to predict the structure of even the simplest crystalline solids from a knowledge of their chemical composition." *See* JTX-86-2.

The evidence at trial further demonstrated that the crystal structure itself is fundamentally unpredictable. *See* Tr. at 496:3-500:18 (Bernstein). Even Dr. Cima agreed that the specific structure of Form I—i.e., the physical dimensions within the crystal and corresponding interplanar XRPD limitations of Claim 6 and its properties—could not have been reasonably predicted, though he disagreed that this information would be relevant for a skilled artisan seeking to obtain and use

---

[46] *See* JTX-35-1: Peterson, M.L et al., *Iterative High-Throughput Polymorphism Studies on Acetaminophen and an Experimentally Derived Structure for Form III*, 1241 Am. Chem. Soc., 10958-10959 (2002).

[47] *See* JTX-7-22: Morissette et al., *High-Throughput Crystallization: Polymorphs, Salts, Co-Crystals and Solvates of Pharmaceutical Solids* 56:275-300 (2004).

[48] *See id.* at -4.

Form I armodafinil. *See id.* at 420:12-421:17, 435:15-436:25 (Cima). Even if there were a way of predicting that a compound would be polymorphic and what the crystal structures might be, the evidence presented shows that person of skill would not know how to make a specific polymorph or predict its properties. *See id.* at 500:11-18, 505:8-10, 505:20-507:7, 548:1-549:5 (Bernstein). Thus, because the existence, structure, and methods of making polymorphs were not predictable, crystal forms could only be prepared and identified by trial and error experimentation. *See* Tr. at 555:9-556:3, 571:24-572:12 (Bernstein); Tr. at 447:8-12 (Cima); Tr. at 233:3-234:3 (Hollingsworth). Notably, even Dr. Cima's expressed the same understanding in his peer-reviewed publications.[49]

With respect to armodafinil in particular, the court finds, based on the foregoing, that researchers in the field could not have predicted whether it would exhibit polymorphism or what recrystallization conditions would generate a particular crystalline form or solvate. (D.I. 314 at 33 (citing Tr. at 828:18-21, 829:2-9, 829:13-830:10, 841:25-843:2 (Coquerel); Tr. at 732:24-733:12, 734:17-25, 757:22-759:11 (Myerson); Tr. at 547:4-15 (Bernstein)).) The prior art disclosure of the enantiomeric molecule armodafinil consisted entirely of the '855 Patent and the defendants did not present secondary references to be combined with or to modify that Patent. (D.I. 314 at 30-31 (citing Tr. at 28:14-18; Tr. at 381:2-383:24, 425:1-16 (Cima)).) As Dr. Bernstein explained, in testimony the court finds credible, the '855 Patent did not provide any basis for a skilled artisan to have known whether armodafinil would crystallize in polymorphic forms or what the structure of

---

[49] *See* PTX-26-4 ("[T]he only manner in which one can be assured of having a complete knowledge of the polymorphic landscape on which to base a development choice (usually the most thermodynamically form) is to subject the API to a variety of crystallizing conditions that can expose the diversity of forms."); JTX-7-22 ("[D]iscrete crystal forms are considered non-obvious and patentable" and, due to the unpredictability, "in order to obtain patent protection on these forms . . . it is essential to prepare them, identify conditions for making them and evaluate their properties as valuable new pharmaceutical materials."); *see also* Tr. at 468:4-8 (Cima). Dr. Cima also acknowledged that the statements of unpredictability and patentability in his 2004 article are not limited to metastable forms. *See* Tr. at 467:6-468:3 (Cima).

those forms would be, due to the unique nature of armodafinil and the unpredictability of polymorphism. (*Id.* (citing Tr. at 496:3-503:2, 511:17-25, 547:16-18, 548:1-551:14, 562:16-563:17, 586:9-588:22 (Bernstein)).) In fact, prior to the '570 Patent, there was no disclosure of Form I armodafinil or anything to indicate that Form I armodafinil was the most stable form. (*Id.* at 34 (citing Tr. at 571:7-12 (Bernstein)).)

Moreover, beyond the absence of any express disclosure, there was no implicit disclosure of Form I armodafinil in the '855 Patent.[50] First, while the result of Preparation I is described as being "in the form of white crystals" that was "recrystallized from ethanol," the '855 Patent is silent was to whether it may or may not have been a solvate, hydrate, a mixture of materials, or a different form of armodafinil. (*Id.* (citing Tr. at 553:7-21 (Bernstein); Tr. at 838:3-839:7 (Coquerel)).) Further, other than stating "recrystallization from ethanol," the '855 Patent does not specifically address any of the multitude of crystallization conditions available and that were set out in Table 1 of Dr. Cima's paper, *High-Throughput Crystallization: Polymorphs, Salts, Co-Crystals and Solvates of Pharmaceutical Solids.*[51] *See* JTX-7; *see also* Tr. at 567:6-9 (Bernstein). The '855 Patent also does not provide any indication as to what thermal conditions might lead to Form I. (D.I. 314 at 34 (citing Tr. at 566:25-567:5 (Bernstein)).)

Second, the reported melting point for the Preparation I material does not indicate whether armodafinil could be polymorphic and is consistent with the material being a solvate. (*Id.* at 34-35 (citing JTX-103-3 at 3:55; Tr. at 554:3-10 (Bernstein)).) The evidence presented demonstrates that the existence of solvates is not hypothetical, as it was later discovered that an ethanol solvate

---

[50] In addition, there was no implicit disclosure of the polymorphism of armodafinil generally or Form I in particular and these would not have been reasonably predictable from the potential pharmaceutical use disclosed in the '855 Patent. *See* Tr. at 569:16-20 (Bernstein). To the contrary, as Dr. Bernstein explained and as was expressed in the peer-reviewed literature, pharmaceutical compounds are no more polymorphic than other compounds. *See id.* at 493:21-494:1, 569:21-571:1; PTX-28-2.

[51] Table I in Dr. Cima's article lists over thirty of the most notable composition and processing variables available that can affect polymorphic form. *See* JTX-7-3.

of armodafinil may be formed. (*Id.* at 35 (citing Tr. at 252:17-253:14 (Hollingsworth)); PTX-129-3).) Thus, the '855 Patent disclosure of "white crystals" prepared from ethanol would not have suggested to a skilled artisan that armodafinil is polymorphic. (*Id.* (citing Tr. at 562:16-563:7 (Bernstein); Tr. at 838:23-839:7 (Coquerel)).) Rather, "white crystals" does not disclose any information beyond describing the substance. (*Id.*)

Third, while the molecular structure of the armodafinil molecule was known based on the '855 Patent, the court finds that that Patent provides no basis to predict polymorphism of armodafinil Form I. *See* Tr. at 556:4-14. Specifically, the inability to predict polymorphism from molecule structure was known in the literature and was not contradicted at trial by any material on which Dr. Cima relied. For instance, an article by Professor Gautam Desiraju, one of the leading researchers in organic solid-state chemistry, explained that there were "major obstacles in routinely predicting crystal structures from molecular structure," including that "the crystal structures of many 'simple' organic compounds need not be simple at all" and "chemists seem unable to accurately foresee" how functional groups of molecules will interact to form crystals. *See* JTX-23-2; *see also* Tr. at 556:15-558:9 (Bernstein); JTX-86-2). This inability to predict polymorphism from molecular function was also discussed in Dr. Bernstein's 2011 article, which explained that there is no evidence of a correlation between the number of hydrogen-bonding functionalities and the tendency to form multiple crystal forms.[52] Dr. Bernstein also provided persuasive, concrete examples as evidence of this point. For instance, neither sucrose nor ibuprofen were known to be polymorphic despite having been prepared in large quantities for long periods of time. *See* Tr. at 558:14-559:19 (Bernstein); PDX-1-14. Thus, Dr. Bernstein explained that there was no way to

---

[52] The court concludes, based on Dr. Bernstein's credible testimony, that Dr. Cima's assertions to the contrary are unsupported. *See* Tr. at 439:7-25 (Cima); Tr. at 559:25-562:15 (Bernstein).

predict whether armodafinil would be consistent or inconsistent with the absence of known polymorphism for sucrose and ibuprofen. *See* Tr. at 559:20-560:23 (Bernstein).

Fourth, contrary to Dr. Cima's assertions, the court finds that neither the polymorphism of armodafinil nor Form I was reasonably predictable based on the polymorphism of racemic modafinil because, importantly, there was no evidence that modafinil is polymorphic.[53] The defendants also did not present evidence in the prior art that a polymorphic racemate would suggest a polymorphic enantiomer or single enantiomer. (D.I 314 at 36 (citing Tr. at 547:22-25, 548:1-20, 567:19-23 (Bernstein)).) Dr. Bernstein, however, presented examples of cases where the racemic compound exhibits polymorphism but the enantiomer does not. (*Id.* (citing Tr. at 567:24-569:9 (Bernstein); PDX-1-15; JTX-8-10 (racemic crystals preferred over enantiomeric crystals).)

Fifth, the court disagrees with the defendants' assertion that Claims 6 and 9 would have been obvious to a person of ordinary skill in the art because that skilled artisan would have been motivated to find the most stable polymorphic form of armodafinil, Form I, and would have a reasonable expectation of success in finding Form I because it would have been easy to obtain. Rather, the court finds that the "motivation" to identify armodafinil's most stable form for pharmaceutical composition, is not equivalent to a skilled artisan having a reasonable expectation of success in obtaining Form I armodafinil for several reasons. Importantly, and as Dr. Bernstein credibly explained, the "most stable" form of a crystal does not refer to a specific material, but, instead, is a relative term that refers to the lowest energy crystalline form known at a given time. (*Id.* at 37 (citing Tr. at 510:2-511:16 (Bernstein); PDX-1-16; PDX-1-17).) Indeed, as the Abbott ritonavir example shows, more stable forms of a crystal can be identified after significant testing. (*Id.* (citing Tr. at 507:14-23, 512:10-513:16, 531:9-533-4 (Bernstein); Tr. at 733:16-734:15

---

[53] As the plaintiffs note, the defendants withdrew the one piece of evidence in support of this argument, JTX-11, because they could not establish it to be prior art. *See id.* at 413:19-415:24.

(Myerson); Tr. at 396:12-397:21 (Cima); JTX-104-1).) To this end, in the court's view, Dr. Cima's description of the skilled artisan's alleged motivation to develop new and improved crystalline forms does not render obvious the specific solution of Form I.[54] (*Id.* at 38 (citing Tr. at 511:14-25, 512:25-513:3 (Bernstein)).)

Moreover, it is clear from the evidence that for persons of skill, other considerations, beyond thermodynamic stability are involved in the calculus that leads to the selection of a polymorph or solid form for use in a pharmaceutical product. Specifically, some drug products employ metastable or amorphous forms of the API because the "most stable" form has undesirable characteristics. (*Id.* (citing Tr. at 512:17-20, 530:8-11, 617:11-23 (Bernstein); Tr. at 441:22-442:16 (Cima); Tr. at 224:9-226:19 (Hollingsworth)).) For instance, a solid material must be sufficiently soluble for its intended pharmaceutical use, yet, solubility and stability are inversely related—the more stable the polymorph, the less soluble it will be. (*Id.* at 39 (citing Tr. at 832:22-833:4 (Coquerel); Tr. at 522:5-525:7, 529:3-530:7 (Bernstein); Tr. at 676:10-18 (Mallamo)).) Ritonavir is an example where the later discovered "most stable" form proved undesirable due to its low solubility. (*Id.* (citing Tr. at 531:9-532:7 (Bernstein)).) Similarly, the more stable polymorph of chloramphenicol palmitate has almost no bioavailability compared to the less stable form. (*Id.* (citing Tr. at 522:5-525:7 (Bernstein)).) Here, there was no disclosure in the prior art as to Form I armodafinil or that Form I was the most stable polymorph and, moreover, its relative stability could not be anticipated because relative energies are not predictable. (*Id.* at 38 (citing Tr. at 513:17-20, 617:11-23 (Bernstein)).)

---

[54] Dr. Bernstein explained that the motivation of a skilled artisan to find the "most stable form" of armodafinil would be no different than the motivation to find an effective drug with the lowest toxicology profile, which likewise does not render obvious a specific drug that has the lowest toxicology profile. *Id.* at 572:24-573:12 (Bernstein).

In view of the foregoing, the court concludes that a person of ordinary skill in the art would not have had a reasonable expectation of success in obtaining the specific Form I armodafinil claimed in the '570 Patent.

### b. Whether a Person of Ordinary Skill in the Art Could Have Obtained Form I Armodafinil Through Routine Experimentation and Techniques

The defendants next assert that a person of ordinary skill in the art in 2002 would have expected to obtain the most stable polymorph of armodafinil using well known and merely routine techniques, such as ageing and polymorph screening, because the most stable polymorph is "by far the easiest [] to obtain." (D.I. 319 at 19-20.) Specifically, the defendants allege that a skilled artisan in the early 2000s would have known of a technique called ageing, also known as solvent-mediated polymorphic transformation, and would have known it to be an efficient method to obtain the most stable polymorph of a crystalline compound. (*Id.* at 20 (citing Tr. at 401:16-402:8, 402:13-15, 402:22-403:2 (Cima); JTX-104.1-.2 ("An efficient method to discover the most stable polymorph is the technique of solvent-mediated polymorphic transformation.").) The defendants note that Dr. Bernstein even acknowledged that slurrying, a type of ageing involving mechanical mixing, is "often used" in industrial crystallizations and "leads to a conversion generally of a mixture of polymorphs to the most stable form." (*Id.* (citing Tr. at 576:24-578:15 (Bernstein)).)

During the ageing process, crystals are allowed to remain in contact with the solvent and the metastable polymorphs dissolve and recrystallize into a more stable form, continuing until only the most thermodynamically stable polymorph remains. (*Id.* (citing JTX-27.8; JTX-104.2); Tr. at 403:23-404:6 (Cima)).) Thus, the defendants assert that a skilled artisan motivated to obtain armodafinil's most stable polymorph would have a reasonable expectation of success in doing so using the ageing experiment. (*Id.* at 20-21 (citing Tr. at 404:21-406:13 (Cima)).) Moreover, the

59

**A59**

defendants note that that expectation of success would be reinforced by the disclosure in the '855 Patent of crystalline armodafinil and ethanol as the appropriate solvent for use in ageing armodafinil. (*Id.* at 21 (citing Tr. at 404:14-20 (Cima)).) Likewise, Cephalon's own documents illustrate that a skilled artisan would have reasonably expected to obtain Form I armodafinil through an ageing experiment because Cephalon used this experiment to verify the most stable form of armodafinil and expected it to produce the most stable form. (*Id.* (citing JTX-123.19; PTX-289.2 ("If the polymorphic mixture had converted into only one crystal form, it could be concluded that the 'surviving' form was the more stable (less soluble) form at room temperature. The theory behind this conclusion is that crystals of the more soluble form will dissolve, then recrystallize as the less soluble form . . . . The process will continue until all of the solid phase has converted to the less soluble crystal form.").) Thus, the defendants contend, the '855 Patent's disclosures coupled with Cephalon's own experimentation demonstrates that a person of ordinary skill in the art would have a reasonable expectation of success in obtaining Form I through routine experimentation. (*Id.* at 21-22.)

In addition to the availability of ageing experiments, the defendants assert that a skilled artisan in 2002 would have reasonably expected to obtain armodafinil's most stable polymorph through a conventional polymorph screen technique. (*Id.* at 22 (citing Tr. at 406:14-407:13 (Cima)).) Specifically, the defendants note that by the early 2000s, it was widely recognized that most drug compounds exist in multiple polymorphic forms and that there is an importance in examining polymorphism even for those artisans seeking the most stable polymorph form as a drug product. (*Id.* at 22-23 (citing JTX-22.4, .6; JTX-27.5 ("Those who study polymorphism are rapidly reaching the conclusion that all compounds . . . can crystallize in different crystal forms or

polymorphs"); JTX-94.7; PTX-28.3; JTX-58.19 ("[I]t is clear that probably every organic medicinal can exist in different polymorphs"); Tr. at 594:11-595:15 (Bernstein)).)[55]

Beyond this general knowledge, the defendants cite the FDA's 1987 guidelines, which instructed drug developers to examine polymorphism and stressed the importance of controlling a compound's polymorphic form. (*Id.* at 23 (citing JTX-24.35; JTX-21.2; Tr. at 409:5-410:11 (Cima)).) Thus, the defendants contend that by the early 2000s it was routine practice in the pharmaceutical industry to conduct a polymorphic screen on drug candidates to confirm the most stable polymorph and identify additional metastable polymorphs. (*Id.* (citing Tr. at 406:14-407:10, 410:12-23; 416:12 (Cima); JTX-20.5-.6; JTX-21.1-.10; JTX-22.5).) The defendants further argue that a skilled artisan would have been motivated to screen armodafinil because, "like almost every other crystalline drug compound," it could exist in multiple polymorphic forms and it has characteristics associated with polymorphism, such as low solubility in water and a molecular weight below 350. (*Id.* (citing Tr. at 411:11-16, 412:4-12 (Cima); JTX-22.6; JTX-27.5; JTX-103.3 col. 3, ll. 51-53; PTX-585.127 at p. 242; Tr. at 530:12-22, 592:4-593:8 (Bernstein)).) Dr. Bernstein agreed that if the product obtained from Preparation I were a candidate to be an active ingredient in a pharmaceutical composition, there would have been a motivation to perform polymorphic screening. (*Id.* at 24 (citing Tr. at 618:4-10 (Bernstein)).)

In sum, the defendants argue that, for commercial success and regulatory reasons, a skilled artisan would have been motivated to conduct a polymorph screen of armodafinil and that it would have been "a simple and routine matter for [that artisan] to identify the most stable polymorph" using this technique. (*Id.* (citing Tr. at 406:14-407:10, 416:13-21 (Cima)).) Dr. Cima testified

---

[55] The defendants note that Dr. Walter McCrone, who Dr. Bernstein acknowledged to be a historically prominent scholar, concluded that every compound has different polymorphic forms. (D.I. 319 at 22 (citing Tr. at 594:11-595:15 (Bernstein)).)

that a person of ordinary skill in the art would have expected to obtain the most stable polymorph of armodafinil at least ninety-percent of the time from a conventional polymorphic screen. Tr. at 381:18-24, 416:22-417:3 (Cima). Moreover, Dr. Cima opined that a skilled artisan would have known how to adjust the parameters of a polymorph screen to ensure the formation of armodafinil's most stable polymorph. *See id.* at 417:4-14. Thus, the defendants contend, the "evidence conclusively establishes that a [person of ordinary skill in the art] would have had more than a reasonable expectation of success of obtaining armodafinil's most stable polymorph—Form I—through a conventional polymorphic screen." (D.I. 319 at 24 (citing Tr. at 411:18-23, 416:22-417:3, 418:3-15, 447:13-21 (Cima)).)

However, for the reasons that follow, the court concludes that the defendants have failed to demonstrate clearly and convincingly that a person of ordinary skill in the art in 2002 would have a reasonable expectation of success of obtaining Form I armodafinil using routine techniques and methods. First, and as Dr. Bernstein explained in testimony the court finds credible, even assuming that there would have been a motivation to obtain the "most stable" form of armodafinil, a skilled artisan would have expected to resort to trial and error experimentation, using a large number of conditions, to try to make this form. (D.I. 314 at 39 (citing Tr. at 500:11-18 (Bernstein)).) Specifically, trial and error crystallization experimentation is necessary because polymorphs are unpredictable. (*Id.* (citing Tr. at 571:24-572:23 (Bernstein); Tr. at 823:7-14 (Blomsma)).) Crystallizing new polymorphs often requires hundreds to thousands of experiments that analyze the effects of various parameters such as temperature, solvent and solvent mixtures, mixing time, cooling rates, stirring rates, and concentrations, as well as methods and processes for precipitation, cooling, evaporation, slurry, and thermo-cycling. (*Id.* at 40 (citing JTX-18-43 at ¶ 6; Tr. at 575:18-576:21 (Bernstein)).)

For example, the plaintiffs cite to a May 2002 article co-authored by Dr. Cima, which shows that, at that time, 7,776 crystallization experiments, representing 2,592 unique conditions, were used in experiments for polymorphs of acetaminophen. (*Id.* (citing JTX-35-2; PTX-38-3; Tr. at 580:23-581:9, 582:3-19, 583:8-13 (Bernstein)).) In addition, for each solvent system, several other parameters would be varied, including the heating parameters, cooling, stirring, etc. (*Id.* (citing Tr. at 583:14-18 (Bernstein)).) The large number of conditions used reflects the fact that the authors, including Dr. Cima, could not predict which conditions to use or the results of their experiments. Tr. at 582:20-25 (Bernstein). The unpredictability of polymorph crystallization further required the use of multiple replicates and these experiments were run in triplicate because crystallization results are not necessarily reproducible even under seemingly identical conditions. (D.I. 314 at 40 (citing JTX-35-2; Tr. at 583:19-585:19 (Bernstein); Tr. at 823:15-22 (Blomsma)).)

The difficulty presented by the large number of crystallization conditions is also reflected in Dr. Cima's 2002 patent application, which states that "[a]t present, industry does not have the time or resources to test hundreds of thousands of combinations to achieve an optimized solid form[]. At the current state of the art, it is more cost effective to use non-optimized or semi-optimized solid-forms in pharmaceutical and other formulations." *See* PTX-27-12 at ¶ 30; *see also* Tr. at 579:17-580:16 (Bernstein). In view of the foregoing, the court finds Dr. Bernstein's testimony on this issue more credible than Dr. Cima's litigation testimony that only metastable forms, which he contends are not used in pharmaceuticals, are unpredictable. *See* Tr. at 442:20-21, 465:7-468:3 (Cima). The court also concludes that the number of crystallization conditions was so large that, even if a "most stable" crystal form could have been predicted, a person of ordinary skill in the art would not have a defined, finite set of reasonably predictable experiments or variables and would have had to rely on trial and error experimentation.

Second, this conclusion is reinforced by the fact that there were no specific teachings or suggestions in the prior art to study armodafinil, notwithstanding the twelve years between publication of the '855 Patent on the enantiomer and the filing of the '570 Patent. (D.I. 314 at 41 (citing Tr. 573:21-574:4 (Bernstein)).) Moreover, and contrary to Dr. Cima's conclusion that a skilled artisan would know what conditions to use in a polymorph screen, Dr. Bernstein testified persuasively that the prior art did not teach or suggest a limited number of conditions (i.e., solvents, concentrations, cooling, heating, and stirring rates) that would be tested in screening experiments for armodafinil.[56] Tr. at 573:13-20, 575:11-14, 586:9-20 (Bernstein); *see also* Tr. at 831:21-832:11 (Coquerel). To this end, there was on way to reasonably predict the outcome of any vast number of possible conditions that could have been chosen, as the selection of certain sets of conditions, but not others, could have resulted exclusively in forms other than Form I or mixtures of forms. (D.I. 314 at 41 (citing Tr. at 573:13-20, 575:11-14, 586:9-20 (Bernstein); JTX-38-42 (describing the conditions for Example No. ON II/149 H, which yielded Form II); Tr. at 198:1-10, 210:5-12 (Hollingsworth); Tr. at 366:19-25 (Robie)).) Thus, the court finds that the absence of known test conditions in the prior would not have allowed a person of ordinary skill in the art to anticipate a reasonable expectation of success.

Third, and with respect to the defendants' assertion that the ageing technique was known and would have allowed a skilled artisan to obtain Form I, the court disagrees that they have proven this by clear and convincing evidence. Specifically, the defendants derive their various ageing, slurry, or solvent-mediated transformation methods from the Gu article. *See* JTX-104-1-2. Importantly, however, this article does not disclose any general applicable method to obtain the

---

[56] The court notes that, while the '855 Patent states that the product of Preparation I was "recrystallization from ethanol," it omits key information necessary to conduct a specific recrystallization experiment, as discussed above in connection with the defendants' anticipation argument. Further, the results of being "recrystallized from ethanol" were still unpredictable. *See* Tr. at 566:13-567:9 (Bernstein); Tr. at 102:25-105:21 (Hollingsworth).

most stable form. *See* Tr. at 630:18-24 (Bernstein). Rather, as Dr. Bernstein described, these experiments can, at best, convert a mixture of forms to the most stable form already present in the mixture, but not necessarily to the most stable form overall. *See id.* at 576:22-577:24. Indeed, the Gu experiments were all based on pre-seeding the samples with ten-percent of the more stable Form II to induce transformation of the less stable Form I. *See* JTX-104-3 ("To determine the crystal growth rate of Form II, 90% of Form I and 10% of Form II were geometrically mixed . . ."); *see also* JTX-104-5, Table 1 ("Time (h) for 10% Form II to Convert to 75% Form II"). The defendants did not present evidence that Form I armodafinil would have been available in advance for use in such an ageing experiment.

In addition, and notwithstanding the pre-seeding with the most stable form, Gu shows and Dr. Cima acknowledged, that in nearly half of Gu's experiments there was no conversion of a less stable Form I to a more stable Form II. (D.I. 314 at 42 (citing JTX-104-5, Table 1; Tr. at 456:19-457:9 (Cima)).) Thus, even with pre-seeding, conversion did not occur in nearly half of the solvent systems, further evidencing that Gu's method is not a generally applicable method to obtain the most stable form of a material. (*See id.* (citing Tr. at 630:18-24 (Bernstein); DTX-201-2 ("It is still unpredictable whether one polymorph will nucleate or grow faster than another from the same liquid, even with the knowledge of their structures and thermodynamic relations."); Tr. at 223:5-224:8 (Hollingsworth)).) Therefore, even if ten-percent of armodafinil Form I was available for use in an experiment according to Gu, there would have been no reasonable expectation of success to convert a mixture of crystalline forms to a pharmaceutical composition consisting essentially of Form I as the active ingredient, as required by asserted Claims 6 and 9.

c. **Whether a Person of Ordinary Skill in the Art Would Have Been Motivated to Make a Pharmaceutical Composition Consisting Essentially of Form I Armodafinil**

65

**A65**

The defendants assert that, in addition to being motivated to use Form I armodafinil in a pharmaceutical composition,[57] a skilled artisan in 2002 would have known that crystalline armodafinil could be successfully formulated into an effective pharmaceutical composition for use in humans based on the '855 Patent. (D.I. 319 at 26.) In light of these teachings, the defendants contend that a person of ordinary skill in the art would have reasonably expected to successfully formulate Form I into a pharmaceutical composition. (*Id.* (citing Tr. at 425:8-16, 432:8-16, 433:24-434:7, 460:18-461:3 (Cima)).) In support of this position, the defendants argue that there "are extremely rare circumstances where the most stable form of a compound is not sufficiently soluble and instead a metastable or pseudopolymorphic form has been developed as a drug product." (*Id.* (citing Tr. at 461:19-462:17 (Cima)).) However, the defendants contend that the '855 Patent teaches that armodafinil's most stable form would be sufficiently soluble and bioavailable to be effective in a pharmaceutical composition and that a skilled artisan would not have to resort to less stable forms. (*Id.* (citing Tr. at 401:8-15, 425:1-426:15 (Cima)).)

The defendants state that, while the '855 Patent details that armodafinil is insoluble in water, a person of ordinary skill in the art would have understood that language to indicate that armodafinil has low solubility in water at neutral pH and not complete insolubility. (*Id.* (citing Tr. at 427:2-21, 429:1-16 (Cima)).) Specifically, the defendants assert that this understanding would be evident based on the fact that the '855 Patent describes the efficacious use of armodafinil pharmaceutical compositions in human clinical trials, demonstrating that armodafinil has sufficient solubility and bioavailability when formulated into tablets or capsules. (*Id.* (citing JTX-103.4 col. 6, ll. 44-66; Tr. at 428:16-20 (Cima); Tr. at 676:10-18 (Mallamo)).) In addition, a skilled artisan would have expected armodafinil's most stable polymorph to be sufficiently soluble and

---

[57] *See supra* Section III.B.3.a.

bioavailable for use in a pharmaceutical composition because racemic modafinil, with lower solubility, was known to be effective in PROVIGIL, Cephalon's earlier commercial drug product and, indeed, the '855 Patent confirms that armodafinil had "better bioavailability" than racemic modafinil. (*Id.* at 26-27 (Tr. at 457:13-426:15, 427:12-21, 428:2-11 (Cima); JTX-103.4 col. 6, ll. 33-37).)

Again, however, the court disagrees and concludes that the defendants have not demonstrated by clear and convincing evidence that a person of ordinary skill in the art would have a reasonable expectation of success in developing a pharmaceutical composition consisting essentially of Form I based on the '855 Patent or routine purification techniques for the following reasons. Specifically, and as Dr. Cima acknowledged in his testimony, the '855 Patent does not disclose the solid-state form of armodafinil used in its tablets and gel capsules or indicate that it consisted essentially of Form I. (D.I. 319 at 42 (citing Tr. at 460:5-9 (Cima)).) Dr. Cima's contention that routine techniques could be used to purify the product of Preparation I is unsupported and, in any event, would not be sufficient to show that the purification would have yielded a pharmaceutical composition consisting essentially of Form I.

Rather, many steps are required between making the product of Preparation I and making a tablet of armodafinil. (*Id.* (citing Tr. at 460:2-461:3 (Cima)).) Despite this fact, Dr. Cima provided no testimony and cited no evidence as to how these steps could affect the material's crystal form, which is a critical omission considering that, as was demonstrated at trial, even small changes in processing conditions can affect a material's crystal form. (*Id.* (citing Tr. at 535:17-537:2, 564:19-565:7, 566:13-19 (Bernstein); JTX-7-3 (table summarizing many, but not all, of the variables that can play a role in the crystallization process and affect the resulting polymorphism); Tr. at 696:23-697:20 (Mallamo)).) Indeed, this was proven by Dr. Hollingsworth, who converted

67

**A67**

a mixture containing mostly Form I armodafinil to mostly Form II armodafinil by using a second recrystallization step, the key technique Dr. Cima proposed to "purify" the product of Preparation I for pharmaceutical use. (*Id.* (citing Tr. at 195:16-200:22, 208:4-7, 210:5-12 (Hollingsworth); Tr. at 430:16-24 (Cima); Tr. at 749:11-19 (Myerson)).)  For these reasons, the court concludes that Dr. Cima's contention that the Preparation I product could be purified to yield a pharmaceutical composition consisting essentially of Form I falls short of proving obviousness by clear and convincing evidence. *See* Tr. at 541:5-542:8, 553:7-21 (Cima); Tr. at 838:3-22 (Coquerel).

### 4.    Conclusion

In view of the foregoing, the court concludes that the defendants have failed to demonstrate obviousness of the asserted claims by clear and convincing evidence. Here, for the reasons detailed above, Form I would not have been obvious because there was no more than a general motivation to find new crystal forms of armodafinil with nothing directed to the unknown Form I itself. However, for a patent challenger to establish obviousness, it is insufficient to allege a general motivation to discover an undefined solution that could take many possible forms. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008) ("[K]nowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed method.").

Moreover, in this case, the prior art did not suggest the particular structure of Form I and there was no suggestion of the structure or method of making Form I armodafinil in the alleged prior art. As Dr. Bernstein explained, a skilled artisan could not have predicted the particular structure of Form I and, likewise, nothing taught or suggested the means of obtaining Form I, which was also unpredictable. Notably, in *Pfizer, Inc. v. Apotex, Inc.*, the Federal Circuit concluded that the non-obviousness of crystal forms is distinct from the obviousness of a

pharmaceutically acceptable salt. 480 F.3d 1348 (Fed. Cir. 2007). Unlike the general notion to find a new or improved crystal form, in *Pfizer* "it [was] not the case where the prior art teaches merely to pursue a general approach that seemed to be a promising field of experimentation or gave only general guidance as to the particular form of the claimed invention or how to achieve it." *Id.* at 1366 (quotations omitted). Instead, a limited number of pharmaceutically acceptable salt anions would have been known to the skilled artisan, who was "capable of further narrowing that list of 53 anions to a much smaller group . . . with a reasonable expectation of success." *Id.* at 1367. There, the Federal Circuit concluded that the "type of experiments used by Pfizer to verify the physicochemical characteristics of each salt are not equivalent to the trial and error procedures often employed to discover a new compound where the prior art gave no motivation or suggestion to make the new compound nor a reasonable expectation of success." *Id.*

Here, the defendants have not produced sufficient evidence to demonstrate that skilled artisans would have had reason to select the route that produced the claimed invention or that the prior art provided indication of which parameters were critical or likely to prove successful amongst the numerous testing conditions and variables available. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012); *see also Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011). Instead, the evidence presented makes clear that the prior art did not direct persons of skill in the field to the specific conditions to use for seeking new polymorphs of armodafinil and none necessarily produced material suitable for a pharmaceutical composition consisting essentially of Form I, as required by Claims 6 and 9. Consequently, because the prior art did not suggest how to make Form I armodafinil consistent with the asserted claims, the defendants have failed to demonstrate,

69

for the reasons expressed more fully above, obviousness by clear and convincing evidence.[58] *See Unigene Labs.*, 655 F.3d at 1361 (citation and quotations omitted) (noting that "[t]o render a claim obvious, prior art cannot be 'vague' and must, collectively, although not explicitly, guide an artisan of ordinary skill towards a particular solution").

Further, the defendants' contention based on allegedly "obvious to try" experiments to prepare the most stable form of armodafinil falls short of proving that Form I would have been obvious. "Obvious to try" is not equivalent to obviousness in every case, particularly where, as here, the prior art provided at most general motivation to conduct trial and error experimentation in a decidedly unpredictable field. *See In re Kubin*, 561 F.3d at 1359-60 (cautioning that "obvious to try" does not necessarily mean obviousness under Section 103); *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 1796 (2012) (rejecting "obvious to try" argument because the claimed invention would not have been an expected result). Rather, the "Court in *KSR* did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is 'obvious to try,' without considering the nature of the science or technology." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008). "To the extent an art is unpredictable, as the chemical arts often are, *KSR*'s focus on [] 'identified, predictable solutions' may present a difficult hurdle [for patent challengers] because potential solutions are less likely to be genuinely predictable." *Eisai Co., Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1075, 1088 (Fed. Cir. 2008). That an invention would have been obvious as a "result of routine

---

[58] The court also notes that the novel crystal forms here are distinguishable from the nucleic acid sequence at issue in *In re Kubin*, which the Federal Circuit found was directly related to, and determinable from, a naturally occurring polypeptide. 561 F.3d 1351, 1360-61 (Fed. Cir. 2009) (noting that "prior art "teach[es] a protein identical to NAIL, a commercially available monoclonal antibody specific for NAIL, and explicit instructions for obtaining the [claimed] DNA sequence for NAIL"). Here, however, and unlike the prior art in *Kubin*, which taught a five-step "protocol for cloning [the claimed] nucleic acid molecules encoding" the known NAIL protein, the prior art had "no narrow set of conditions" (561 F.3d at 1360), and "no recipe for planning or designing a polymorph screen," the results of which are entirely unpredictable (Tr. at 574:20-575:17 (Bernstein).) Importantly, the skilled artisan here lacked any defined set of rules to determine how molecules can form into crystals.

pharmaceutical development, not invention"—as the defendants generally assert here—has been rejected where the experiments were unpredictable.[59]

Specifically, the Federal Circuit has clarified that "obvious to try" is also not obvious when a skilled artisan would have to: (1) "vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful"; or (2) "explore a new technology or general approach that seemed to be a promising filed of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *See In re O'Farrell*, 83 F.2d 894, 903 (Fed. Cir. 1988); *see also In re Kubin*, 561 F.3d at 1359-60 (reaffirming holdings in *O'Farrell* in view of *KSR*).

As detailed above, the defendants argue that the '855 Patent discloses ethanol as the recrystallization solvent for the preparation and isolation of armodafinil, such that the skilled artisan would not have to choose between a wide range of solvents to obtain Form I. Tr. at 268:1-4 (Hollingsworth); Tr. at 318:1-319:24 (Lee). However, the court finds that this argument is based on an impermissible hindsight analysis, because a person of ordinary skill in the art in 2002 would not have known of the existence of Form I, and could not have known the method to produce Form I with any solvent. A skilled artisan would have known this method only after the '570 Patent, which identified Form I armodafinil and detailed the method to recrystallize Form I from ethanol

---

[59] *See Merck & Co., Inc. v. Sandoz, Inc.*, No. 10-1625, 2012 WL 266412, at *2 (D.N.J. Jan. 30, 2012) (citations and quotations omitted). In *Merck*, the defendant argued that the invention was the result of "routine pharmaceutical development," but entailed a freeze-drying process that was "very hard to predict." *Id.* at *8-9 ("[T]he skilled artisan must experiment with freeze-drying and cannot predict the outcome of the experiments."). As a result, the court concluded that the defendants could not "prove that [the claimed invention] was a predictable solution, and thus [could not] prove obviousness through this approach." *Id.* at *9.

71

under slow cooling conditions. *See* JTX-1-32 at 27:37; *see also Glaxo Group*, 376 F.3d at 1348-49. The defendants also cannot establish obviousness through non-prior art experiments (Tr. at 419:14-420:8), but must instead demonstrate that the claimed invention "would have been obvious at the time the invention was made." 35 U.S.C. § 103(a); *KSR Int'l v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007). Here, the evidence presented at trial demonstrated that the results of crystallization and polymorphism testing were unpredictable, which required crystallization experiments using a large number of variable conditions. Thus, even if the general idea of using crystallization experiments were obvious to try, such unpredictable trial and error experimentation fails to render Form 1 obvious because the testing required was more than simply routine. *See In re Cyclobenzaprine*, 676 F.3d at 1073 (finding non-obviousness where "skilled artisans would not have encountered finite, small, or easily traversed options in developing a therapeutically effective, extended-release formulation"); *see also Sanofi-Synthelabo v. Apotex*, 550 F.3d 1075, 1088 (Fed. Cir. 2008).

## C. Injunctive Relief

The plaintiffs assert that, pursuant to 35 U.S.C. §§ 271(e)(4)(A), (B), the court "shall order the effective date of any [FDA] approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed" and may grant "injunctive relief . . . against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation in the United States of an approved drug." *See* 35 U.S.C. §§ 271(e)(4)(A), (B). The plaintiffs also request that, because the defendants have stipulated that their proposed generic armodafinil ANDA products will infringe Claims 6 and 9 of the '570 Patent, and because both of those claims are not invalid, the FDA be enjoined from approving defendants' ANDAs. The defendants further request that the defendants be enjoined

from commercially manufacturing, using, offering for sale, or selling their proposed armodafinil ANDA products prior to the expiration of the '570 Patent, including any associated extensions and exclusivities.[60]

In light of the court's holdings in this action, the court agrees that the plaintiffs are entitled to the requested injunctive relief detailed in this section.

## IV. CONCLUSION

For the reasons stated above, the court concludes that: (1) the asserted claims of the patent-in-suit are not invalid due to anticipation; (2) the asserted claims of the patent-in-suit are not invalid due to obviousness; and (3) the plaintiffs' Rule 52(c) motion is granted and the defendants' Rule 52(c) motion is denied. An appropriate order will follow.

March 30, 2013

_____
CHIEF, UNITED STATES DISTRICT JUDGE

---

[60] The plaintiffs note that they reserve arguments under 35 U.S.C. § 285 for costs and for fees. (D.I. 314 at 50.)

73

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: ARMODAFINIL PATENT LITIGATION INC. ('722 PATENT LITIGATION) | MDL No. 10-md-2200 (GMS) |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,<br>    Plaintiffs,<br><br>    v.<br><br>WATSON LABORATORIES, INC.,<br>    Defendant. | Civil Action No. 10-cv-007 (GMS) |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,<br>    Plaintiffs,<br><br>    v.<br><br>SANDOZ, INC.,<br>    Defendant. | Civil Action No. 10-cv-055 (GMS)<br>Civil Action No. 11-cv-782 (GMS) |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,<br>    Plaintiffs,<br><br>    v.<br><br>LUPIN LIMITED,<br>    Defendant. | Civil Action No. 10-cv-210 (GMS) |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS,<br>    Plaintiffs,<br><br>    v.<br><br>APOTEX, INC.,<br>    Defendant. | Civil Action No. 10-cv-695 (GMS)<br>Civil Action No. 10-cv-1078 (GMS) |

## ORDER

At Wilmington, this 30th day of March, 2013, IT IS HEREBY ORDERED THAT:

1. The asserted claims of the patent-in-suit are not invalid due to anticipation;

2. The asserted claims of the patent-in-suit are not invalid due to obviousness;

3. The defendants are enjoined from commercially manufacturing, using, offering for sale, or selling their proposed armodafinil ANDA products prior to the expiration of the '570 Patent, including any associated extensions and exclusivities and the FDA is enjoined from approving the defendants' armodafinil ANDAs prior to expiration of the '570 Patent;

4. The plaintiffs' Rule 52(c) motion (D.I. 314) is GRANTED and the defendants' Rule 52(c) motion (D.I. 319) is DENIED;

5. The plaintiffs' Motion for Judgment as a Matter of Law (D.I. 300) is terminated as MOOT in light of this Order (D.I. 329);

6. The Clerk of Court is directed to enter final judgment in favor of the plaintiffs and against the defendants.

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ARMODAFINIL PATENT LITIGATION INC. ('722 PATENT LITIGATION) | ) ) ) ) | MDL No. 10-md-2200 (GMS) |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS, Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | Civil Action No. 10-cv-007 (GMS) |
| WATSON LABORATORIES, INC., Defendant. | ) ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS, Plaintiffs, | ) ) ) ) | |
| v. | ) ) ) | Civil Action No. 10-cv-055 (GMS) Civil Action No. 11-cv-782 (GMS) |
| SANDOZ, INC., Defendant. | ) ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS, Plaintiffs, | ) ) ) ) | |
| v. | ) ) ) | Civil Action No. 10-cv-210 (GMS) |
| LUPIN LIMITED, Defendant. | ) ) ) ) | |
| CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS, Plaintiffs, | ) ) ) ) | |
| v. | ) ) ) | Civil Action No. 10-cv-695 (GMS) Civil Action No. 10-cv-1078 (GMS) |
| APOTEX, INC., Defendant. | ) ) ) ) | |

## JUDGMENT

This action came before the court for a bench trial on July 17, 2012 through July 20, 2012.

The issues have been tried and the court issued a Memorandum and Order (D.I. 329) on March 30,

2013. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED that:

1. Judgment be and is hereby entered in favor of the plaintiffs, CEPHALON, INC., CEPHALON FRANCE, and TEVA SANTE SAS, and against the defendants APOTEX, INC., LUPIN LIMITED, SANDOZ, INC., and WATSON LABORATORIES, INC.;

2. Pursuant to 35 U.S.C. §§ 271(e)(4)(A), the effective date of any approval of the products that are the subject of the defendants' ANDAs shall be the a date which is not earlier than the expiration of the patent-in-suit; and

3. Pursuant to 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283, the defendants, including their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them who receive actual notice of this Order are enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the products described in defendants' ANDAs until the expiration of the patent-in-suit.

March _30_, 2013

_____
CHIEF, UNITED STATES DISTRICT JUDGE

US007132570B2

(12) **United States Patent** (10) **Patent No.:** **US 7,132,570 B2**

Neckebrock et al. (45) **Date of Patent:** **Nov. 7, 2006**

(54) **METHOD FOR THE PRODUCTION OF CRYSTALLINE FORMS AND CRYSTALLINE FORMS OF OPTICAL ENANTIOMERS OF MODAFINIL**

(75) Inventors: **Olivier Neckebrock**, Ponteau Combault (FR); **Pierre Leproust**, Créteil (FR)

(73) Assignee: **Cephalon France**, Maisons-Alfort Cedex (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/539,918**

(22) PCT Filed: **Dec. 18, 2003**

(86) PCT No.: **PCT/FR03/03799**

§ 371 (c)(1),
(2), (4) Date: **Feb. 17, 2006**

(87) PCT Pub. No.: **WO2004/060858**

PCT Pub. Date: **Jul. 22, 2004**

(65) **Prior Publication Data**

US 2006/0135621 A1 Jun. 22, 2006

(30) **Foreign Application Priority Data**

Dec. 20, 2002 (FR) .................................. 02 16412

(51) **Int. Cl.**
  *C07C 233/05* (2006.01)
  *A61K 31/165* (2006.01)

(52) **U.S. Cl.** ...................................... 564/162; 514/618

(58) **Field of Classification Search** ................ 564/162; 514/618

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,177,290 A | 12/1979 | Lafon | 424/324 |
| 4,927,855 A | 5/1990 | Lafon | 514/618 |
| 6,489,363 B1 | 12/2002 | Jacobs et al. | 514/615 |
| 6,919,378 B1 | 7/2005 | Jacobs et al. | 514/618 |
| 6,992,219 B1 * | 1/2006 | Broquaire et al. | 564/162 |
| 2003/0022940 A1 | 1/2003 | Corvari et al. | 514/618 |
| 2003/0220403 A1 | 11/2003 | Corvari et al. | 514/618 |
| 2004/0048931 A1 | 3/2004 | Heacock et al. | 514/629 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 720 595 B1 | 12/1998 |
| GB | 1 197 809 | 7/1970 |
| WO | WO2001/022961 A1 | 4/2001 |
| WO | WO 02/10125 A1 | 2/2002 |

| | | |
|---|---|---|
| WO | WO2004/060858 A1 | 7/2004 |

OTHER PUBLICATIONS

Amiard, G., "No. 81.-Sur le dédoublement direct de la thréonine, par entrainement," *Bull. Soc. Chim. Fr.,* 1956, 447 (no English abstract).

Armodafinil Search, "Preliminary results from registry number search," Apr. 10, 2006, 1-36 and 1-296.

Bernstein, J., "Polymorphism in molecular crystals," *University Press,* UK, 2002, Chapter 10, 297-307.

Coquerel, G., "Review on the heterogeneous equilibria between condensed phases in binary systems of enantiomers," *Enantiomers, Gordon & Breach Science Publishers,* 2000, 5, 481-498.

Collet, A., et al., "Optical resolution by direct crystallization of enantiomer mixtures," *Chem. Rev.,* 1980, 80(3), 215-230.

Courvoisier, L., et al., "Influence of the process on the mechanisms and the performances of the preferential crystallization: example with (±)-5-4(4-Bromophenyl)-5-methylhydantoin," *Chemistry Letters,* 2001, 364-365.

De Min., M., et al., "Chiral resolutions, asymmetric synthesis and amplification of enantiomeric excess," *J. Chem. Phys.,* 1988, 85, 603-619.

Donovan, J.L., et al., "Chiral analysis of *d*- and *l*-modafinil in human serum: application to human pharmacokinetic studies," *Ther. Drug Monitoring,* 2003, 25, 197-202.

In, Y., et al., "Crystal and molecular structure of an (S)-(+)-enantiomer of modafinil, a novel wake-promoting agent," *Chem. Pharm. Bull.,* 2004, 52(10), 1186-1189.

Kim, S., et al., "A simple and mild esterification method for carboxylic acids using mixed carboxylic-carbonic anhydrides," *Am. Chem. Soc.,* 1985, 560-565.

Ndzié, E., et al., "An efficient access to the enantiomers of α-methyl-4-carboxyphenylglycine via a hydantoin route using a practical variant of preferential crystallization AS3PC (auto seeded programmed polythermic preferential crystallization)," *Tetrahedron Asymmetry,* 1997, 8(17), 2913-2920.

Prisinzano, T., et al., "Synthesis and determination of the absolute configuration of the enantiomers of modafinil," *Tetrahedron: Asymmetry,* 2004, 15, 1053-058.

Raynal, H., et al., "Disposition of modafinil enantiomers in humans and dogs," *ISSX Proceedings, Fifth European ISSX Meeting, Tours, France,* Sep. 26-29, 1993, 1 page.

* cited by examiner

*Primary Examiner*—Shailendra Kumar

(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

The invention relates to a process for the preparation of crystalline forms of the optical enantiomers of modafinil, comprising stages comprising:

  i) dissolving one of the optical enantiomers of modafinil in a solvent other than ethanol,

  ii) crystallising the modafinil enantiomer,

  iii) recovering the crystalline form of the modafinil enantiomer so obtained.

The invention also relates to a process for the preparation of the optical enantiomers of modafinil.

**10 Claims, 16 Drawing Sheets**



FIG.1



FIG.2

KEY: ———— equilibrium at $T_F$
— — — — equilibrium at $T_D$
— ·· — ·· — isopleth section RY



FIG.3



FIG.4



<u>FIG.5</u>



FIG.6



FIG.7



**FIG.8**



FORM II

FIG.9



FORM III

FIG.10



FORM IV

FIG.11





ACETONITRILE SOLVATE

FIG.13

2-Theta-scale



**Form V**

Relative intensity

degrees 2theta

## FIG.14





**FIG.16**

Amorphous form

Relative intensity

degrees 2theta

US 7,132,570 B2

1

# METHOD FOR THE PRODUCTION OF CRYSTALLINE FORMS AND CRYSTALLINE FORMS OF OPTICAL ENANTIOMERS OF MODAFINIL

The invention relates to a process for obtaining crystalline forms of the enantiomers of modafinil, and the crystalline forms which it is possible to obtain according to this process.

The invention also relates to a new process for the preparation of optical enantiomers of modafinil from (±) modafinil acid.

U.S. Pat. No. 4,177,290 describes modafinil in racemic form, also known as (±) 2-(benzhydrylsulphinyl)acetamide or (±) 2-[(di-phenylmethyl)sulphinyl] acetamide, as a compound having properties of stimulating the central nervous system.

U.S. Pat. No. 4,927,855 describes the two optical enantiomers of modafinil. More particularly it describes the laevorotatory enantiomer and its use as an antidepressant or stimulant agent in the treatment of hypersomnia and disorders associated with Alzheimer's disease. The process for the preparation of the two optical enantiomers of modafinil from (±) modafinil acid or (±)-benzhydrylsulphinylacetic acid described in this document is illustrated in the following synthesis diagram:



( ⅋ ) benzhydrylsulphinylacetic acid



(−)-α-methylbenzylamine-(−)-benzhydrylsulphinyl acetate



(−)-benzhydrylsulphinylacetic acid



(−)-benzhydrylsulphinylacetamide

*In relation to (−)-benzhydrylsulphinylacetic acid

2

This process comprises carrying out resolution of the optical enantiomers of (±) modafinil acid in a first stage via the formation of diastereoisomers with the optically active agent α-methylbenzylamine.

The (−)-α-methylbenzylamine-(−)-benzhydrylsulphinyl acetate is then converted to (−)-benzhydrylsulphinylacetic acid by acid hydrolysis. The latter is esterified in the presence of dimethyl sulphate and then converted to amide in the presence of ammonia (gas). The (−) or I (laevorotatory) enantiomer of modafinil is obtained through this process with an overall yield of 5.7% in relation to the (±) modafinil acid, calculated on the basis of the yields corresponding to each stage.

The term "enantiomer" refers to stereoisomer molecules which are non-superimposable mirror images of each other. Enantiomers are typically designated using either (+) and (−) or (d) and (I), which indicates optical rotating power in the chiral centre.

Stereoisomerism may also be denoted by either (D) or (L) or by (R) and (S), these being descriptive of the absolute configuration.

In what follows the laevorotatory enantiomer of modafinil will be referred to without distinction as the I or (−) enantiomer, and the dextrorotatory enantiomer will for its part be referred to as the d or (+) enantiomer.

A process through which different crystalline forms of the optical enantiomers of modafinil can be obtained has now been discovered. More specifically the inventors have shown that the crystalline form obtained mainly depends on the nature of the crystallisation solvent used.

For the purposes of this description the term "crystalline form" refers to either a polymorphic form or a solvate, without distinction.

By "polymorphic form" is meant an organised structure involving only molecules of the solute, having a characteristic crystalline signature.

The term "solvate" relates to an organised structure having a characteristic crystalline signature which involves both molecules of solute and molecules of solvent. Solvates having one molecule of solute for one molecule of solvent are called true solvates.

Furthermore the inventors have shown that that l-modafinil and d-modafinil prepared according to the conditions described in U.S. Pat. No. 4,177,290 are obtained in the form of one polymorphic form described as form I, which corresponds to the thermodynamically most stable polymorphic form under normal temperature and pressure conditions.

Form I has the X-ray diffraction spectrum below in which d represents the interplanar spacing and the ratio (I/Io) the relative intensity.

| CRL 40982 FORM I | | |
| --- | --- | --- |
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 9.8 | 13.40 | 32 |
| 15.4 | 8.54 | 87 |
| 20.8 | 6.34 | 24 |
| 26.4 | 5.01 | 14 |
| 28.3 | 4.68 | 19 |
| 28.7 | 4.62 | 16 |
| 29.9 | 4.44 | 45 |
| 31.1 | 4.27 | 100 |
| 31.6 | 4.20 | 23 |
| 32 | 4.15 | 14 |
| 33.1 | 4.02 | 78 |
| 33.4 | 3.98 | 84 |

US 7,132,570 B2

3

4

-continued

CRL 40982 FORM I

| 2 Theta (degrees) | d (Å) | I/Io (%) |
|---|---|---|
| 34.1 | 3.90 | 16 |
| 35.1 | 3.80 | 15 |
| 39 | 3.43 | 22 |

Diffractometer: Miniflex Rigaku (Elexience)

The crystalline forms of a given compound generally have physical, pharmaceutical, physiological and biological properties which differ from each other very sharply.

In this respect the crystalline forms of optically active modafinil, in particular the polymorphic forms, are of interest in that they have different and advantageous properties in comparison with form I.

According to another aspect, a new process for the preparation of the optical enantiomers of modafinil from (±)-modafinil acid has now been discovered, and this process can be used to isolate each enantiomer in yields and with an optical purity which are markedly superior to those described in U.S. Pat. No. 4,927,855.

In a particularly advantageous fashion a process for resolution of the two optical enantiomers of (±)-modafinil acid by preferential crystallisation, which is advantageously applicable to the preparation scale, has now been developed.

This process for the resolution of (±)-modafinil acid has many advantages:

it avoids the use of a costly chiral intermediate whose further preparation involves losses which are rarely less than 10% (De Min., M., Levy, G. and Michwater J. -C., 1988, J. Chem. Phys. 85, 603–19),

the two enantiomers are obtained directly, contrary to the method which makes use of conventional resolution through the formation of diastereoisomer salts,

the yield is theoretically quantitative as a result of successive recycling of the mother liquors,

Purification of the crude enantiomer crystals is easy.

The invention therefore aims to provide a process of preparation for crystalline forms of the enantiomers of modafinil.

The invention also aims to provide a new process for preparation of the optical enantiomers of modafinil, and in particular the laevorotatory enantiomer of modafinil.

Process for the Preparation of 1-Modafinil Polymorphs

These objects and others are accomplished by this invention which relates more particularly, in a first aspect, to a process for the preparation of crystalline forms of the optical enantiomers of modafinil, comprising the following stages:

i) dissolving one of the optical enantiomers of modafinil in a solvent other than ethanol,

ii) crystallising the said enantiomer of modafinil, and

iii) recovering the crystalline form of the said enantiomer of modafinil so obtained.

For the purposes of this invention, the solvent used in stage i) of the process, also referred to as the "recrystallisation solvent", is a solvent capable of bringing about crystallisation of the said optical enantiomer of modafinil, preferably at atmospheric pressure. In other words it comprises any solvent A which with at least one of the enantiomers is capable of forming at a given pressure

in a first temperature and concentration domain, a monophase system comprising at least one of the enantiomers in dilute solution in solvent A,

in a second temperature and concentration domain which is not the same as the former, a second two-phase system comprising crystals of the said enantiomer in the presence of saturated solution,

the two domains being separated from each other by the solubility curve of the said enantiomer T (° C.)=f (enantiomer concentration) at the pressure considered.

In general the crystallisation in stage ii) comprises changing from the monophase system to the two-phase system by varying the temperature and concentration.

By way of a non-restrictive illustration of solvents which may be suitable for the recrystallisation process according to the invention mention may in particular be made of alcoholic solvents, carboxylic acid ester solvents, ether solvents, chlorinated solvents, aromatic solvents, and lower aliphatic ketone solvents. Other solvents are for example, carboxylic acid solvents, aprotic polar solvents, alicyclic hydrocarbons, aliphatic hydrocarbons, carbonates, heteroaromatics and water.

Among the alcoholic solvents mention may be made in particular of lower alkyl alcohols such as methanol, ethanol, propanol, isopropanol, butanol, isobutanol, 2-methyl-2-pentanol, 1,2-propanediol and t-amyl alcohol, with methanol, propanol and isopropanol being particularly preferred.

Among solvents of the carboxylic acid ester type mention may be made in particular of alkyl acetates such as methyl acetate, ethyl acetate, n-propyl acetate, isopropyl acetate, n-butyl acetate and alkyl formates such as ethyl formate, with ethyl acetate being particularly preferred.

Useful ether recrystallisation solvents are diethylether, tetrahydrofuran (THF), dioxan, dibutylether, isopropyl ether, t-butylmethylether and tetrahydropyran, with tetrahydrofuran being particularly preferred.

Among the chlorinated solvents mention may be made of chlorinated hydrocarbons, in particular chloroform, 1,2-dichloroethane, dichloromethane and chlorinated aromatics such as chlorobenzene.

As examples of aromatic solvents mention may be made of ortho, meta, and para xylene or a mixture of ortho, meta and para xylene, methoxybenzene, nitrobenzene, trifluorotoluene and toluene, with ortho, meta and para xylene being particularly preferred.

Useful ketone solvents are solvents such as acetone, methylethylketone, methylisobutylketone, butan-2-one, cyclopentanone, isobutylmethylketone, 2-pentanone, 3-pentanone.

As an example of a carboxylic acid solvent, mention may be made in particular of acetic acid.

By way of an example of a heteroaromatic solvent, mention may be made in particular of pyridine.

Examples of aprotic polar solvents are in particular acetonitrile, propionitrile, 4-methylmorpholine, N,N-dimethylacetamide, nitromethane, triethylamine, N-methyl-pyrrolidone (NMP).

Examples of aliphatic hydrocarbons are in particular heptane, 2,2,4-trimethylpentane.

Examples of alicyclic hydrocarbons are in particular cyclopentane, cyclohexane.

Examples of carbonates are in particular alkyl carbonates such as dimethyl carbonate.

According to a preferred embodiment of the process according to the invention the crystallisation solvents are selected from acetone, methanol, 1–4 dioxan, ethyl acetate, mixtures of ortho, meta, para xylene, isopropanol, n-propanol, dimethyl carbonate, tetrahydrofuran, chloroform and methylethylketone, water and alcohol/$H_2O$ mixtures.

US 7,132,570 B2

5

Thus, crystalline forms of the optical enantiomers of modafinil can be obtained by recrystallisation of the enantiomers in particular solvents, where the nature and possibly the conditions of crystallisation mainly determine the type of crystalline form obtained.

Through its interaction with functional groups and electron-attracting or electron-donor substituents the recrystallisation solvent can in fact encourage certain molecular arrangements which give rise to a particular crystalline form under given crystallisation conditions.

Generally the recrystallisation solvent used in stage i) is heated, in particular under reflux, until the optical enantiomer of modafinil is completely dissolved in the solvent. Although the concentration of the optical enantiomer of modafinil in stage i) is not a critical factor for the crystallisation, it is however preferable to work in the presence of a concentration of optical enantiomer of modafinil which is close to the saturation concentration in the recrystallisation solvent in question.

According to one embodiment the optical enantiomer of modafinil is dissolved by heating the solvent under reflux and an additional quantity of the said optical enantiomer is then added in fractions in such a way as to achieve saturation. Additional solvent may be added to ensure complete dissolution.

According to another embodiment the optical enantiomer of modafinil is suspended in the solvent heated under reflux and an additional quantity of solvent is then added in fractions so as to obtain a homogeneous solution and thus achieve saturation.

The process of crystallisation of the optical enantiomer of modafinil in stage ii) may be accelerated using techniques known to those skilled in the art, namely cooling of the solution, evaporation of some of the solvent, the addition of an antisolvent or seeding the solution with crystals of optically active modafinil having the same crystalline form as that desired. Most commonly the mixture is stirred continually throughout the crystallisation process so as to obtain a homogeneous suspension and rapid renewal of the mother liquor around each crystallite.

The crystallisation process in the process according to the invention may be carried out under thermodynamic or kinetic conditions.

For the purposes of this description, by "crystallisation under thermodynamic conditions" is meant crystallisation performed under conditions in which equilibrium is maintained between the homogeneous solution and the saturated solution in the presence of crystals of l- or d-modafinil.

By way of example, a thermodynamic crystallisation may be performed by slowly cooling the solution obtained in stage i), typically by allowing the solution to cool to ambient temperature or by applying a rate of cooling or a cooling gradient which is preferably less than or equal to 0.75° C./min, more preferably to 0.6° C./min and more preferably to 0.5° C./min.

By "crystallisation performed under kinetic conditions" for the purposes of this description is meant a crystallisation in which equilibrium between the homogeneous solution and the saturated solution in the presence of crystals of d- or l-modafinil is suddenly displaced towards the latter two-phase domain, i.e. towards the formation of crystals.

By way of illustration, a crystallisation which is said to be kinetic can be performed in particular by rapid cooling, for example by implementing a cooling gradient of 300° C./min, or by precipitation through the addition of an antisolvent to the solution obtained in stage i).

6

By way of an illustrative and non-restrictive example these two types of thermodynamic or kinetic crystallisation are effected in this description by slow or rapid cooling.

Of course any other technique of crystallisation such as evaporation of the solvent or precipitation which would make it possible for kinetic and/or thermodynamic conditions to obtain also falls within the scope of the process according to the invention.

Thus according to a particular embodiment the crystallisation in stage ii) may be performed by precipitation, possibly in the presence of seed crystals of the desired crystal form.

The inventors have also shown that some solvents can give rise to different crystalline forms, more specifically to polymorphic forms, according to whether the crystallisation is performed under kinetic or thermodynamic conditions.

According to a particularly advantageous embodiment crystallisation comprises cooling of the solution obtained in stage i).

As applicable, in a first mode, cooling is rapid and generally corresponds to quenching of the solution obtained in stage i) in a bath at a temperature at or below 0° C. such as a bath of ice water for a sufficient time to permit complete crystallisation of the solution, or again cooling with a temperature gradient of for example between –1° C. and –5° C./min.

According to a second embodiment cooling is slow. In this context the solution is generally allowed to cool from the reflux temperature of the solvent to ambient temperature or the solution is cooled with a cooling gradient preferably between –0.1° C./min and –0.8° C./min, and more preferably close to –0.5° C./min, generally down to a temperature of 15° to 20° C.

Among the preferred combinations of solvents/antisolvents according to the invention mention may be made in particular of the combinations water/acetone, acetonitrile/water, ethanol/water, methanol/water, acetic acid/water.

Finally the crystalline forms of the optical enantiomers of modafinil can be isolated using conventional methods such as filtration and centrifuging.

By way of a non-restrictive illustration the process of preparation according to the invention is more particularly implemented using the laevorotatory enantiomer of modafinil.

According to a particular embodiment the crystalline form obtained according to this process is a polymorphic form.

In this respect it will be noted that in general each of the (l) and (d) enantiomers of a given chemical compound yield crystalline forms, in particular polymorphic forms, having powder X-ray diffraction spectra which are identical when they are recrystallised under the same experimental conditions.

In this respect reference should be made in particular to the work of J. Bernstein <<Polymorphism in molecular crystals>> 2002, University Press, Oxford, UK, and the publication by G. Coquerel, Enantiomer, 2000; 5(5): 481–498, Gordon and Breach Science Publishers.

In this respect the dextrorotatory form, whose X-ray diffraction spectra for the crystalline forms are identical to those of the laevorotatory form described below and vice versa, forms part of the invention.

In what follows the polymorphic forms designated forms I, II, III, IV and V also cover the CRL 40982 forms I, II, III, IV, V obtained from the laevorotatory enantiomer and the CRL 40983 forms I, II, III, IV, V obtained from the dextrorotatory enantiomer.

A97

US 7,132,570 B2

7

### Form I

In this context, the process using a solvent selected from acetone, ethanol, 1–4 dioxan, ethyl acetate and mixtures of ortho, meta and para xylene, and a stage of crystallisation by slow cooling leads to the acquisition of form I or CRL 40982 form I.

The process using a solvent selected from methanol, water or alcohol/water mixtures, in particular methanol/water and ethanol/water, and a stage of crystallisation by rapid cooling leads to the acquisition of form I or CRL 40982 form I.

According to another equally preferred variant of the invention, the process using methanol and a stage of crystallisation by precipitation through the addition of cold water as an antisolvent for methanol leads to form I.

### Form II

According to another embodiment of the invention, the process using a solvent in stage i) selected from isopropanol, ethyl acetate, n-propanol, or ethanol denatured with toluene and a stage of crystallisation by rapid cooling leads to a polymorphic form described as Form II or CRL 40982 form II.

According to a variant of the process form II can also be obtained by slow cooling from isopropanol.

It may also be commented that the production of form II from isopropanol does not depend on the conditions of crystallisation (thermodynamic or kinetic).

### Form III

According to another variant of the process according to the invention the solvent used in stage i) is acetone, and crystallisation stage ii) comprises rapid cooling, this apparently leading to acquisition of a polymorphic form described as form III or CRL 40982 form III.

### Form IV

As a variant of the process according to the invention, the solvent used in stage i) is selected from tetrahydrofuran, chloroform and methylethylketone, and crystallisation stage ii) comprises slow cooling of the solution, as a result of which a polymorphic form described as form IV or CRL 40982 form IV is obtained.

Depending upon the nature of the solvent used, the process for recrystallisation of the optical enantiomers of modafinil can give rise to the production of solvates.

### Form V

As a variant of the process according to the invention the solvent used in stage i) is selected from 2-pentanone and tetrahydrofuran, and crystallisation stage ii) comprises slow cooling of the solution in 2-pentanone and rapid cooling in THF, as a result of which a polymorphic form described as form V is obtained.

### Dimethyl Carbonate Solvate

Thus according to a particular embodiment of the invention, when the solvent used in stage i) is dimethyl carbonate and crystallisation consists of slow cooling, a dimethyl carbonate (−)-modafinil solvate is obtained.

### Acetic Acid Solvate

According to a particular embodiment of the invention, when the solvent used in stage i) is acetic acid and crystallisation consists of a rapid or slow cooling, an acetic acid solvate is obtained.

### Polymorphic Forms of (−)-Modafinil

The invention also relates to the polymorphic form of the laevorotatory enantiomer of modafinil described as CRL 40982 form II, characterised in that it produces an X-ray diffraction spectrum comprising intensity peaks for the interplanar spacings: 11.33, 8.54, 7.57, 7.44, 4.56, 3.78, 3.71

8

Å, the intensity peaks corresponding to the interplanar spacings of 8.54, 7.57, 7.44, 4.56, 3.78, 3.71 Å being particularly characteristic.

More specifically the X-ray diffraction spectrum below, in which d represents the interplanar spacing and I/Io the relative intensity:

| CRL 40982 FORM II | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 11.6 | 11.33 | 54 |
| 15.4 | 8.54 | 58 |
| 17.4 | 7.57 | 41 |
| 17.7 | 7.44 | 34 |
| 23.3 | 5.67 | 19 |
| 24.8 | 5.33 | 26 |
| 27.4 | 4.83 | 19 |
| 28.9 | 4.59 | 36 |
| 29.1 | 4.56 | 97 |
| 29.8 | 4.45 | 23 |
| 32.8 | 4.05 | 29 |
| 34.3 | 3.88 | 23 |
| 35.3 | 3.78 | 100 |
| 35.9 | 3.71 | 40 |
| 40.1 | 3.34 | 21 |
| 47.7 | 2.83 | 20 |
| 53.7 | 2.53 | 32 |

Diffractometer: Miniflex Rigaku (Elexience)

The invention also relates to the polymorphic form of the laevorotatory enantiomer of modafinil described as CRL 40982 form III, characterised by an X-ray diffraction spectrum incorporating intensity peaks at the following interplanar spacings d: 13.40, 12.28, 8.54, 7.32, 6.17, 5.01, 4.10, 3.97, 3.42, 3.20 Å, and the interplanar spacings: 12.28, 8.54, 5.01, 4.10, 3.97, 3.42, 3.20 Å corresponding to the most characteristic intensity peaks.

In this context the invention relates more particularly to form III of (−)-modafinil which produces the following X-ray diffraction spectrum in which d represents the interplanar spacing and I/Io the relative intensity:

| CRL 40982 FORM III | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 9.8 | 13.40 | 40 |
| 10.7 | 12.28 | 39 |
| 15.4 | 8.54 | 100 |
| 18.0 | 7.32 | 33 |
| 21.4 | 6.17 | 23 |
| 25.9 | 5.11 | 26 |
| 26.4 | 5.01 | 87 |
| 29.6 | 4.48 | 26 |
| 29.9 | 4.44 | 20 |
| 31.1 | 4.27 | 34 |
| 31.7 | 4.19 | 20 |
| 32.4 | 4.10 | 77 |
| 33.1 | 4.02 | 23 |
| 33.5 | 3.97 | 64 |
| 36.5 | 3.66 | 38 |
| 39.1 | 3.42 | 40 |
| 41.9 | 3.20 | 32 |
| 46.4 | 2.91 | 23 |
| 52.7 | 2.58 | 25 |

Diffractometer: Miniflex Rigaku (Elexience)

The invention also relates to the polymorphic form of the laevorotatory enantiomer of modafinil described as CRL 40982 form IV, characterised in that it produces an X-ray

US 7,132,570 B2

9

diffraction spectrum comprising intensity peaks at the interplanar spacings: 12.38; 8.58; 7.34; 6.16; 5.00; 4.48; 4.09; 3.66 Å, the most characteristic peaks corresponding to the interplanar spacings of 12.38; 8.58; 7.34; 5.00; 4.09 Å.

More specifically, form IV of (−)-modafinil is characterised in that it produces the following X-ray diffraction spectrum in which d represents the interplanar spacing and I/Io the relative intensity comprising intensity peaks at the interplanar spacings:

| CRL 40982 FORM IV | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 6.37 | 13.88 | 26 |
| 7.14 | 12.38 | 69 |
| 8.60 | 10.27 | 23 |
| 10.30 | 8.58 | 100 |
| 12.04 | 7.34 | 49 |
| 14.37 | 6.16 | 24 |
| 15.65 | 5.66 | 11 |
| 17.30 | 5.12 | 29 |
| 17.72 | 5.00 | 60 |
| 19.12 | 4.64 | 15 |
| 19.81 | 4.48 | 25 |
| 20.82 | 4.26 | 10 |
| 21.24 | 4.18 | 12 |
| 21.70 | 4.09 | 51 |
| 23.28 | 3.82 | 9 |
| 24.30 | 3.66 | 30 |
| 25.18 | 3.53 | 9 |
| 26.02 | 3.42 | 21 |
| 27.13 | 3.28 | 9 |
| 27.90 | 3.20 | 15 |

Diffractometer: Siemens AG.

The invention also relates to the polymorphic form of the dextrorotatory enantiomer of modafinil referred to as CRL 40983 form V, characterised in that it produces an X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings 9.63, 5.23; 5.03, 4.74, 4.66, 4.22, 4.10, 3.77 (Å).

| CRL 40983 FORM V | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 6.65 | 13.27 | 22 |
| 7.24 | 12.21 | 5 |
| 9.17 | 9.63 | 51 |
| 10.38 | 8.51 | 19 |
| 12.28 | 7.20 | 15 |
| 14.33 | 6.17 | 14 |
| 15.81 | 5.60 | 4 |
| 16.95 | 5.23 | 68 |
| 17.64 | 5.03 | 100 |
| 18.69 | 4.74 | 51 |
| 19.03 | 4.66 | 58 |
| 20.06 | 4.42 | 3 |
| 21.06 | 4.22 | 91 |
| 21.67 | 4.10 | 64 |
| 22.39 | 3.97 | 17 |
| 23.61 | 3.77 | 55 |
| 24.64 | 3.61 | 8 |
| 25.40 | 3.50 | 13 |
| 26.21 | 3.40 | 20 |
| 26.95 | 3.31 | 18 |

Diffractometer: Bruker GADDS

The invention also relates to the dimethyl carbonate solvate of (−)-modafinil, characterised by the following

10

diffraction spectrum in which d represents the interplanar spacing and I/Io the relative intensity:

| DIMETHYL CARBONATE SOLVATE | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 7.17 | 12.31 | 38 |
| 9.12 | 9.69 | 29 |
| 9.72 | 9.09 | 16 |
| 10.35 | 8.54 | 35 |
| 12.17 | 7.27 | 100 |
| 14.25 | 6.21 | 16 |
| 16.26 | 5.45 | 10 |
| 17.36 | 5.10 | 13 |
| 17.72 | 5.00 | 21 |
| 18.35 | 4.83 | 9 |
| 19.16 | 4.63 | 9 |
| 19.88 | 4.46 | 14 |
| 21.04 | 4.22 | 12 |
| 21.49 | 4.13 | 25 |
| 21.73 | 4.09 | 24 |
| 23.49 | 3.78 | 22 |
| 24.55 | 3.62 | 35 |
| 25.24 | 3.53 | 8 |
| 26.05 | 3.42 | 9 |
| 26.88 | 3.32 | 7 |
| 27.48 | 3.24 | 13 |
| 27.81 | 3.21 | 10 |
| 28.79 | 3.10 | 8 |

Diffractometer: Siemens AG

The invention also relates to the acetic acid solvate of the laevorotatory and dextrorotatory enantiomers of modafinil which can be obtained by the recrystallisation process according to the invention, characterised in that it produces a X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings: 9.45; 7.15; 5.13; 4.15; 3.67 (Å).

| ACETIC ACID SOLVATE | | |
|---|---|---|
| 2-Theta (degrees) | d (Å) | I/Io % |
| 6.64 | 13.30 | 8.5 |
| 7.15 | 12.35 | 15 |
| 9.36 | 9.45 | 100 |
| 10.43 | 8.48 | 6.5 |
| 12.38 | 7.15 | 25 |
| 14.38 | 6.16 | 15 |
| 16.37 | 5.41 | 8 |
| 17.29 | 5.13 | 28 |
| 17.82 | 4.97 | 21 |
| 18.24 | 4.86 | 16 |
| 18.96 | 4.68 | 7 |
| 19.24 | 4.61 | 6 |
| 20.09 | 4.42 | 20 |
| 21.40 | 4.15 | 75 |
| 22.55 | 3.94 | 21 |
| 23.42 | 3.80 | 7 |
| 24.25 | 3.67 | 40 |
| 24.92 | 3.57 | 12 |
| 25.21 | 3.53 | 9.5 |
| 26.15 | 3.40 | 11 |
| 26.78 | 3.33 | 8 |
| 26.99 | 3.30 | 6 |
| 28.43 | 3.14 | 13 |
| 28.79 | 3.10 | 14 |
| 29.63 | 3.01 | 7 |
| 30.03 | 2.97 | 4 |
| 32.33 | 2.77 | 9 |
| 33.13 | 2.70 | 7 |
| 34.29 | 2.61 | 3 |
| 34.86 | 2.57 | 7 |
| 35.90 | 2.50 | 7 |

Diffractometer: Bruker GADDS

US 7,132,570 B2

11

According to another aspect, the invention also relates to a process for conversion from a first crystalline form of one of the enantiomers of modafinil to a second crystalline form which is different from the former, the said process comprising the stages of:

i) suspending the crystalline form of the said enantiomer of modafinil in a solvent;

ii) recovering the crystalline form obtained.

By way of solvents which may be suitable for this process mention may be made in particular of acetonitrile.

In general the initial crystalline form is held in suspension at a temperature lower than the homogenisation temperature for a sufficient length of time to permit total conversion of the initial form. This period may vary in particular according to the nature of the solvent, the initial crystalline form and the temperature of the medium. Conventionally the crystalline form is held in suspension for at least 24 hours at ambient temperature under atmospheric pressure, most commonly for approximately 72 hours.

By way of illustration this process is implemented using (−)-modafinil.

In this context, according to a particular embodiment of the invention, the process uses form I in acetonitrile in stage i), as a result of which an acetonitrile solvate of (−)-modafinil is obtained.

By way of indication form I is held in suspension for several days, preferably for 3 days at ambient temperature, at atmospheric pressure.

The invention also relates to the acetonitrile solute of (−)-modafinil which can be obtained through the recrystallisation process according to the invention. It is characterised by the following diffraction spectrum in which d represents the interplanar spacing and I/Io the relative intensity:

| ACETONITRILE SOLVATE | | |
|---|---|---|
| 2 Theta (degrees) | d (Å) | I/Io (%) |
| 5.46 | 16.17 | 46 |
| 6.25 | 14.14 | 95 |
| 7.17 | 12.32 | 51 |
| 8.28 | 10.66 | 81 |
| 9.02 | 9.79 | 68 |
| 9.51 | 9.29 | 53 |
| 10.34 | 8.54 | 53 |
| 10.84 | 8.15 | 63 |
| 11.33 | 7.80 | 79 |
| 12.47 | 7.09 | 53 |
| 14.02 | 6.31 | 45 |
| 15.20 | 5.83 | 35 |
| 15.76 | 5.62 | 34 |
| 16.37 | 5.41 | 40 |
| 17.37 | 5.10 | 51 |
| 18.10 | 4.90 | 46 |
| 19.05 | 4.66 | 44 |
| 19.36 | 4.58 | 37 |
| 19.89 | 4.46 | 39 |
| 20.48 | 4.33 | 59 |
| 21.14 | 4.20 | 55 |
| 22.10 | 4.02 | 100 |
| 22.65 | 3.92 | 60 |
| 23.17 | 3.835 | 42 |
| 23.89 | 3.72 | 33 |
| 24.72 | 3.60 | 38 |
| 24.93 | 3.57 | 37 |
| 25.81 | 3.45 | 37 |
| 26.73 | 3.33 | 55 |
| 27.52 | 3.24 | 30 |
| 27.97 | 3.19 | 30 |
| 28.89 | 3.09 | 31 |
| 29.44 | 3.03 | 27 |

Diffractometer: Siemens AG.

12

Pharmaceutical Compositions Comprising Polymorphic Forms II, III, IV and V of (−)-Modafinil and (+)-Modafinil Respectively

The invention also relates to pharmaceutical compositions comprising the polymorphic forms CRL 40982 form II, CRL 40982 form III, CRL 40982 form IV or CRL 40982 form V of (−)-modafinil and form CRL 40983 form II, CRL 40983 form III, CRL 40983 form IV and CRL 40983 form V respectively, possibly in association with a pharmaceutically acceptable vehicle.

These compositions may be administered orally, via the mucosa (for example, the mucosa of the eye, nose, lungs, stomach, intestines, rectum, vagina or the urinary apparatus) or parenterally (for example subcutaneously, intradermally, intramuscularly, intravenously or intraperitoneally).

According to a preferred embodiment the pharmaceutical compositions according to the invention are administered orally in the form of tablets, pills, gelules or immediate release or controlled release granules, in the form of powder, capsules, suspension of a liquid or in a gel or emulsion, or as a lyophilisate, or preferably in the form of tablets, capsules, suspension in a liquid or in a gel. The vehicle for administration may comprise one or more pharmaceutically acceptable excipients which are likely to ensure stability of the polymorphic forms (for example a suspension of a polymorph in an oil).

The pharmaceutical compositions according to the invention comprise the II, III, IV or V polymorphic forms of (−)-modafinil and (+)-modafinil respectively, possibly as mixtures of each other and/or with one or more pharmaceutically acceptable excipients.

A solid composition for oral administration is prepared by adding one or more excipients to the active ingredient, in particular a filler, and, if appropriate a binder, an exfoliating agent, a lubricant, a surfactant and an emulsifier, a solubiliser, a colouring agent, a sugar substitute or a taste modifier, with the mixture being formed for example into the form of a table or capsule.

Examples of fillers include lactose, sucrose, mannitol or sorbitol; preparations based on cellulose, such as for example maize starch, rice starch, potato starch.

Examples of binders include gelatine, gum tragacanth, methylcellulose, hydroxypropylcellulose, sodium carboxymethylcellulose, and/or polyvinyl pyrrolidone (PVP), povidone, copovidone, dextran, dextrin, cyclodextrin and its derivatives such as hydroxypropyl-β-cyclodextrin.

Examples of sugar substitutes include aspartame, saccharin and sodium cyclamate.

Examples of taste modifying agents include cocoa powder, mint in vegetable form, aromatic powder, mint in the form of oil, borneol and powdered cinnamon.

Examples of surfactants and emulsifiers include in particular polysorbate 20, 60, 80, sucroester (7–11–15), poloxamer 188, 407, PEF 300, 400 and sorbitan stearate.

Examples of solubilising agents include miglyol 810, 812, glycerides and their derivatives and propylene glycol.

Examples of exfoliating agents include, for example, polyvinyl pyrrolidone, sodium carmellose or alginic acid or a salt of the latter such as sodium alginate.

Examples of lubricants include magnesium stearate, stearyl magnesium fumarate, behenic acid and its derivatives.

The pharmaceutical compositions according to this invention may also contain another crystalline form of (−)-modafinil or (+)-modafinil respectively, in particular form I and/or another active ingredient or inactive ingredient as a

US 7,132,570 B2

13

mixture with one or more other polymorphic forms of modafinil such as form III, form II, form IV and form V.

For the purposes of this invention the term "pharmaceutically acceptable vehicle" covers solvents, dispersion media, antifungal and antibacterial agents, isotonic agents and absorption-delaying agents. The use of such media and agents for pharmaceutically active substances is well known to those skilled in the art.

The invention also relates to the use of the forms CRL 40982 form II, CRL 40982 form III, CRL 40982 form IV or CRL 40982 form V of (–)-modafinil and the forms CRL 40983 form II, CRL 40983 form III, CRL 40983 form IV or CRL 40983 form V of (+)-modafinil respectively for the manufacture of a medication intended for the prevention and/or treatment of a condition selected from hypersomnia, in particular idiopathic hypersomnia and hypersomnia in patients affected by a cancer treated by morphine analgesics to relieve pain; sleep apnoeas, excessive somnolence associated with a disease, obstructive sleep apnoeas, narcolepsy; somnolence, excessive somnolence, excessive somnolence associated with narcolepsy; disturbances of the central nervous system such as Parkinson's disease; protection of the cerebral tissue against ischaemia, alertness disturbances, in particular alertness disturbances associated with Steinert's disease, attention disturbances, for example associated with hyperactivity (ADHD); the condition of fatigue, in particular that associated with multiple sclerosis and other degenerative diseases; depression, the depressive condition associated with low exposure to sunlight, schizophrenia, rotating shift working, time shifts; eating disturbances, in which modafinil acts as an appetite stimulant, the stimulation of cognitive functions in low doses.

Process for the Preparation Optically Active Modafinil

In accordance with another aspect the invention relates to a process for preparation of the optical enantiomers of (±) modafinil from (±) modafinil acid, the said process comprising the following stages:

i) separating the two optical enantiomers of (±) modafinil acid and recovering at least one of the enantiomers,

ii) placing one of the two enantiomers obtained in contact with a lower alkyl haloformate and an alcohol in the presence of a base,

iii) recovering the product obtained,

iv) converting the ester obtained in stage iii) into an amide,

v) recovering the product obtained in stage iv).

Preferably the lower alkyl haloformate is a lower alkyl chloroformate and, better still, it comprises methyl chloroformate.

Advantageously the lower alkyl haloformates, among which in particular methyl chloroformate, used in this process to bring about the esterification of modafinil acid are less toxic than the dimethyl sulphate described in the process in the prior art U.S. Pat. No. 4,927,855, giving equivalent or better yields. The process is therefore easier to use and more suitable for industrial application.

Preferably the operation is conducted in the presence of an equimolar quantity of lower alkyl haloformate and base in stage ii) in relation to optically active modafinil acid.

It is particularly preferred to use organic bases, more preferably nitrogen-containing bases.

As a particularly preferred base mention may be made in particular of triethylamine, diisopropylamine, diethylmethylamine, diisopropylethyl amine, 1,8-diazabicyclo[5.4.0]undec-7-ene (DBU).

Preferably the solvent used in stage ii) is a lower aliphatic alcohol such as methanol, ethanol or propanol, methanol being particularly preferred.

14

According to a particular embodiment the ester obtained from stage ii) is crystallised by the addition of iced water.

Conversion of the ester to amide in stage iv) preferably consists of ammonolysis, i.e. treatment with ammonia.

In this context it is generally preferably to work with an excess of ammonia.

According to a particularly advantageous variant of the invention, ammonia is used in the form of gas.

In a preferred embodiment the ammonolysis reaction is performed in a polar solvent, preferably a protic solvent such as lower aliphatic alcohols, for example in methanol or ethanol, methanol being particularly preferred.

The (+) or (–)modafinil acid ester in stage iii) and the (+) or (–)modafinil respectively in stage iv) are recovered using conventional methods known to those skilled in the art.

According to another aspect the invention relates to a process for the preparation of optical enantiomers of modafinil comprising the following stages

a. resolving the two optical enantiomers of (±) modafinil acid or salts of the same according to a preferential crystallisation process,

b. converting the said isolated enantiomers into an amide,

c. recovering the modafinil enantiomer obtained.

According to a preferred embodiment stage b) is performed in two stages:

b1) converting the said enantiomers into a lower alkyl ester,

b2) converting the product obtained in stage b1) into an amide.

According to a particularly preferred embodiment stage b1) is carried out in the presence of a lower alkyl haloformate, an alcohol and a base, under the conditions described previously.

According to a particularly advantageous embodiment, when b1) is performed in the presence of methyl chloroformate, a base and an alcohol and c1) comprises an ammonolysis such as described previously, this process in which the (±)-modafinil acid is separated by preferential crystallisation gives rise to an overall yield generally of the order of 25%. Thus the yield of the (–)-modafinil enantiomer in particular obtained by this process is markedly greater than that obtained in U.S. Pat. No. 4,927,855.

The preferential crystallisation technique is a technique which is widely used in laboratories and in industry.

This method is based on the alternate crystallisation of two chiral compounds referred to as R and S, forming a conglomerate in solvent A and over a given temperature range $D_T$. This means that within this temperature range any mixture of the two antipodes in thermodynamic equilibrium with the solution comprises two types of crystals each of which only contain molecules having the same configuration, which may or may not incorporate solvent molecules (solvates). The existence of such a conglomerate, without miscibility in the solid state, is implicitly accepted in what follows, at least during the temperature range $D_T$ and in the case of solvent A.

Two kinds of factors influence crystallisation of the optical antipodes, on the one hand parameters associated with ternary heterogeneous equilibria and on the other hand factors affecting the kinetics of crystallisation.

The parameters associated with ternary heterogeneous equilibria comprise:

the positions of the crystallisation surfaces for the solid species which are deposited at each temperature and more particularly the solubilities of the stable and metastable phases, of the s(+) racemic mixture and the

US 7,132,570 B2

15

antipodes s(+)=s(−) in relation to temperature, and the ratio of solubilities α=s(±)/s(+),

the extent of the stable and metastable domains for the solid solutions, the racemate, the racemic solvate, the active solvates and the polymorphic varieties of the crystallised solids.

The factors acting on the kinetics of crystallisation include:

factors internal to the crystals, associated with the bonds between molecules, which cannot be modified by the experimenter,

external factors which can be modified by the experimenter; these are the nature of the solvent, the nature and concentration of impurities, the supersaturation acquired in relation to time, the temperature range $D_T$, the speed and manner of stirring, the mass and particle size of the nuclei, the wall effect, etc.

These two kinds of factors directly influence the yield, the purity of the phases obtained and the conduct of the separation operations. The feasibility of filtration also depends on the particle size spectrum and the habits of the crystals, the viscosity of the suspension, the vapour pressure of the solvent, the supersaturation of each of the antipodes and the possible presence of a true racemate of a metastable nature. These choices may also affect the kinetics of racemisation of the antipodes or degradation of the molecule.

For each combination comprising the pair of antipodes (R and S) and the solvent (A), the factors affecting the kinetics are of a particular type.

Two preferred methods of crystallisation are mainly distinguished:

conventional processes, described as SIPC, for "Seeded Isothermal Preferential Crystallization" and their polythermic variants, and

the process referred to as AS3PC, for "Auto-Seeded Polythermic Programmed Preferential Crystallization".

In the AS3PC preferential crystallisation method which is referred to as being auto-seeded, the system is placed under conditions such that it itself generates its own seeds to produce the required enantiomer, while in the SIPC method these seeds are introduced by seeding. The two types of processes are described in greater detail below.

For more information concerning resolution processes by preferential crystallisation by the AS3PC methods reference may be made in particular to the documents by G. Coquerel, M. -N. Petit and R. Bouaziz, Patent EP 0720595 B1, 1996, E. Ndzié, P. Cardinaël, A. -R. Schoofs and G. Coquerel, Tetrahedron Asymmetry, 1997, 8(17), 2913–2920, L. Courvoisier, E. Ndzie, M. -N. Petit, U. Hedtmann, U. Sprengard and G. Coquerel, Chemistry Letters, 2001, 4, 364–365.

According to a particular embodiment, the process for resolution of the optical enantiomers of (±) modafinil acid or its salts is a seeded SIPC or S3PC process, the said process comprising the following stages:

a) homogenisation of an combination comprising a racemic mixture of crystals in the form of a conglomerate of the first enantiomer of modafinil acid at a temperature $T_D$, for which the defining point E, defined by the variables concentration and temperature $T_D$, lies within the monophase domain of the dilute solution,

b) rapidly cooling the solution prepared in stage a) initially at the temperature $T_D$ down to the temperature $T_F$,

c) seeding the solution obtained in stage b) while cooling (i.e. between $T_L$ and $T_F$) or when cooling is complete (i.e. at $T_F$) with very pure seeds of the first enantiomer,

d) harvesting crystals of the first enantiomer,

16

e) adding the racemic mixture of crystals in the form of conglomerate to the mother liquors resulting from the harvest performed in stage d) and homogenising the new combination by heating to a temperature $T_D$, so that the defining point E' is symmetrical for E with respect to the plane of the racemic mixture of the solvent, antipode (−), antipode (+) system, the said point E' lying within the monophase domain of the dilute solution,

f) rapidly cooling the solution obtained in stage e), initially at temperature $T_D$, down to temperature $T_F$,

g) seeding the solution obtained in stage f) with very pure seeds of the second enantiomer,

h) harvesting the crystals of the second enantiomer,

i) adding the racemic mixture in the form of a conglomerate of crystals resulting from the crystal harvest made in stage h) to the mother liquors and homogenising the new combination by heating to a temperature $T_D$ in order to obtain a composition identical to that of the combination having the initial defining point E,

j) repeating stages a), b), c), d), e), f), h) and j) to subsequently obtain the first and then the second of the two enantiomers.

Reference is frequently made to these two methods by describing them as "SIPC" and "S3PC" respectively, the latter being a variant of SIPC as described in detail further on in the description.

In what follows, for the purposes of this invention,

$T_F$ represents the temperature at the end of crystallisation and filtration, located in the three-phase domain,

$T_L$ represents the homogenisation temperature of the racemic mixture,

$T_D$ represents the starting temperature at which the starting mixture is a homogenous solution,

antipode means an enantiomer.

Preferably the process for the resolution of these two optical enantiomers of (±)-modafinil acid or salts of these by preferential crystallisation is an AS3PC self-seeded process, the said process comprising the following stages:

a) creating a combination comprising a racemic mixture of the crystals in the form of a conglomerate of the first enantiomer of modafinil acid and solvent, for which the defining point E, defined by the variables concentration and temperature $T_B$, lie within the two-phase domain of the enantiomer in excess, and is in equilibrium with the saturated solution,

b) applying a temperature cooling programming function to the two-phase mixture prepared in stage a), this programming function being such that the mother liquors remain slightly supersaturated, encouraging growth of the enantiomer present in the form of crystals while preventing spontaneous nucleation of the second enantiomer present in the solution,

c) throughout the time of crystal growth in stage b) adopting a rate of stirring which increases slightly in relation to time so that it is at all times sufficiently slow to encourage growth of the first enantiomer while avoiding the generation of excessively large shear forces bringing about uncontrolled nucleation but sufficiently fast to achieve a homogeneous suspension and rapid renewal of the mother liquor around each crystallite of the first enantiomer,

d) harvesting the crystals of the first enantiomer,

e) adding the racemic mixture of crystals in the form of a conglomerate to the mother liquors resulting from the harvest performed in stage d) and bringing the new combination to a temperature threshold $T_B$ during the time necessary to achieve thermodynamic equilibrium so that

17

the defining point E' is symmetrical for E with respect to the plane of the racemic mixtures for the solvent, antipode (−), antipode (+) system, the said point E' lying within the two-phase domain of the second enantiomer which is in excess and in equilibrium with its saturated solution,

f) applying the same cooling programming function as in stage b) to the two-phase mixture prepared in stage e) containing the second enantiomer so that the mother liquors remain slightly supersaturated during crystallisation in order to encourage growth of the enantiomer present in the form of crystals while preventing spontaneous nucleation of the first enantiomer present in the solution,

g) adopting a stirring speed which increases slightly in relation to time over the entire time of crystal growth in stage f) so that it is at all times sufficiently slow to encourage growth of the second enantiomer while avoiding generation of excessively large shear forces giving rise to uncontrolled nucleation, but sufficiently fast to obtain a homogeneous suspension and rapid renewal of the mother liquor around each crystallite of the second enantiomer,

h) harvesting crystals of the second enantiomer.

i) adding the racemic mixture of crystals in the form of conglomerate to the mother liquors resulting from the crystal harvest performed in stage g) or to obtain a combination in which the composition is identical to that of the initial combination E,

j) repeating stages a), b), c), d), e), f) g), h) and i) to obtain the first and then the second of the two enantiomers successively.

In what follows, for the purposes of this invention, $T_{HOMO}$ shall mean the homogenisation temperature of the combination comprising the racemic mixture, the first enantiomer and the solvent.

Thus in stage (a) of the process according to the invention the choice of the solvent or solvents and the working temperature range are defined in such a way so as to obtain simultaneously:

antipodes which form a conglomerate and of which any racemate is metastable in the working temperature range,

liquors which are sufficiently concentrated but of low viscosity and low vapour pressure,

the absence of solvolysis and racemisation,

stability of the solvates if these are present at equilibrium and they are resolvable enantiomers.

In stages (a) and (e) of the process according to the invention, the temperature $T_B$ is higher than the temperature $T_L$ for homogenisation of the quantity of racemic mixture present in the initial suspension, in that from the curve for the change in $T_{HOMO}$ in relation to the excess of enantiomer and for a constant concentration of the racemic mixture $X_L$ the said temperature $T_B$ is defined in such a way that the mass of fine crystals of the first enantiomer from stages (a) and (i) and the second enantiomer from stage (e), in equilibrium with their saturated solutions, represent at most 50% and preferably between 25% and 40% of the expected harvest.

In stages (b) and (f) of the process according to the invention, the function for programming cooling from temperature $T_B$ to $T_F$, appropriate to the experimental assembly, is defined so as to:

achieve slight supersaturation throughout the time for crystallisation of the enantiomer present in the form of

18

crystals at the start of each cycle, this slight supersaturation giving rise to gentle growth and secondary nucleation,

achieve maximum supersaturation of the other enantiomer at $T_F$ without primary nucleation,

obtain a harvest of crystals in stages (d) and (h) which after addition of the racemic mixture and the provision of make-up in stages (e) and (i), makes it possible to perform the operations cyclically.

In fact every experimental assembly has an influence on the supersaturation capacities of the mixtures used and the efficiency of stirring, and as a consequence the function programming cooling must be adapted to the circumstances in which the process is carried out. However the temperature $T_B$, the solubilities of the racemic mixture in relation to temperature, and the $T_{HOMO}$ curve in relation to the excess of enantiomer for a constant concentration of the racemic mixture $X_L$ are themselves wholly independent of the experimental assembly.

The cooling programming function, which is the function linking temperature with time, is determined in its part from $T_L$ to $T_F$ by cooling of the solution of concentration $X_L$ from $T_L+1°$ C. to $T_F$, where $T_F$ is lower than $T_L-(T_{HOMO}-T_L)$, in order to obtain a stable saturated solution without primary nucleation while permitting a double harvest of the initial enantiomer excess and the said cooling programming function is determined in its part from $T_B$ to $T_L$ by extrapolation of the same function as established from $T_L+1°$ C. to $T_F$.

The process for the preferential crystallisation of (±)-modafinil acid or salts of the same has other advantageous features alone or in combination such that:

in stages (a) and (i) the mass of fine crystals of the first enantiomer in equilibrium with the saturated solution represents between approximately 25% and 40% of the expected harvest, 50% representing a maximum limit,

in stage e) the mass of fine crystals of the second enantiomer in equilibrium with its saturated solution represents between approximately 25% and 40% of the expected harvest, 50% representing a maximum limit,

in stages (b) and (f) the heat released accompanying deposition of the first enantiomer and the second enantiomer is incorporated into the temperature programming function,

in stages (e) and (i) compensatory additions of solvent are made,

in stages (a), (e) and (i) the fine crystals of the racemic mixture in the form of conglomerate added were subjected to prior treatment to accelerate the dissolution stage, such as grinding and sieving, treatment with ultrasound waves or partial lyophilisation, before being added; these treatments being also for the purpose of providing fine crystals capable of generating a large surface area for crystal growth,

in stages (a), (e) and (i) involving dissolution, the rate of stirring is high in comparison with stages (c) and (g).

In addition to the heterogeneous equilibrium data required for implementing the AS3PC process, the operations are also subject to adjustable kinetic constraints, particularly the cooling function, and these are specific to each solvent/ enantiomer combination.

According to one embodiment the solvent used in stage a) of the SIPC, S3PC or AS3PC processes is absolute or denatured ethanol, possibly in a mixture with an organic or mineral base, or with one or more solvents capable of improving the solubility of the racemic mixture in ethanol.

As a variant, the solvent used in stage a) of the SIPC, S3PC or AS3PC processes is 2-methoxyethanol or metha-

US 7,132,570 B2

19                                                    20

nol, possibly mixed with an organic or mineral base, and/or one or more solvents capable of improving the solubility of the racemic mixture in ethanol.

According to a particularly advantageous embodiment the solvent used in stage a) of the SIPC or AS3PC process is ethanol, 2-methoxyethanol or methanol. For (±)-modafinil acid the filtration temperature $T_F$ preferably lies between 0° C. and 40° C.

In the case of ethanol the temperature $T_F$ preferably lies between 0° C. and 25° C., and better still it is close to 18° C. or 17° C.

In the case of 2-methoxyethanol or methanol, the temperature $T_F$ preferably lies between 20° C. and 35° C. and in particular is close to 30° C.

Preferably the concentration of the racemic mixture in stage a) then lies between 2 and 50% by mass, more preferably between 2 and 30% by mass, and, better still, close to 5.96% by mass in the case of ethanol, 15.99% in the case of 2-methoxyethanol and 25.70% in the case of methanol.

In this context it is most particularly preferred that the enantiomer excess in stage a) should be between 1 and 50% by mass, more preferably between 1 and 20% by mass, and better still, close to 11% by mass in the case of ethanol, 8% by mass in the case of 2-methoxyethanol and 10% by mass in the case of methanol.

In the SIPC and S3PC processes the temperature $T_D$, the temperature at which the starting mixture is a homogeneous solution, depends on concentration and then generally lies between 35° and 50° C. when the solvent is under reflux. The cooling from temperature $T_D$ to $T_F$ is very fast so as to remain within the monophase domain and is preferably carried out in less than 20 min, for example by quenching.

According to a preferred embodiment of the AS3PC process the temperature $T_B$ then lies between the temperatures $T_L$ and $T_{HOMO}$. The temperature $T_B$ may in particular lie between 25° C. and 50° C.

By way of example, in the case of ethanol, when the enantiomer excess is close to 11% by mass temperature $T_B$ preferably lies between 25° C. and 40° C., in particular between 30.1° C. and 36.2° C. and more preferably close to 33.5° C. or 31.5° C.

In the case of 2-methoxyethanol, when the enantiomer excess is close to 8% by mass temperature $T_B$ preferably lies between 35° C. and 50° C., in particular between 39.1° C. and 47.9° C. and more preferably close to 41° C.

In the case of methanol, when the enantiomer excess is close to 10% by mass, temperature $T_B$ preferably lies between 40° C. and 55° C., in particular between 45.1° C. and 53.9° C. and more preferably close to 46.5° C.

It is most particularly preferred that cooling from $T_B$ to $T_F$ in stage b) be carried out in a time which is sufficiently long for the average mass of desired enantiomer crystals harvested to be large, but sufficiently short to prevent the other enantiomer from crystallising, thus obtaining a high optical purity, in particular greater than 85%. Cooling is generally monitored by polarimetry to determine the right moment for filtration. Preferably cooling takes place between 50 and 70 minutes, better still, it takes 60 minutes when the solvent used is ethanol.

Likewise, the length of the plateau at temperature $T_F$ for the SIPC, AS3PC and S3PC processes is preferably sufficiently great to allow a large mass of the desired enantiomer crystals to be harvested, but not too long so as to prevent the other enantiomer from crystallising at the same time as the desired enantiomer, thus obtaining a high optical purity.

According to a preferred embodiment the length of the temperature plateau $T_F$ lies between 15 and 60 minutes, preferably about 60 minutes.

A person skilled in the art will be able to adjust the rate of stirring to the type of reactor used in SIPC, S3PC or AS3PC processes. By way of indication, for a 2 or 10 litre reactor the speed at which the medium is stirred may be held between 150 and 250 rpm.

In a particularly useful manner these methods of preferential crystallisation make it possible to isolate the optical enantiomers of modafinil, in particular the laevorotatory enantiomer, in yields which are very much greater than those obtained by resolution using a chiral agent. The yields obtained are generally of the order of 90%, or even higher, in relation to the (+) or (−) optical enantiomer, or of the order of 45% or more in relation to the racemic mixture.

AS3PC, SIPC and S3PC Methods

The AS3PC and SIPC methods mentioned above are described below.

Ternary Heterogeneous Equilibria: R and S Antipodes, and Solvent A

For example the work by J. E. Ricci (Ed. Dover Publication Inc. New York, 1966, The Phase Rule and Heterogeneous Equilibrium) deals with the general case of heterogeneous equilibria in ternary systems. The description below will be restricted to particular aspects of the ternary system, A (achiral solvent), R and S (enantiomers which cannot be racemised in the temperature domain used), which are necessary for an understanding of the various processes of preferential crystallisation.

In order to show the special role of the solvent this ternary system will be represented by a right prism having a cross-section which is a right-angled isoceles triangle on which the temperature is plotted on an axis perpendicular to the plane of concentration.

The fact that the thermodynamic variables for the two enantiomers, Tf, ΔHf, solubility in a achiral solvent, etc., are identical has the result that representation of the domains is symmetrical with respect to the vertical plane A-TS-T, which includes the optically inactive mixtures, in FIG. 1. The following simplifications have been made in order to assist an initial description of this system

the only phases which crystallise out are the pure constituents in a given arrangement (absence of racemate, solvate and polymorphism in the case of the antipodes),

miscibility between the independent constituents is zero in the solid state,

the solvent has a melting point which is appreciably lower than that of the antipodes,

in the temperature range used the solubility of an antipode is not influenced by the presence of the other in the solution (Meyerhoffer's law is respected), which is reflected in the ratio having the value α=2).

Representation of Ternary Equilibria as a Function of Temperature

FIG. 1 shows the domains for the following phases:

the monophase domain for the dilute solution (Φ=1),

the two crystallisation surfaces for the constituents bounding the two-phase domains (Φ=2).

the surface for deposition of the solvent is confined to the vicinity of A because the melting point of this constituent is appreciably lower than that of the other constituents, in accordance with the conditions mentioned above.

the three monovariant curves (Φ=3) or eutectic valleys originating from binary eutectic points,

US 7,132,570 B2

21

the ternary eutectic invariant at $Te(\Phi=4)$, above which the three constituents are crystallised.

FIG. 2 shows in a superimposed fashion the two isothermal cross-sections of the ternary displayed in FIG. 1 at $T_D$ and $T_F$. At each temperature the cross-section consists of four domains as detailed in the table below.

| Temperature | Domain boundary | Nature of the phases in equilibrium | Number of phases in equilibrium |
|---|---|---|---|
| $T_D$ | $A \cdot S_D' \cdot I_D \cdot S_D'$ | dilute solution | 1 |
| $T_D$ | $R \cdot S_D \cdot I_D$ | solution + crystals of R | 2 |
| $T_D$ | $S \cdot S_D' \cdot I_D$ | solution + crystals of S | 2 |
| $T_D$ | $I_D \cdot R \cdot S$ | solution + crystals of R and S | 3 |
| $T_F$ | $A \cdot S_F \cdot I_F \cdot S_F'$ | dilute solution | 1 |
| $T_F$ | $R \cdot S_F \cdot I_F$ | solution + crystals of R | 2 |
| $T_F$ | $S \cdot S_F' \cdot I_F$ | solution + crystals of S | 2 |
| $T_F$ | $I_F \cdot R \cdot S$ | solution + crystals of R and S | 3 |

Isopleth Cross-section RYT

FIG. 3 shows the isopleth cross-section R-Y-T which is fundamental to an understanding of crystallisation in the cooling of ternary solutions in thermodynamic quasi-equilibrium. This cross-section is also necessary for following non-equilibrium processes, SIPC, variants and AS3PC. This plane is the geometric locus of the points fulfilling the relationship:

$$X_A/X_S=(1-Y)/Y=\text{constant, with } X_A \text{ and } X_S \text{ providing the}$$

fractions by mass of solvent and antipodes S.

In FIG. 3 it is possible to see:

the monophase domain of the ternary solution,

the liquidus for antipode R, this curve representing the intersection of plane R-Y in FIG. 2 with the crystallisation surface for that constituent. This stable equilibrium curve originates at the melting point of antipode R (not shown) and is bounded on the low temperature side by point L which forms part of the ternary eutectic valley for the racemic mixtures. This latter curve and the line of the conoid at $T_L$ (horizontal segment at $T_L$) are the boundary of the two-phase domain—saturated solution plus crystals of R. It extends into the underlying three-phase domain through a solubility curve for the same antipode R which is of a metastable nature (dashed lines),

the three-phase domain: crystals of T and S, plus saturated solution. This domain is bounded at the top by the horizontal line of the conoid for R, and at the bottom by the line of the invariant ternary eutectic plane and on the left by the line Lm of one of the conoids relating to the antipode S.

the line KL of the crystallisation surface for antipode S which bounds the two-phase domain at the top—saturated solution plus crystals of S. This domain is bounded in its lower part by the lines of the two conoids for S gm and Lm. The location of the second line Lm of the conoid for S in relation to the metastable solubility curve for R, which is an extension of EL, will be discussed below in relation to the relative position of F1 and F in relation to the ratio of solubilities $\alpha$,

The ternary invariant at the temperature Te above which the three crystallised constituents A, R and S lie.

22

Change on Cooling and with Thermodynamic Quasi-equilibrium of the Ternary Solutions having a Slight Excess of Enantiomer

It is taken in what follows that the overall point for the system (i.e. the point representing the overall composition of the mixture) lies on the vertical passing through point E in FIGS. 2 and 3, and its precise position is defined by its temperature (or level). Only the following temperature range is considered:

$T_D$: temperature at which the starting mixture is a homogeneous solution, and

$T_F$: temperature at the end of crystallisation and filtration, which lies in the three phase domain.

This overall composition E corresponds to a racemic solution which is slightly enriched by a mass M of the antipode R forming a total mass Mt (the enantiomer excess R–S/R+S generally lies between 4% and 9%). Equilibrium conditions are obtained by very slow cooling and by seeding in the solid phase(s) when the overall point E defining the mixture reaches a domain where this (these) phase(s) is (are) present at equilibrium.

At the starting temperature $T_D$ the solution is homogeneous. The following are observed in succession on cooling:

crystallisation of the antipode R alone, from $T_{HOMO}$ to $T_L$, at the same time the solution point moves on the solubility curve for antipode R, that is from point E at level $T_{HOMO}$ to point L within the isopleth cross-section R-Y. At point L, mass M of crystals R in equilibrium with saturated solution is given by Mt $(X_E–X_L/1–X_L)=$ M and corresponds to the enantiomer excess present in the initial solution (FIG. 3), the abscissas of the points L, E and R correspond to the compositions, and 1 (FIG. 3).

from $T_L$ the solution point moves from L to $I_F$ along the line of fixed gradient containing the solutions of racemic composition shown in FIG. 2, thus leaving the isopleth cross-section R-Y in FIG. 3, crystals of R and S are then deposited simultaneously and in equal quantities.

Resolution cannot be effected under equilibrium conditions at temperatures below $T_L$.

Change in the Solution when Resolving by Conventional Control in Accordance with the SIPC Process

Crystallisation of the First Antipode in Excess

The previous solution E is homogenised at temperature $T_D$ (FIGS. 4 and 5). In order to make it supersaturated it is cooled rapidly to temperature $T_F$ without any crystallisation occurring. This solution, which is not in thermodynamic equilibrium, is then seeded with very pure seeds of the antipode R having the same chirality as the antipode in excess. The isothermal crystallisation of antipode R is established and the point representing the solution moves within the cross-section R-Y-T from E to the level $T_F$ with which it is first coterminous to F after filtration is rapidly performed. The mass of antipode R recovered is 2M or again is equal to Mt $(X_E–X_F/1–X_F)$.

Crystallisation of the Second Antipode, Cyclicity of the Operations

The above fundamental operation thus gave rise to a solution F enriched with antipode S. By adding a mass 2M of racemic mixture (equal to that of the antipode recovered) and heating this mixture to temperature $T_D$ a homogeneous solution E' which is symmetrical for E with respect to the vertical plane A-(RS)-T is obtained. The process making it possible to obtain a mass 2M of antipode S will itself also

US 7,132,570 B2

23

be represented by symmetrical movement of the above in relation to this median plane. The following operations are then performed in sequence:

solution E' which is homogeneous at temperature $T_D$ is first cooled to $T_F$, then,

seeded with very pure seeds of antipode S, the growth of this antipode displaces the point representing the solution on the horizontal segment E'F' (at the level TF), when the solution point is the same as F', the solution is filtered and provides a mass 2M of antipode S,

after a further addition of a mass 2M of racemic mixture and a further heating to $T_D$ a homogeneous solution is again obtained and its representative point is the same as the initial point E at level $T_D$,

the rest of the process is merely a repeat of this cycle of operations.

Variants in the SIPC Process

The literature (Amiard, G., 1956, Bull. Soc. Chim. Fr. 447, Collet, A., Brienne, M. J., Jacques, J., 1980, Chemical reviews 80, 3, 215–30, Noguchi Institute, 1968, patent GB 1 197 809) is based on the above general scheme; the main modifications which have appeared in the literature are classified as follows:

a) Spontaneous primary nucleation of the antipode in excess When (±)-threonine is separated (Amiard, G., 1956, Bull. Soc. Chim. Fr. 447), the primary nucleation of the antipode in excess occurs spontaneously within the supersaturated homogeneous solution. This primary nucleation occurs when point E representing the composition of the whole lies within the three-phase domain and the solution is not stirred (Collet, A., Brienne, M. J., Jacques, J., 1980, Chemical Reviews 80, 3, 215–30).

b) Seeding during cooling (S3PC)

This protocol is the one most frequently found in the literature (Noguchi Institute, 1968, patent GB 1 197 809) when the process differs from SIPC.

There are differences between the procedures cited, but nevertheless the following common broad lines can be identified:

cooling of the homogeneous solution from $T_D$ to a temperature below to $T_L$ but above $T_F$,

seeding of the supersaturated homogeneous solution located in the three-phase domain with seeds of the same chirality as the antipode in excess,

cooling to $T_F$. In some cases the latter stage is controlled by precise temperature programming (Noguchi Institute, 1968, patent GB 1 197 809).

These protocols will be grouped together under the same term "S3PC" for "Seeded polythermic programmed preferential crystallization" although temperature programming is not present or is limited to the second stage of cooling.

Change in the Solution Point in the Case of Resolution by Programmed Control and Self-seeding in Accordance with the AS3PC Process According to the Invention

In order to achieve a better comparison between conventional processes and the AS3PC process the initial point E is chosen arbitrarily in FIGS. 6 and 7 to be the same as in the previous case; however, as will be apparent in the examples which follow, the AS3PC process makes it possible to take a point E which is further away from the plane A-(RS)-T and therefore with a larger enantiomer excess and thus improve the harvest of crystals in each operation.

Crystallisation of the First Antipode in Excess

At the start of the process, and contrary to conventional protocols, the whole, crystals plus solution, is no longer

24

homogeneous but is raised to the temperature $T_B$. The initial solution is then in equilibrium with the crystals of the enantiomers in excess (for example R in FIG. 7). The points representing the solution $(S_E)$ and the whole (E) are therefore not the same from the start of the process. The two-phase mixture is subjected to a programmed temperature reduction function without the addition of seed crystals. The point representing the solution describes a curve $S_EF$, contained within the plane R-Y-T, which depends on the kinetics of cooling (FIG. 7). With correctly adjusted kinetics, growth of the enantiomer crystals in excess occurs at the start, crystallisation then progressing towards a simultaneous regimen of growth plus secondary nucleation. When the point representing the solution reaches the point F, filtration is performed to recover a mass 2M of crystals of antipode R.

Crystallisation of the Second Antipode, Cyclic Nature of the Operations

From point F, which corresponds to the above parent solution, there is a move to point E, which is symmetrical for E with respect to the vertical plane A-(RS)-T, by adding a mass 2M of the racemic mixture and heating to temperature $T_B$. The enantiomer excess is then profited from to take up a position in the two-phase domain containing the saturated solution and the crystals of the antipode in excess. To begin with the racemic mixture added during the passage from F to E (as from F' to E) will be ground and sieved so as to accelerate the stage of dissolution of the two antipodes and more particularly the antipode of which there is less, and thus permit the formation of a large number of crystals of the antipode in excess which has the role of the seeds added in conventional processes.

The saturated solution $S'_E$, which is symmetrical for $S_E$ with respect to the plane A-(RS)-T is subjected to the same cooling function. The crystals present from the start of cooling grow and then take part in a double mechanism of growth+secondary nucleation. As in the case of the first crystallisation no seeding is therefore necessary.

During this time the point representing the solution moves along a curve $S_EF'$ contained within the plane of the isopleth cross-section S-Y'-T which is symmetrical with respect to the bisecting plane A-(RS)-T.

When the solution reaches the representative point located at F', filtration is performed to harvest a mass 2M of ground and sieved racemic mixture followed by raising the temperature to $T_B$ yielding the two-phase mixture at the starting equilibrium.

Continuation of the process consists of repeating this cycle of operations yielding crystals of antipode R and S alternately.

Necessary Conditions for Implementing the AS3PC Process

a) The equimolar mixture of optical antipodes produces a conglomerate (pure antipodes or solvates) in the solvent used within the temperature range $T_B$–$T_F$; however the existence of a metastable racemate is not a handicap.

b) The molecules which are to be resolved are stable in this solvent and in the temperature range used between $T_B$ and $T_F$.

c) It is necessary to determine the ternary equilibrium temperatures $T_L$ and $T_{HOMO}$. Temperature $T_L$ is the temperature at which the racemic mixture dissolves in the absence of any enantiomer excess in the solution. Once $T_L$ has been determined, the temperature $T_{HOMO}$ corresponds to the homogenisation temperature of the solution. It depends on the starting enantiomer excess and the ratio α of the solubilities of the racemic mixture

US 7,132,570 B2

25

and the antipode at $T_L$. Knowledge of the supersaturation capacities of the solutions between $T_L$ and $T_F$ is also necessary, depending on the cooling kinetic, the form of stirring, the nature of the vessel and the particle size of the crystals of the antipode in excess. To a first approximation, the time to the appearance of crystals by primary nucleation in the homogeneous racemic solution L cooled from a temperature slightly above $T_L$ using the same kinetics yields an indication of the supersaturation capacity tolerated by the conglomerate under these experimental conditions. This method of operation has been taken into account in the examples.

d) Knowledge of the kinetics of dissolution of a known mass of racemic mixture (of a given particle size) dispersed in the solution at temperature $T_B$. A few tests will be sufficient to discover this time.

In what follows the examples and figures are provided by way of a non-restrictive illustration of this invention.

BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a perspective view of the ternary system solvent A—antipode R—antipode S, in relation to temperature and crystallisation surfaces for each constituent and compositions of the doubly saturated solutions (monovariant curves); this figure also shows the isotherms at temperatures $T_D$ and $T_F$ and the ternary eutectic plane at the temperature $T\epsilon$ including four phases.

FIG. 2 is a projection onto the plane of concentrations of the equilibria at $T_D$ and $T_F$, as well as a representation of the line of the isopleth cross-section RY on which point E represents the composition of the initial mixture slightly enriched in antipode R which will deposit this same antipode.

FIG. 3 is the isopleth vertical cross-section RY in FIG. 2 containing the composition points for the antipode in excess and that of the initial solution E on which the path of the solution point for a mixture of composition $X_E$ at equilibrium and on cooling is shown (as a bold line). For $T < T_L$ the solution point no longer falls within this cross-section.

FIG. 4 is a projection onto the concentrations plane of the path of the solution point (as a bold line) during alternating resolution by isothermal control at temperature $T_F$ and seeded in accordance with the SIPC method.

FIG. 5 is the vertical isopleth cross-section containing the straight line RY in FIG. 4 and illustrating the path of the solution point (as a bold line) from E to F during isothermal control (to $T_F$) and seeded according to the SIPC method.

FIG. 6 is a projection onto the concentrations plane of the path of the solution point (as a bold line) when resolving by the self-seeded programmed polythermal process (AS3PC).

FIG. 7 is the vertical isopleth cross-section containing the straight line RY in FIG. 6 and illustrating the path of the solution point (as a bold line) from $S_E$ to F during resolution by the self-seeded programmed polythermal process according to the invention (AS3PC).

FIG. 8 is a projection on the concentrations plane of the path of the solution point (as a bold line) during resolution by the self-seeded programmed polythermal process (AS3PC) and confirming the relationship $s(\pm)<2-\alpha$.

All the isothermal cross-sections and isopleths illustrated in these figures have composition variables expressed as fractions by mass.

FIG. 9 shows the powder X-ray diffraction spectrum obtained corresponding to form II of the laevorotatory enantiomer and dextrorotatory enantiomer of modafinil respectively (Diffractometer: Miniflex Rigaku (Elexience).

26

FIG. 10 shows the powder X-ray diffraction spectrum obtained corresponding to form III of the laevorotatory enantiomer and dextrorotatory enantiomer of modafinil respectively (Diffractometer: Miniflex Rigaku (Elexience).

FIG. 11 shows the powder X-ray diffraction spectrum obtained corresponding to form IV of the laevorotatory enantiomer and dextrorotatory enantiomer of modafinil respectively (Diffractometer: Siemens AG).

FIG. 12 shows the powder X-ray diffraction spectrum obtained corresponding to the dimethyl carbonate solvate of the laevorotatory enantiomer and the dextrorotatory enantiomer of modafinil respectively (Diffractometer Siemens AG).

FIG. 13 shows the powder X-ray diffraction spectrum obtained corresponding to the acetonitrile solvate of the laevorotatory enantiomer and dextrorotatory enantiomer of modafinil respectively (Diffractometer: Siemens AG).

FIG. 14 shows the powder X-ray diffraction spectrum obtained corresponding to form V of the laevorotatory enantiomer of modafinil (Diffractometer: Bruker GADDS).

FIG. 15 shows the powder X-ray diffraction spectrum obtained corresponding to the acetic acid solvate of the laevorotatory enantiomer and the dextrorotatory enantiomer of modafinil respectively (Diffractometer: Bruker GADDS).

FIG. 16 shows the powder X-ray diffraction spectrum obtained corresponding to the amorphous form of the laevorotatory enantiomer and dextrorotatory enantiomer of modafinil respectively (Diffractometer: Bruker GADDS).

EXAMPLES

Preparation of Crystalline Forms of the (−)-Modafinil Enantiomer and the (+)-Modafinil Enantiomer Respectively

General

The new crystalline forms of the enantiomers of modafinil have been characterised respectively by powder X-ray diffraction spectroscopy, which provides a unique digital signature characteristic of the crystalline form investigated and can be used to distinguish it from amorphous enantiomers of modafinil and any other crystalline form of modafinil enantiomers.

The X-ray diffraction data were measured:

the D5005 system as an X-ray powder diffractometer (Siemens AG, Karlsruhe, Germany, Eva 5.0 data analysis method), with nickel-filtered copper radiation at $\lambda=1,540$ Å (with an accelerator speed of 40 KV, tube current 40 mA) and rotation of the sample during measurement (angle: 3 to 40° [2 theta] at a rate of 0.04° [2 theta].$s^{-1}$, the step size being 0.04°), preparation of the sample with a preferential orientation).

a Miniflex Rigaku (Elexience) system as an X-ray powder diffractometer using chromium radiation, an accelerator speed of 30 KV, a tube current of 15 mA and rotation of the sample during measurement (angle: 3 to 80° [2 theta] at a rate of 0.05° [2 theta]. $s^{-1}$, the step size being 0.1°, preparation of the sample with a preferential orientation).

Using a GADDS system as a X-ray powder diffractometer (Bruker, the Netherlands), equipped with a <<Hi-Star area>> detector and equipped for the analysis of plates with 96 wells. The analyses were performed at ambient temperature using $CuK_{alpha}$ copper radiation in the region of 2 theta angles between 3 and 42°. The diffraction spectrum for each well is collected between two domains of the value for the 2 theta angle ($3°\leqq 2$

US 7,132,570 B2

27

Theta$\leq$21° and 19°$\leq$2 Theta$\leq$42°) with an exposure time of between 50 and 250 seconds.

Of course the intensity values can vary in relation to sample preparation, the assembly and the measuring instruments. The 2 theta measurement can also be affected by variations associated with the measuring instruments, so the corresponding peaks can vary from ±0.04° to ±0.2° according to the equipment. Also a person skilled in the art will appreciate having available the interplanar spacings which constitute essential data for diffraction spectra. The interplanar spacings are calculated using Bragg's relationship [(2d sin theta=n$\lambda$, in which d=the interplanar spacing (Å), $\lambda$=the wavelength of the copper radiation, theta=the angle of rotation of the crystal (in degrees)] when this relationship is satisfied.

### Examples 1 to 10

#### Preparation of Form I of (−)-Modafinil and (+)-Modafinil Respectively

Example 1:

a) Enantiomer I of modafinil was dissolved in polar solvents: methanol, absolute ethanol, absolute ethanol containing 3% of water, ethanol denatured with toluene (2.5%) and containing 3% of water, and water under reflux under the experimental conditions detailed in Table 1.

TABLE 1

| Solvent | Quantity of l-modafinil (g) | Volume of solvent (ml) | Yield % |
|---|---|---|---|
| Methanol | 8.37 | $\leq$50 | 63 |
| Absolute ethanol | 7.85 | 115 | 56 |
| Absolute ethanol + 3% of water | 5 | 70 | 54 |
| Ethanol denatured with toluene + 3% of water | 5 | 70 | 56 |
| Water | 5 | $\geq$400 | 88 |

After rapid cooling by quenching in a water and ice bath for 30 minutes the medium was filtered and then dried in a stove at 35° C. The crystallised product was identified by its powder X-ray diffraction spectrum as being the polymorph of form I of the l-enantiomer of modafinil.

b) Enantiomer II of modafinil (555 g), treated under the same experimental conditions as example 1a in a mixture of ethanol denatured with toluene (2 L) and water (0.1 L), crystallised in polymorphic form 1 as identified by its powder X-ray diffraction spectrum with a yield of 91%.

Example 2: Recrystallisation from Acetone

a) 2 g of (−)-modafinil were suspended in acetone (20 ml) in a three-necked flask fitted with a condenser, a thermometer and a stirrer. The mixture was heated under reflux. The reaction mixture was stirred for 30 minutes at approximately 56° C. until the (−)-modafinil was completely dissolved. The solution was then cooled slowly at a rate of −0.5° C./min to 10° C. with stirring. The reaction mixture was filtered, and the solid obtained was dried to yield the I form of (−)-modafinil identified by its X-ray diffraction spectrum. Yield 62%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

28

Example 3: Recrystallisation from Methanol

a) 1 g of (−)-modafinil was added to 7 ml of methanol and heated under reflux until the (−)-modafinil was completely dissolved. The reaction mixture was precipitated by adding 6 ml of water at 1° C. The suspension was stirred continuously for 1 minute and then filtered on sintered glass (No. 3). The solid isolated was dried to yield form I of (−)-modafinil identified by its X-ray diffraction spectrum. Yield 55%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 4: Recrystallisation from Methanol (2nd Example)

a) 2.5 g of (−)-modafinil were added to 90 ml of methanol and heated under reflux until the (−)-modafinil was completely dissolved. The clear solution was added to 200 ml of water at 1° C. and kept stirred for 10 min. The reaction mixture was filtered and the recovered solid was dried to yield form I of (−)-modafinil identified by its X-ray diffraction spectrum. Yield 78%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 5: Recrystallisation from 1–4 Dioxan

a) 20 mL of 1–4 dioxan were placed in a 50 mL flask and placed under reflux. 2 g of (−)-modafinil were added in order to achieve saturation; stirring was provided by a magnetic bar (300 rpm). The whole was cooled after total dissolution of the (−)-modafinil using a cooling gradient of −0.5° C./min down to 20° C. The crystals obtained were filtered on sintered glass and identified as being form I by its X-ray diffraction spectrum. Yield 51%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 6: Recrystallisation from a Mixture of Ortho, Meta and Para Xylene

a) 180 mL of a mixture of ortho, meta and para xylene were placed in a 250 mL flask and placed under reflux. 0.5 g of (−)-modafinil were added to achieve saturation; stirring was provided by a magnetic bar (300 rpm). The whole was cooled after total dissolution of the (−)-modafinil using a cooling gradient of −0.5° C./min down to 15° C. The crystals obtained were filtered on sintered glass and identified as being form I by its X-ray diffraction spectrum. Yield 26%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 7: Recrystallisation from Ethyl Acetate

a) 100 mL of ethyl acetate were placed in a 250 mL flask and placed under reflux; 2 g of (−)-modafinil were added in order to achieve saturation; stirring was provided by a magnetic bar (300 rpm). The whole was cooled after total dissolution of the (−)-modafinil using a cooling gradient of −0.5° C./min down to 20° C. The crystals obtained were filtered on sintered glass and identified as being form I by its X-ray diffraction spectrum. Yield 66%.

b) (+)-modafinil (3 g) was dissolved in ethyl acetate (100 ml) under reflux. After cooling by quenching in a water and ice bath for 30 minutes, the medium was filtered and then dried in a stove at 50° C. under vacuum. The crystallised product was identified by its powder X-ray diffraction spectrum as being the polymorph of form I of (+)-modafinil.

Example 8: from Other Polymorphic Forms

a) CRL 40982 form IV (0.5 g) and CRL 40982 form II (0.5 g) yielded form I by heating to 100° C.

US 7,132,570 B2

<table>
<tr><td>29</td><td>30</td></tr>
</table>

Furthermore the pure form I of (−)-modafinil can be prepared by taking up a mixture of (−)-modafinil form I (0.5 g) and form II (0.5 g) and form III (0.5 g) in acetone (20 ml) for a sufficient time to achieve complete conversion (3 days).

In the two procedures form I was identified by its powder X-ray diffraction spectrum.

b) The use of (+)-modafinil (CRL 40983) under the same conditions yielded the same results.

Example 9: from Acetonitrile Solvate

a) 1 g of acetonitrile solvate of (−)-modafinil heated to 100° C. for 8 hours converted into a white solid identified as being (−)-modafinil form I by its powder X-ray diffraction spectrum.

b) The use of (+)-modafinil (CRL 40983) under the same conditions led to the same results.

Example 10: from Monodimethyl Carbonate Solvate

a) 1 g of the monodimethyl carbonate solvate of (−)-modafinil heated to 110° C. for 16 hours converted into a white solid identified as being (−)-modafinil form I by its powder X-ray diffraction spectrum.

b) The use of (+)-modafinil (CRL 40983) under the same conditions led to the same results.

Examples 11 to 12

Preparation of Form II (CRL 40982 Form II) of (−)-Modafinil and (CRL 40983 Form II) of (+)-Modafinil Respectively

Example 11 through Rapid Cooling

a) Modafinil enantiomer 1 was dissolved under reflux in the solvents: ethyl acetate, isopropanol, n-propanol and ethanol denatured with toluene (2.5%), according to the experimental conditions detailed in Table 2.

TABLE 2

| Solvent | Quantity of l-modafinil (g) | Volume of solvent (ml) | Yield % |
|---|---|---|---|
| Ethyl acetate | 6.33 | 385 | 53 |
| Isopropanol | 8 | 110 | 69 |
| n-propanol | 7.85 | 65 | 70 |
| Ethanol denatured with toluene (2.5%) | 5 | 80 | 54 |

After cooling by quenching in a water and ice bath for 30 minutes, the medium was filtered and then dried in a stove at 35° C. In each experimental procedure the crystallised product was identified by its powder X-ray diffraction spectrum as being the form II polymorph (CRL 40982 form II) of the l-enantiomer of modafinil.

b) The d enantiomer of modafinil (3.02 g) was dissolved in 100 ml of isopropanol under reflux and then cooled by quenching in a water and ice bath for 30 minutes, filtered and dried under vacuum in a stove at 50° C. Under these experimental conditions (+)-modafinil crystallised into polymorphic form II (CRL 40983 form II) identified by its powder X-ray diffraction spectrum.

Example 12: by Cooling from Isopropanol

a) 100 mL of isopropanol was placed in a 250 mL flask which was placed under reflux and then 3 g of (−)-modafinil were added so as to achieve saturation, the mixture was stirred using a magnetic bar (300 rpm). After total dissolution of the (−)-modafinil the solution was slowly cooled to 20° C. at a cooling gradient of −0.5° C./min. The crystals obtained were filtered on sintered glass. The crystallised product was identified by its powder X-ray diffraction

spectrum as being the form II polymorph (CRL 40982 form II) of the l-enantiomer of modafinil. Yield 42%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 13

Preparation of Form III (CRL 40982 Form III) of (−)-Modafinil and (CRL 40983 Form III) of (+)-Modafinil Respectively

Example 13: by Slow Cooling from Acetone

a) The l enantiomer of modafinil (5 g) was dissolved under reflux in 90 ml of acetone. After rapid cooling by quenching in a water and ice bath for 30 minutes the medium was filtered and then dried in a stove at 35° C. The crystallised product was identified by its powder X-ray diffraction spectrum as being the form III polymorph of l-enantiomer of modafinil. Yield 61%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Examples 14 to 16

Preparation of Form IV (CRL 40982 Form IV) of (−)-Modafinil and (CRL 40983 Form III) of (+)-Modafinil Respectively

Example 14: Recrystallisation from Chloroform

a) 20 mL of chloroform was placed in a 50 mL flask and heated under reflux. 1.5 g of (−)-modafinil were added so as to achieve saturation; stirring was provided by a magnetic bar (300 rpm). The whole was slowly cooled after total dissolution of the (−)-modafinil at a cooling gradient of −0.5° C./min down to 20° C. The crystals obtained were filtered on sintered glass and identified as being (−)-modafinil form IV by its powder X-ray diffraction spectrum.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 15: Recrystallisation from Methylethylketone

a) 100 mL of methylethylketone was placed in a 250 mL flask and heated under reflux. 2 g of (−)-modafinil were added so as to achieve saturation; stirring was provided by a magnetic bar (300 Rpm). The whole was slowly cooled after total dissolution of the (−)-modafinil at a cooling gradient of −0.5° C./min down to 20° C. The crystals obtained were filtered on sintered glass and identified as being (−)-modafinil form IV by its powder X-ray diffraction spectrum.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 16: Recrystallisation from Tetrahydrofuran

20 mL of tetrahydrofuran was placed in a 50 mL flask which was heated under reflux. 1 g of (−)-modafinil was added so as to achieve saturation; stirring was provided by a magnetic bar (300 Rpm). The whole was slowly cooled after total dissolution of the (−)-modafinil with a cooling gradient of −0.5° C./min down to 10° C. The crystals obtained were filtered on sintered glass and identified as being (−)-modafinil form IV by its powder X-ray diffraction spectrum.

US 7,132,570 B2

31

Examples 17 and 17 B

Preparation of Form V (CRL 40982 Form V) of (+)-Modafinil and (CRL 40983 Form V) of (+)-Modafinil Respectively

Operating Procedure for Examples 17 and 17 b

A methanol solution of the d enantiomer of modafinil (150 mg/ml) was distributed over a 96-well plate and then the methanol was evaporated under slight vacuum before adding 25 µL of various solvents (concentration=3.75 mg/25 µL of solvent) at ambient temperature. The multi-well plates were made of stainless steel (316 L) and each sealed well contained a total volume of 50 µL. The plate was heated to an initial temperature of 60° C. with a temperature gradient of 4.8° C./min. After 30 minutes the plate was cooled slowly (−0.6° C./min) or rapidly (−300° C./min) until a final temperature of 3° C. was achieved, and it was then held at that final temperature for a minimum of 1 hour or a maximum of 48 hours. The solvent was evaporated under vacuum (nitrogen atmosphere) and the crystallised product was analysed.

Example 17: Recrystallisation from 2-Propanone

d-modafinil crystallised from 2-propanone in accordance with the operating conditions above by applying slow cooling (−0.6° C./min) and holding the temperature at 3° C. for 1 hour. The crystals were identified as being d-modafinil form V (CRL 40983 form V) by powder X-ray diffraction spectrum.

Example 17 b: Recrystallisation from Tetrahydrofuran (THF)

d-modafinil crystallised from THF in accordance with the operating conditions above by applying rapid cooling (−300° C./min) and holding the temperature at 3° C. for 1 hour. The crystals were identified as being (+)-modafinil form V (CRL 40983 form V) by its powder X-ray diffraction spectrum.

Examples 18 to 19

Preparation of (−)-Modafinil Solvates and of (+)-Modafinil

Example 18: Preparation of the Dimethyl Carbonate Solvate of (−)-Modafinil

a) 20 ml of dimethyl carbonate were added to 2 g of (−)-modafinil and refluxed. The reaction mixture was stirred for 10 minutes until the (−)-modafinil completely dissolved. The solution was cooled slowly (−0.5° C./min) down to 10° C. with stirring. The reaction mixture was then filtered through sintered glass (No. 3). Analysis of the dimethyl carbonate solvate of modafinil yielded a mass of approximately 24% starting from around 50° C. down to 110° C. The stoichiometry of the dimethyl carbonate solvate is therefore 1-1. This is therefore a true solvate, identified as being the dimethyl carbonate solvate of (−)-modafinil by its powder X-ray diffraction spectrum. Yield 88%.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 19: Preparation of the Acetonitrile Solvate of (−)-Modafinil

a) Crystals of polymorphic form I of (−)-modafinil were suspended in acetonitrile for 3 days at 20° C. The solid recovered was identified as an acetonitrile solvate by X-ray diffraction. The solvate corresponded to a true solvate having a stoichiometry of 1-1, identified as being the acetonitrile solvate of (−)-modafinil by its powder X-ray diffraction spectrum. Yield 92%.

32

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 20: Preparation of the Acetic Acid Solvate

a) 75 mg of d or l-modafinil were suspended in acetic acid in Minimax reactors in order to achieve a concentration of 15% (weight/volume). The crystallisation medium, which was constantly stirred, was raised to an initial temperature of 60° C. or 80° C. using a temperature gradient of 3° C./min. After 30 minutes the medium was cooled slowly (−0.6° C./min) or rapidly (−300° C./min) until a final temperature of 3° C. was obtained, and was then held at this final temperature for a minimum of 1 hour or a maximum of 48 hours. Under these experimental conditions the acetic acid solvate was obtained and identified by its powder X-ray diffraction spectrum.

b) The same experimental conditions applied to (+)-modafinil led to the acquisition of an identical X-ray diffraction spectrum.

Example 21: Preparation of the Amorphous Form of (−) and of (+)-Modafinil

The solvate of (−) or (+)-modafinil obtained in example 20 was converted into the amorphous form by heating at 120° C. for 3 hours. The powder X-ray diffraction spectrum obtained is shown in FIG. 16.

Examples 22 to 29

Resolution of (±)-Modafinil Acid by Preferential Crystallisation

Using the AS3PC Method in Ethanol

Conditions associated with the equilibria
Solubility of the racemic mixture in ethanol:

| Temperature (° C.) | 10.0 | 20.0 | 30.0 |
|---|---|---|---|
| Solubility by mass (%) | 3.0 | 4.1 | 5.96 |

Solubility of the pure (+)-antipode=1.99% at 20° C.; ratio α=2.06

Coordinates of point L=Concentration: 5.96% temperature: 30° C.

Change in $T_{HOMO}$ with enantiomer excess=(racemic mixture/(solvent+racemic mixture))=5.96%=constant

| Enantiomer excess | 0 | 3.94 | 7.66 | 11.1 |
|---|---|---|---|---|
| $T_{HOMO}$ (° C.) | $T_L$ = 30 | 32.4 | 34.5 | 36.3 |

Conditions associated with the kinetics

By adjusting $T_B$ to be closer to $T_L$ approximately 40% of the final harvest in the form of fine crystals can be thus obtained at the start of the experiment, and then only 60% of the expected final mass has to be produced. This operation is easy to carry out when the Z ratio is sufficiently high (equal to or greater than 0.8 per percentage enantiomer excess).

US 7,132,570 B2

<table>
<tr><td>33</td><td>34</td></tr>
</table>

In the case of modafinil acid, crystallisation is carried out correctly.

$$Z = \left[\frac{d(T_{HOMO})}{de.e}\right]_{t(\pm)constant} = Z = \left[\frac{d(T_{HOMO})}{de.e}\right]_{TLconstant} = \frac{5}{9}$$

Temperature $T_{B1}$=33.5° C. and $T_{B2}$=31.5° C.

Temperature $T_F$=17° C.

Cooling function=T=f(t)

| Temperature (° C.) | 33.5 | 17 | 17 |
|---|---|---|---|
| t (min) | 0 | 60 | $T_{Filtration}$ |

Type I cooling function

| Temperature (° C.) | 31.5 | 17 | 17 |
|---|---|---|---|
| t (min) | 0 | 60 | $T_{Filtration}$ |

Type II cooling function

In the two cases in point, from TB1 or TB2 the cooling function is a linear segment:

$$T_1 = 33.5 - 0.275\,t \quad \text{(Type 1)}$$

$$T_2 = 31.5 - 0.24167\,t \quad \text{(Type 2)}$$

followed by a plateau at 17° C.

Example 22: Resolution of (±)-Modafinil Acid by the AS3PC Method at the 35 cc Scale in Ethanol

Initial Conditions

Enantiomer excess=11%

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 38.38 | 2.43 | 0.3 | Type 1 |

Duration of the plateau at $T_{B1}$ or $T_{B2}$=30 minutes.
Stirring speed=200 rpm
Results

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 1 | 0.61 | (+) 90.7 |
| 2 | 0.65 | (−) 89.4 |
| 3 | 0.68 | (+) 90.5 |
| 4 | 0.64 | (−) 90.6 |
| 5 | 0.65 | (+) 88.8 |
| 6 | 0.72 | (−) 91.5 |
| 7 | 0.71 | (+) 92.8 |

Mean mass of the crystals of the pure antipode=0.66 g
Average optical purity=90.6%

Example 23: Resolution of (±)-Modafinil Acid by the AS3PC Method on a Scale of 400 cc in Ethanol

Initial conditions

Initial enantiomer excess=11%

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 511 | 32.42 | 3.99 | Type I |

Stirring speed=200 rpm
Results

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 1 | 8.41 | (+) 89.4 |
| 2 | 8.69 | (−) 90.7 |
| 3 | 8.57 | (+) 89.8 |

Mean mass of the crystals of the pure antipode=8.55 g
Average optical purity=89.63%

Example 24: Resolution of (±) Modafinil Acid by the AS3PC Method on a 2 Litre Scale in Ethanol

Initial conditions

Initial enantiomer excess=11.1%

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 1874 | 118.4 | 14.84 | Type I |

Results

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 1 | 32.1 | (+) 89.1 |
| 2 | 32.3 | (−) 90.3 |
| 3 | 32.5 | (+) 91.2 |
| 4 | 32.9 | (−) 89.7 |
| 5 | 33.1 | (+) 90.3 |
| 6 | 32.7 | (−) 90.7 |
| 7 | 32.9 | (+) 90.6 |

Mean mass of the crystals of the pure antipode=32.6 g
Average optical purity=90.3%

Example 25: Resolution of (±) Modafinil Acid by the AS3PC on a 10 Litre Scale in Ethanol

Initial conditions

Initial enantiomer excess=11.7%

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 6481 | 408 | 51.32 | Type I or II |

Stirring speed=200 rpm throughout the procedure using an Impeller® moving stirrer.

US 7,132,570 B2

Results

| No. | Mass of the pure antipode (g) | Optical purity (%) | Cycle length | Cooling function |
|---|---|---|---|---|
| 1 | (+) 121.9 | 90.5 | 103 | I |
| 2 | (−) 121.1 | 92.2 | 104 | I |
| 3 | (+) 137.6 | 91.3 | 83 | II |
| 4 | (−) 134.7 | 90.8 | 84 | II |
| 5 | (+) 135.1 | 90.6 | 83 | II |
| 6 | (−) 134.5 | 91.2 | 82 | II |

Mean mass of the crystals of the pure antipode=130.8 g
Average optical purity=89.9%

Using the AS3PC Method in 2-methoxyethanol

Conditions associated with the equilibria
Solubility of the racemic mixture in 2-methoxyethanol:

| Temperature (° C.) | 10.0 | 20.0 | 30.0 | 40.0 |
|---|---|---|---|---|
| Solubility by mass (%) | 7.4 | 8 | 13.5 | 16 |

Solubility of the pure (+) antipode=4% at 20° C. ratio α=2.53
Coordinates of point L=Concentration: 16% temperature: 39.4° C.
Change in $T_{HOMO}$ with enantiomer excess=(racemic mixture/(solvent+racemic mixture))=16%=constant

| Enantiomer excess | 0 | 4% | 6% | 8% |
|---|---|---|---|---|
| $T_{HOMO}$ (° C.) | $T_L$ = 39 | 44 | 46 | 48 |

Example 26: Resolution of (±)-Modafinil Acid in 2-Methoxyethanol by the AS3PC Method on a 10 Litre Scale
Initial conditions
Enantiomer excess=10%
Initial temperature $T_B$: 41° C.
Filtration temperature $T_F$: 30° C.
Linear temperature gradient from 41° to 30° C. in 1 hour

| Mass of solvent | Mass (±) (g) | Mass (+) (g) |
|---|---|---|
| 8000 g | 1523 | 132 |

Stirring speed=200 rpm
Results

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 1 | 269.86 | (+) 100 |
| 2 | 300 | (−) 97 |
| 3 | 348.68 | (+) 100 |
| 4 | 369.2 | (−) 99.97 |
| 5 | 413.97 | (+) 100 |
| 6 | 453.2 | (−) 95.5 |
| 7 | 423.8 | (+) 98 |

-continued

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 8 | 456 | (−) 99.7 |
| 9 | 494.6 | (+) 99.3 |
| 10 | 485.4 | (−) 100 |
| 11 | 517 | (+) 92 |
| 12 | 487.97 | (−) 95.9 |
| 13 | 471.24 | (+) 99.5 |

Mean mass of the crystals of the pure antipode=422.4 g
Average optical purity=98.2%

Using the AS3PC Method in Methanol

Conditions associated with the equilibria
Solubility of the racemic mixture in methanol:

| Temperature (° C.) | 10.0 | 20.0 | 30.0 | 40.0 |
|---|---|---|---|---|
| Solubility by mass (%) | 7.4 | 9.7 | 13.9 | 25.7 |

Solubility of the pure (+) antipode=4.9% at 20° C. ratio α=2.53
Coordinates of point L=Concentration: 25.6% temperature: 46.5° C.
Change in $T_{HOMO}$ with enantiomer excess=(racemic mixture/(solvent+racemic mixture))=25.7%=constant

| | Enantiomer excess | | | | |
|---|---|---|---|---|---|
| | 0 | 4% | 6% | 8% | 10% |
| $T_{HOMO}$ (° C.) | $T_L$ = 45 | 50 | 52 | 53 | 54 |

Example 27: Resolution of (±)-Modafinil Acid by the AS3PC Method on a 1 Litre Scale in Methanol
Experimental conditions
Enantiomer excess=10%
Initial temperature $T_B$: 46.5° C.
Filtration temperature $T_F$: 30° C.
Temperature gradient: linear from 39.4° C. to 18° C. for 1 hour

| Mass of solvent | Mass (±) (g) | Mass (+) (g) |
|---|---|---|
| 1450 g | 501.5 | 55.7 |

Stirring speed=230 rpm
Results

| No. | Mass of the pure antipode (g) | Optical purity (%) |
|---|---|---|
| 1 | 107.1 | (+) 99.7 |
| 2 | 90.9 | (−) 78.2 |
| 3 | 137.1 | (+) 72.7 |
| 4 | 125.5 | (−) 84.1 |
| 5 | 95.9 | (+) 94.0 |

US 7,132,570 B2

<table>
<tr><td>37</td><td>38</td></tr>
</table>

## 37

-continued

| | Mass of the pure antipode | |
|---|---|---|
| No. | (g) | Optical purity (%) |
| 6 | 91.6 | (−) 88.6 |
| 7 | 87.0 | (+) 85.7 |
| 8 | 92.2 | (−) 88.1 |
| 9 | 107.0 | (+) 104.2 |
| 10 | 130.6 | (−) 120.7 |
| 11 | 159.9 | (+) 111.0 |
| 12 | 123.3 | (−) 113.8 |
| 13 | 133.0 | (+) 130.3 |
| 14 | 143.0 | (−) 134.7 |
| 15 | 139.2 | (+) 128.5 |
| 16 | 159.4 | (−) 127.5 |
| 17 | 114.0 | (+) 111.5 |
| 18 | 123.4 | (−) 120.9 |
| 19 | 180.6 | (+) 99.3 |
| 20 | 114.2 | (−) 110.9 |
| 21 | 123.1 | (+) 120.6 |
| 22 | 118.4 | (−) 115.0 |
| 23 | 140.1 | (+) 135.9 |
| 24 | 186.2 | (−) 118.6 |
| 25 | 157.1 | (+) 106.8 |
| 26 | 121.2 | (−) 102.2 |
| 27 | 126.5 | (+) 122.5 |
| 28 | 106.6 | (−) 99.0 |

Mean mass of the crystals of the pure antipode=108 g

Average optical purity=87.5%

Using the SIPC Method in Ethanol

Conditions associated with the equilibria (see AS3PC method)

Example 28: Resolution of (±) Modafinil Acid by the SIPC Method on a 2 Litre Scale with Seeding at the end of Cooling in Ethanol

Initial conditions

Initial enantiomer excess=11.8%

Temperature at which the starting mixture is a homogeneous solution $T_D$=40° C.

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 1874 | 118.4 | 14.84 | 20 min from 40° C. to 17° C. = seeding temperature |

Time (plateau) at $T_F$ before adding the seeds=0 minutes

Mass of seeds=1%

Crystallisation time=fastest possible cooling by quenching

Stirring speed=200 rpm throughout the procedure using an Impeller® mobile

Results

| | Mass of the pure antipode | |
|---|---|---|
| No. | (g) | Optical purity (%) |
| 1 | 30.9 | (+) 90.4 |
| 2 | 31.5 | (−) 90.7 |
| 3 | 31.3 | (+) 91.4 |
| 4 | 31.2 | (−) 90.9 |
| 5 | 31.6 | (+) 91.5 |

Mean mass of the crystals of the pure antipode=31.28 g

Average optical purity=91%

## 38

Example 29: Resolution of (±)-Modafinil Acid by the S3PC Method on a 2 Litre Scale with Seeding During Cooling in Ethanol

Initial enantiomer excess: 11.14%

| Mass of solvent | Mass (±) (g) | Mass (+) (g) | Cooling function |
|---|---|---|---|
| 1874 | 118.4 | 14.84 | 20 min from 40° C. to 17° C. |

Seeding temperature=29° C.

Seed mass=1%

Crystallisation time=the fastest possible cooling by quenching Stirring speed=200 rpm throughout the procedure using an Impeller® mobile stirrer.

Results

| No. | Mass | Optical purity (%) before purification |
|---|---|---|
| 1 | 25.2 | (+) 84.5 |
| 2 | 24.9 | (−) 85.6 |
| 3 | 25.6 | (+) 84.6 |
| 4 | 25.2 | (−) 85.3 |
| 5 | 24.9 | (+) 85.8 |

Mean mass of the crystals of the pure antipode=25.2 g

Average optical purity=85.2%

Examples 30 to 32

Conversion of the Optical Enantiomers of Modafinil Acid to Alkyl Ester

This stage is illustrated through the use of (−)modafinil acid.

Examples 30 to 31: Esterification of (−)-Modafinil Acid

Example 30: in the Presence of Dimethylsulphate

3.3 litres of acetone, 0.6 litres of water, 349 g of $Na_2CO_3$ (3.29 moles), 451 g of (−)-modafinil acid (1.64 moles) were placed in a 10 litre flask and heated to achieve reflux. Then 330 ml of dimethyl sulphate (3.29 moles) were run in over half an hour. Reflux was continued for one hour and then it was allowed to cool to ambient temperature in 20 hours.

The medium was then poured on to 6.6 kg of ice. Crystallisation was immediate and after 3 hours additional stirring filtration yielded a white precipitate which was washed in 6 litres of water.

This product was taken up again in 6 litres of water and again filtered. The precipitate was dried under vacuum at 35° C. and in this way 436.3 g of methyl ester were obtained (Yield=92.3%).

Example 31: in the Presence of Methyl Chloroformate

100 g of (−)-modafinil acid (0.36 mole) and 21.6 ml of triethylamine (0.36 mole) were added to 450 ml of methanol. 30 ml of methyl chloroformate 0.36 mole) were progressively poured onto the solution obtained after dissolution of the salt.

Pouring was carried out over 15 minutes increasing from 28° C. to 35° C. (release of $CO_2$). This was stirred for 2 hours and poured onto piled ice+water (500 g/500 ml).

The ester crystallised out; after filtering and drying 94.5 g of ester was obtained.

(Yield=90.1%).

US 7,132,570 B2

39

40

Example 32: Ammonolysis of the Alkyl Ester of Optically Active Modafinil Acid

1.63 litres of methanol denatured with toluene, 0.1 litres of water and 425.1 g of methyl ester (1.474 moles) were placed in a 4 litre double jacket reactor.

The temperature was raised to 30° C. and bubbling of ammonia was begun maintaining this temperature. The operation lasted 1 hour and 45 minutes and the mass of ammonia introduced was 200 g. Stirring was maintained for 21 hours 30 minutes, and then it was cooled with the temperature being set to 0° C.

The medium was then filtered on No. 3 sintered glass and 57.2 g was obtained straight away, together with a filtrate which was evaporated to dryness. The residue was taken up in 1.2 litres of ethanol denatured with toluene and after filtration a second amount of 308.6 g was obtained.

First crystallisation:

The two amounts were pooled and recrystallised in 1.83 litres of ethanol denatured with toluene. Hot filtration yielded a filtrate which when cooled yielded a product which was filtered and dried under vacuum at 30° C. 162.2 g of a white product was obtained.

Second crystallisation:

These 162.2 g were mixed with 810 ml of ethanol denatured with toluene and heated under reflux to achieve complete dissolution. This was then allowed to crystallise by cooling with ice and then filtered through No. 4 sintered glass and dried under vacuum at 30° C. 147.3 g (−)-modafinil (CRL 40982) was obtained.

Yield=36.6%.

Characteristics:

Rotation power=−18.6 (4.9% solution in methanol)

Melting point=163° C.

Examples 33 to 34

Crystalline Structures

Example 33: Structure of Modafinil Acid

Modafinil crystals were obtained from acetone. This phase has the following characteristics:

Hexagonal $P3_1$ or $P3_2$ depending upon the enantiomer, the modafilil is therefore a conglomerate,

a=9.55, b=9.55, c=13.14 Å

α=90,000, β=90,000, γ=120,000°

The diffraction intensities were measured using an automatic SMART APEX (Brucker) diffractometer at 20° C.

The structure was resolved using the set of Saintplus, Sadabs, Shelxs software packages.

The unusual nature of this spatial group in the case of chiral organic molecules must be emphasised.

The pattern repeats three times in the crystal lattice, so again Z=1. The molecules are linked together by hydrogen bonds via the acid and sulphoxide groups. It may be commented that the strongest interactions (the hydrogen bonds) wrap around the ternary helical axis along the crystallographic direction z.

Example 34: Structure of (−) and (+)-Modafinil form I

The crystalline structure of (+)-modafinil form I, identified as being identical to that of (−)-modafinil form I, was determined. It has the following properties:

Crystalline system=monoclinic,

Spatial group=$P2_1$

a=5.6938, b=26.5024, c=9.3346 Å

β=105.970°

The diffraction intensities were measured using an automatic SMART APEX (Brucker) diffractometer at 20° C.

The invention claimed is:

1. A laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising intensity peaks at the interplanar spacings: 8.54, 4.27, 4.02, 3.98 (Å).

2. The laevorotatory enantiomer of modafinil according to claim 1, wherein the polymorphic form produces a powder X-ray diffraction spectrum further comprising intensity peaks at the interplanar spacings: 14.60, 6.34, 5.01, 4.68, 4.62, 4.44, 4.20, 4.15, 3.90, 3.80, 3.43 (Å).

3. A laevorotatory enantiomer of modafinil in a polymorphic form that produces a powder X-ray diffraction spectrum comprising reflections at 15.4, 31.1, 33.1 and 33.4 degrees 2θ.

4. The laevorotatory enantiomer of modafinil according to claim 3, wherein the polymorphic form produces a powder X-ray diffraction spectrum further comprising reflections at 9.8, 20.8, 26.4, 28.3, 28.7, 29.9, 31.6, 32, 34.1, 35.1 and 39 degrees 2θ.

5. A pharmaceutical composition comprising a laevorotatory enantiomer of modafinil according to any one of claims 1 to 4.

6. A pharmaceutical composition consisting essentially of a laevorotatory enantiomer of modafinil according to according to any one of claims 1 to 4.

7. A Form I polymorph of (−)-modafinil.

8. A pharmaceutical composition comprising a Form I polymorph of (−)-modafinil according to claim 7.

9. A pharmaceutical composition consisting essentially of a Form I polymorph of (−)-modafinil according to claim 7.

10. A process for preparing a Form I polymorph of (−)-modafinil comprising the steps of:

(a) providing a solution of (−)-modafinil dissolved in a hot solvent;

(b) rapidly cooling the solution from step (a) to produce crystals;

(c) filtering the crystals;

(d) drying the crystals; and

(e) obtaining the crystals of said Form I polymorph of (−)-modafinil, wherein the solvent of step (a) is selected from water, methanol, absolute ethanol, absolute ethanol plus 3% water (v/v), and ethanol denatured with toluene plus 3% water, (v/v, based on the total volume of ethanol and toluene).

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,132,570 B2                                    Page 1 of 1
APPLICATION NO. : 10/539918
DATED              : November 7, 2006
INVENTOR(S)      : Olivier Neckebrock and Pierre Leproust

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page:
Item (86), please delete "Feb. 17, 2006" and insert -- Feb 7, 2006-- therefor.

Column 14
Line 5, please delete "preferably" and insert --preferable-- therefor.

Column 39
Line 43, please delete "modafilil" and insert --modafinil-- therefor.

Signed and Sealed this

Twentieth Day of February, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.      : 7,132,570 B2                               Page 1 of 1
APPLICATION NO. : 10/539918
DATED           : November 7, 2006
INVENTOR(S)    : Olivier Neckebrock and Pierre Leproust

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 40
Line 35, Claim 6, please delete the second occurrence of "according to".

Signed and Sealed this

Tenth Day of July, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2013, I caused the foregoing BRIEF OF

DEFENDANTS-APPELLANTS WATSON LABORATORIES, INC., SANDOZ

INC., AND APOTEX INC. to be electronically filed with the Clerk of Court using

the CM/ECF system, and served on counsel of record via CM/ECF.


Dated:  August 14, 2013                    /s/ James F. Hurst
                                           JAMES F. HURST

                                           *Counsel for Defendant-Appellant*
                                           *Watson Laboratories, Inc.*

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.　　This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,075 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.　　This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2010.

Dated:　August 14, 2013

/s/ James F. Hurst
JAMES F. HURST

*Counsel for Defendant-Appellant
Watson Laboratories, Inc.*